UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| ILIA KOLOMINSKY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:21-cv-01197-EAS-CMV |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | Judge Edmond A. Sargus, Jr. |
| ROOT, INC., ALEXANDER TIMM, DANIEL ROSENTHAL, MEGAN BINKLEY, CHRISTOPHER OLSEN, DOUG ULMAN, ELLIOT GEIDT, JERRI DEVARD, LARRY HILSHEIMER, LUIS VON AHN, NANCY KRAMER, NICK SHALEK, SCOTT MAW, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., and WELLS FARGO SECURITIES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Chelsey M. Vascura<br><br>DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | |

AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
(murray@mmmb.com)
1114 Dublin Road
Columbus, OH 43215
Telephone:  614/488-0400
614/488-0401 (fax)

*Local Counsel for Plaintiff*

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN (srudman@rgrdlaw.com)
MICHAEL G. CAPECI (mcapeci@rgrdlaw.com)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631-367-7100
631/367-1173 (fax)

*Proposed Lead Counsel for Plaintiff*

Plaintiff Plumbers Local #290 Pension Trust Fund ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters based on the investigation undertaken by its counsel, which included, among other things, a review of: (i) U.S. Securities and Exchange Commission ("SEC") filings of Root, Inc. ("Root" or the "Company"); (ii) securities analyst reports and advisories about the Company; (iii) press releases, media reports, and other information by or about the Company; (iv) investor presentations made by the Company; and (v) consultations with a financial expert. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all those who purchased or otherwise acquired shares of the Class A common stock of Root from October 28, 2020 through August 12, 2021, inclusive (the "Class"). The period from October 28, 2020 through August 12, 2021, inclusive is the "Class Period."

2. Plaintiff brings the following claims on behalf of the Class: (i) violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act") for all purchasers or acquirers of Root Class A common stock pursuant and/or traceable to the prospectus and Form S-1 registration statement, as amended (collectively, the "Registration Statement"), issued in connection with Root's initial public offering on or about October 28, 2020 (the "IPO"); and (ii) violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") for all purchasers of Root Class A common stock during the Class Period, except for purchasers who purchased directly from the Underwriter Defendants (defined below) at the offering price in the IPO.

3. In the IPO, Defendants allowed for Root and select pre-IPO shareholders to sell more than 26 million shares of Root Class A common stock at $27.00 per share, reaping over $600 million in net proceeds for Root and achieving a valuation for the Company of approximately $6.7 billion. The IPO was the largest initial public offering ever conducted by a company headquartered in Ohio.

4. Founded in 2015, Root is a technology company that seeks to disrupt the traditional automobile insurance model by pricing and quoting insurance through a mobile phone app and using the app to collect driving data from Root's customers. Root believes that by doing so the Company can better screen for risky drivers compared to traditional automobile insurers like GEICO, Allstate, and Progressive.

5. At the time of the IPO, Root's insurance product was only available in thirty states. As explained in the Registration Statement, Root intended to expand to all fifty states by the beginning of 2021.

6. For growth-phase companies like Root, one of the most important measures of profitability is customer acquisition cost – *i.e.*, the average amount that a company must spend to acquire a new customer. The lower a company's customer acquisition cost, the more profitable each additional customer is for the company.

7. Recognizing the critical importance of customer acquisition costs to Root's business and operations, the Registration Statement is replete with discussion about how Root's purported average customer acquisition cost of $332 for the period of August 2018 to August 2020 – the two year period before Root began exploring the IPO – was significantly lower than the amounts that traditional insurers incurred for customer acquisition costs. According to an analyst

that covers Root, traditional insurers typically spend between $500 and $800 to acquire a customer, on average.

8.  In other words, Root's purported $332 average customer acquisition cost is portrayed in the Registration Statement as providing a competitive advantage for the Company over traditional insurers that Root was competing with for new customers.

9.  The Registration Statement also describes Root's planned national advertising campaign in connection with its expansion to all fifty states.  The Registration Statement does not, however, disclose that this advertising campaign had already increased Root's customer acquisition costs before and as of the IPO, and would continue to do so once Root became publicly traded.  To the contrary, the Registration Statement only includes a hypothetical risk warning that marketing expenditures could cause Root's customer acquisition costs to rise in the present or future.

10.  Unbeknownst to investors, at the time of the IPO Root's customer acquisition costs had already significantly increased to a level at or above the amount incurred by traditional automobile insurers.  Moreover, increased customer acquisition costs would continue to be elevated following the IPO because of the Company's planned national marketing campaign in connection with Root's expansion to all fifty states.

11.  Indeed, during the roadshow for the IPO, Root's Chief Executive Officer ("CEO") and co-founder, Alexander Timm ("Timm"), acknowledged the significant increase in Root's customer acquisition costs as of October 2020.  Nonetheless, Timm misleadingly assured investors that this "recent spike" was caused by Root doing "experimentation on brand" with the Company's marketing expenditures, incorrectly implying that Root's customer acquisition costs would remain at the $332 level following the IPO.

- 3 -

12. Moreover, Timm failed to explain that the cause of the "spike" in customer acquisition costs was the Company's planned national advertising campaign and that it would continue to be elevated following the IPO due to this campaign. Timm also failed to disclose that Root did not, in fact, have a competitive advantage over traditional insurers in terms of customer acquisition costs, and instead misleadingly stated during the roadshow that "we do have the ability to keep our customer acquisition costs much lower than our competitors."

13. Nowhere in the Registration Statement does it state that Root's customer acquisition costs had already materially risen as of the IPO due to the Company's national expansion throughout the United States, or that Root did not have a competitive advantage versus traditional insurers in terms of customer acquisition costs.

14. Instead of ensuring that accurate information regarding Root's customer acquisition costs was included in the Registration Statement, in the month leading up to the IPO Defendants were focused on significantly increasing its price and size, boosting the price to $27.00 per share of Root Class A common stock from a previously announced range of $22.00 to $25.00 per share, and increasing the size of the offering by over 2.6 million shares.

15. Shortly following the lucrative IPO, beginning on November 23, 2020, analysts began initiating coverage on Root. In these initial reports, analysts disclosed that Root's customer acquisition costs had already increased as of the IPO to a level at or above those of traditional automobile insurers.

16. Then, in a series of disclosures made in connection with Root's earnings reports in December 2020, February 2021, and August 2021, the Company confirmed, among other things, that these increased costs were caused by the national advertising campaign, that they were sustained throughout the Company's first year as a publicly-traded company, and that at no point

during the Class Period – *i.e.*, Root's existence as a publicly traded company – has the Company had a competitive advantage over traditional insurers in terms of customer acquisition costs.

17.     On March 19, 2021, when the initial complaint in this action was filed, Root Class A common stock closed at $12.00 per share, an approximate 55.5% decline from the IPO price. Root Class A common stock closed under $4.50 per share on November 18, 2021.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§77k, 77l(a)(2) and 77o), and Sections 10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over this action pursuant to Section 22 of the 1933 Act (15 U.S.C. §77v), Section 27 of the 1934 Act (15 U.S.C. § 78aa), and 28 U.S.C. §1331.

20.     Venue is properly laid in this District pursuant to Section 22 of the 1933 Act, Section 27 of the 1934 Act, and 28 U.S.C. §§1391(b) and (c) because Root conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in this District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

22.     Plaintiff Plumbers Local #290 Pension Trust Fund, as set forth in its previously-filed certification in this action that is incorporated by reference herein (ECF No. 15-4), and as set

forth in the attached certification that is incorporated by reference herein, purchased Root Class A common stock in and traceable to the Registration Statement for the IPO, and during the Class Period, and has been damaged thereby.

23. Defendant Root is a holding company that, through its subsidiaries, operates a technology company that focuses on selling automotive insurance products throughout the United States. Root is incorporated in Delaware and its principal executive offices are located at 80 E. Rich Street, Suite 500, Columbus, Ohio 43215. Root Class A common stock trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ROOT." Each share of Root Class A common stock is entitled to one vote. References to "Root" or the "Company" are intended to encompass Root and all of its subsidiaries, including, but not limited to, Caret Holdings, Inc., Root Insurance Company, Root Reinsurance Company, Ltd., and Root Insurance Agency, LLC. According to the Registration Statement, "all references in this prospectus to 'we,' 'us,' 'our,' 'our company' and 'Root' refer to Root, Inc., and, where appropriate, our consolidated subsidiaries."

24. Defendant Timm co-founded Root in March 2015 a few years after graduating college. At the time of the IPO, Timm was Root's CEO and a member of the Company's board of directors (the "Board"). Timm reviewed and signed the Registration Statement. Timm made statements concerning Root's business in the Company's roadshow meetings with investors.

25. Timm also signed certain documents comprising the Registration Statement as "attorney-in-fact" for the remaining Individual Defendants (defined below), each of whom served as an officer or director of the Company as of the IPO. The October 5, 2020 Form S-1 included the following Power of Attorney, which vested authority in Timm to sign as "attorney-in-fact" on behalf of these officers and directors the other materials that, with the October 5, 2020 Form S-1, constitute the Registration Statement:

[E]ach person whose signature appears below constitutes and appoints Alexander Timm and Daniel Rosenthal, and each one of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in their name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this registration statement, and to sign any registration statement for the same offering covered by this registration statement that is to be effective on filing pursuant to Rule 462(b) under the Securities Act of 1933, as amended, and all post-effective amendments thereto, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

26. Timm also personally signed the Form S-1 registration statement, dated and filed with the SEC on October 5, 2020, and the Form S-1/A registration statement, dated and filed with the SEC on October 27, 2020.

27. Defendant Daniel Rosenthal ("Rosenthal") was Root's Chief Financial Officer ("CFO") at the time of the IPO, a position he has held since November 2019. Rosenthal was a director on the Board at the time of the IPO, a position he has held since March 2017. Rosenthal reviewed and signed and/or authorized signing of the Registration Statement. Rosenthal made statements concerning Root's business in the Company's roadshow meetings with investors.

28. Defendant Megan Binkley ("Binkley") was Root's Chief Accounting Officer at the time of the IPO, a position she has held since April 2019. Binkley reviewed and signed and/or authorized signing of the Registration Statement.

29. Defendant Christopher Olsen ("Olsen") was a director on the Board at the time of the IPO, a position he has held since March 2015. Olsen reviewed and signed and/or authorized signing of the Registration Statement.

30.     Defendant Doug Ulman ("Ulman") was a director on the Board at the time of the IPO, a position he has held since December 2016.  Ulman reviewed and signed and/or authorized signing of the Registration Statement.

31.     Defendant Elliot Geidt ("Geidt") was a director on the Board at the time of the IPO, a position he has held since March 2018.  Geidt reviewed and signed and/or authorized signing of the Registration Statement.

32.     Defendant Jerri DeVard ("DeVard") was a director on the Board at the time of the IPO, a position she has held since October 2020.  DeVard reviewed and signed and/or authorized signing of the Registration Statement.

33.     Defendant Larry Hilsheimer ("Hilsheimer") was a director on the Board at the time of the IPO, a position he has held since October 2020.  Hilsheimer reviewed and signed and/or authorized signing of the Registration Statement.

34.     Defendant Luis von Ahn ("von Ahn") was a director on the Board at the time of the IPO, a position he has held since October 2020.  Von Ahn reviewed and signed and/or authorized signing of the Registration Statement.

35.     Defendant Nancy Kramer ("Kramer") was a director on the Board at the time of the IPO, a position she has held since August 2020.  Kramer reviewed and signed and/or authorized signing of the Registration Statement.

36.     Defendant Nick Shalek ("Shalek") was a director on the Board at the time of the IPO, a position he has held since June 2017.  Shalek reviewed and signed and/or authorized signing of the Registration Statement.

37.     Defendant Scott Maw ("Maw") was a director on the Board at the time of the IPO, a position he has held since October 2020.  Maw reviewed and signed and/or authorized signing of the Registration Statement.

38.     Defendants Timm, Rosenthal, Binkley, Olsen, Ulman, Geidt, DeVard, Hilsheimer, von Ahn, Kramer, Shalek, and Maw are referred to herein as the "Individual Defendants."  As directors and/or executive officers of the Company, the Individual Defendants participated in the solicitation and sale of Root Class A common shares to investors in the IPO.

39.     Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., and Wells Fargo Securities, LLC acted as underwriters and co-lead book running managers of the IPO, helping to draft and disseminate the offering documents (the "Underwriter Defendants").  The Underwriter Defendants participated in preparing the Registration Statement, were required to conduct due diligence on Root and the IPO, and solicited investors to purchase Root Class A common stock in the IPO.  As indicated in the Registration Statement, the Underwriter Defendants agreed to purchase and/or received the following numbers of Root Class A common stock in connection with the IPO, which they then sold and/or intended to sell to the investing public:

| Underwriters | Number of Shares | Number of Optional Shares if Maximum Option Exercised |
|---|---|---|
| Goldman Sachs & Co. LLC | 9,406,891 | 1,411,033 |
| Morgan Stanley & Co. LLC | 7,577,031 | 1,136,554 |
| Barclays Capital Inc. | 2,084,757 | 312,713 |
| Wells Fargo Securities, LLC | 1,159,093 | 173,864 |
| Deutsche Bank Securities Inc. | 1,159,093 | 173,864 |
| Truist Securities, Inc. | 1,159,093 | 173,864 |
| Citigroup Global Markets, LLC | 925,664 | 138,850 |
| Credit Suisse Securities (USA) LLC | 694,919 | 104,238 |
| Evercore Group L.L.C. | 694,919 | 104,238 |
| UBS Securities LLC | 694,919 | 104,238 |
| Cantor Fitzgerald & Co. | 464,174 | 69,626 |
| JMP Securities LLC | 464,174 | 69,626 |
| Siebert Williams Shank & Co., LLC | 230,745 | 34,612 |
| Huntington Securities, Inc. | 115,373 | 17,306 |
| Total | 26,830,845 | 4,024,626 |

40.     Unless otherwise noted, Root, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

41.     Non-parties SVB Financial Group ("SVB") and DRD Contact, LLC ("DRD") are collectively referred to herein as the "Selling Stockholders."

42.     Non-party Carvana Co. is referred to herein as "Carvana."

## RELEVANT BACKGROUND

### The Company and Its Business

43.     Shortly after graduating college in 2011 and serving as an associate and consultant for a few years at Nationwide Insurance, Timm co-founded Root in 2015.  Before Root, Timm had no experience as a manager, executive, or board member for any private or public corporation.

44.     Root describes itself in the Registration Statement as a technology company that is revolutionizing automobile insurance with a pricing model based upon fairness and a modern customer experience.

45.     Essentially, Root seeks to use technology to "disrupt" the typical automotive insurance model used by traditional insurance companies, such as GEICO, Progressive, and Allstate, that use pooled-risk underwriting to price insurance.

46.     To accomplish this, Root collects massive amounts of behavioral data across thousands of driving variables, which is known as "telematics."  Root uses telematics data to identify what the Company believes to be the riskiest 10% to 15% of drivers, who the Company believes are approximately two times more likely to get into an accident compared to the average driver.  Root then proceeds to offer its automotive insurance products to all drivers outside of this risk zone.  By doing so, Root believes that it can offer a lower price compared to traditional insurance companies while reducing insurance claims.

47. To collect telematics data, Root requires its customers to download the Company's app to their mobile phones and then drive their vehicles for two to four weeks to allow the app to collect data. Root believes that it has the largest proprietary telematics data set of miles driven of any automobile insurance company.

48. According to Root, most traditional insurance companies rely upon insurance agents as their primary form of distribution, which requires expensive selling commissions that reduce the profitability of automotive insurance. Root believes that its competitive advantage lies in its near-exclusive reliance on mobile phones and telematics, which the Registration Statement claims has not been meaningfully adopted by traditional insurance companies.

49. According to the Registration Statement, Root was licensed to sell insurance in thirty-six states and was currently selling insurance in thirty states at the time of the IPO. Approximately 40.1% of Root's gross written premium originated from customers in Texas, Georgia, and Kentucky.

50. Root's goal, as stated in the Registration Statement, was to be licensed in all fifty states by early 2021.

**The IPO**

51. Seeking to raise capital from public investors, and seeking to provide liquidity for Root securities held by the Selling Stockholders, Root, with the assistance of the Individual Defendants and the Underwriter Defendants, caused the Company to complete the lucrative IPO.

52. On August 10, 2020, Root filed a draft registration statement with the SEC on Form DRS. Thereafter, Root filed an amended Form DRS/A with the SEC on September 17, 2020.

53. On October 5, 2020, Root filed a draft registration statement with the SEC on Form S-1.

54.     Root subsequently filed three amendments to the Form S-1 with the SEC on Form S-1/A, on: (i) October 20, 2020; (ii) October 26, 2020; and (iii) October 27, 2020.

55.     According to the October 20, 2020 Form S-1/A, Root intended to issue 24,164,515 shares in the IPO, with 22,000,000 to be sold by Root and 2,164,515 to be sold by SVB, at a price between $22.00 and $25.00 per share.

56.     According to the October 26 and October 27, 2020 Forms S-1/A, Root intended to issue 24,581,515 shares in the IPO, with 22,000,000 to be sold by Root and 2,581,515 to be sold by the Selling Stockholders (2,164,515 by SVB and 417,000 by DRD), at a price between $22.00 and $25.00 per share.

57.     The SEC declared the Registration Statement effective on October 27, 2020.

58.     On October 28, 2020, notwithstanding the previous range of $22.00 to $25.00 per share disclosed in the three Form S-1/A amendments, Defendants priced Root's Class A common stock at $27.00 per share for the IPO.

59.     In addition, although Defendants had already increased the size of the IPO from 24,164,515 shares to 24,581,515 shares, Root ultimately issued 24,249,330 shares in the IPO and the Selling Stockholders sold 2,581,515 shares (2,164,515 shares sold by SVB and 417,000 shares sold by DRD), for a total of 26,830,845 shares issued and sold in the IPO.

60.     Root Class A common stock began trading on the NASDAQ on October 28, 2020.

61.     On October 29, 2020, Defendants filed the final prospectus for the IPO on Form 424B4 with the SEC.

62. The Registration Statement told investors to only rely on the information contained therein when determining whether to invest in the IPO, and not from any other source, stating, in pertinent part, as follows:[1]

> *We and the selling stockholders have not authorized anyone to provide you with any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared.* We, the selling stockholders and the underwriters take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We are offering to sell, and seeking offers to buy, shares of our Class A common stock only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of our Class A common stock. Our business, financial condition, results of operations and future growth prospects may have changed since that date.

63. Likewise, the Registration Statement states, in pertinent part, as follows:

> Information contained on, or that can be accessed through, *our website is not incorporated by reference into this prospectus*, and you should not consider information on our website to be part of this prospectus.

64. The IPO generated approximately $618.7 million in net proceeds for Root after underwriting discounts and commissions and estimated offering costs.

65. The IPO also generated approximately $65.8 million in net proceeds for the Selling Stockholders after underwriting discounts and commissions and estimated offering costs. Root did not receive any of the proceeds obtained by the Selling Stockholders.

66. The Underwriter Defendants received approximately $39.843 million as compensation for facilitating the IPO.

67. Root granted the Underwriter Defendants a 30-day option to purchase up to 4,024,626 additional Root Class A common stock at the IPO price of $27.00 per share, less underwriting discounts and commissions.

---

[1]    Unless otherwise noted, all emphasis is added.

- 13 -

68. According to the Form 10-Q filed by Root with the SEC on December 2, 2020, the Underwriter Defendants declined to exercise this option.

69. Concurrently with the IPO, Root issued and sold 18.5 million shares of Class A common stock at $27.00 per share in private placements with Dragoneer Investment Group, LLC and Silver Lake Technology Management, LLC, for approximately $500 million in net proceeds (the "Private Placement").

70. The shares sold in the Private Placement were subject to a lock-up agreement with the Underwriter Defendants for a period of 180 days following the IPO.

71. Altogether, the IPO and Private Placement generated $1.1 billion in net proceeds for Root. The Underwriter Defendants received approximately $53.4 million as compensation for facilitating the IPO and Private Placement.

72. The IPO generated enormous amounts of wealth for Root's executives, directors, and pre-IPO investors. For example, based on the IPO price, Timm's Root holdings were worth more than $500 million, instantly making him a multimillionaire.

## 1933 ACT CLAIMS

### Root's Customer Acquisition Costs Were Material to Investors in the IPO

73. Customer acquisition cost, commonly referenced as "CAC," is a non-GAAP financial metric that represents the average cost to a company associated with acquiring a new customer.

74. Customer acquisition cost is commonly understood to be calculated as follows: (i) sales and marketing expenditure for a given period; divided by (ii) new customers acquired in a given period. For example:

## Sales & Marketing Costs: $100,000
## Sales (1 per customer): 10,000

$$\text{Customer Acquisition Cost (CAC)} = \frac{\$100,000}{10,000} = \$10$$

75.     Customer acquisition cost is a critical performance metric for newer companies in particular because it indicates how well they can improve their profitability as they grow.  For this reason, growth-phase companies typically closely monitor customer acquisition costs.

76.     According to Root, efficiently managing customer acquisition costs is one of the four "principal profitability levers" for the Company.  Thus, Root recognizes the critical importance of customer acquisition costs to the Company's profitability.

77.     Unsurprisingly, the Registration Statement repeatedly discusses the importance of customer acquisition costs to Root.

78.     Among other things, the Registration Statement highlights the Company's purported ability to keep customer acquisition costs below those of traditional insurance companies.  The Registration Statement represents that "over the period from August 2018 to August 2020 our average customer acquisition cost was $332."

79.     The Registration Statement repeatedly emphasizes that Root's purported $332 average customer acquisition cost was much lower than the customer acquisition costs of its larger

- 15 -

competitors. In other words, the Registration Statement indicated that Root's purportedly low customer acquisition cost was a key competitive advantage for the Company as of the IPO.

80. Due to the highly competitive nature of the automobile insurance industry, it typically costs between $500 and $800 to acquire a new customer. For automobile insurers that, like Root, focus on direct-to-consumer marketing – such as GEICO and Progressive – the average customer acquisition cost is approximately $700.

81. Investors and analysts were keenly focused on Root's customer acquisitions costs in connection with the IPO.

82. For example, an October 6, 2020 article by stock researcher *coverager.com* highlighted Root's purportedly low customer acquisition cost of $332.

83. Likewise, an October 10, 2020 article by stock researcher *nanalyze.com* favorably compared Root's purported customer acquisition cost of $332 with the fact that "it typically costs [companies in the automobile insurance industry] between $500-800 to acquire a new customer."

84. In addition, an October 27, 2020 article by venture capital firm Meritech Capital also highlighted Root's purportedly low customer acquisition cost of $332.

85. Further, an October 28, 2020 IPO advisory by *ipoboutique.com* commented that "[t]he efficiency of [Root's] customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels" and that the Company's "average customer acquisition cost was $332."

86. Thus, Root's customer acquisition costs, and especially Root's representation in the Registration Statement that the Company's average customer acquisition costs were purportedly much lower than those of traditional insurers, were highly material to investors in the IPO.

**Root's Customer Acquisition Costs as of the IPO Were and Would Continue to Be
Materially Higher Than the $332 Disclosed in the Registration Statement**

87.     According to the Registration Statement, Root is able to achieve its purportedly low

average customer acquisition cost of $332 by focusing its marketing efforts on mobile devices.

Specifically, as of the IPO, Root stated in the Registration Statement that it principally uses search

engines, social media platforms, digital app stores, content-based online advertising, and other

online sources to generate traffic to the Company's website and mobile app, which are the two

principal sources Root relies upon for new customers.

88.     The Registration Statement further explained that "[t]hrough our hyper-targeted,

data-driven and ever-improving performance marketing capabilities, we have been able to acquire

customers for below the average cost of doing so through each of the direct and agent-based

channels."

89.     Notwithstanding the Company's focus on marketing through mobile devices, the

Registration Statement stated that Root planned to "invest in our national brand, which will

increase awareness, build credibility and support all four of our distribution channels."  Likewise,

the Registration Statement disclosed that Root was planning "to increase our presence in digital

and traditional channel media and launch a national advertising campaign to build our brand

awareness."

90.     In making these statements, however, the Registration Statement failed to disclose

that the Company's plan to increase its marketing expenditures in connection with its nationwide

rollout had caused, and would continue to cause, Root's customer acquisition costs to be materially

higher than $332.

91.     In fact, these increased marketing expenditures had caused Root's customer

acquisition cost as of the IPO to be virtually the same as those of the traditional insurers that the

Registration Statement stated the Company had a competitive advantage over in terms of customer acquisition costs.

92.    During Root's roadshow,[2] Timm indicated that Root's customer acquisition costs had spiked by October 2020 far in excess of the amount incurred by the average traditional insurer. Nonetheless, Timm misleadingly stated that the reason for the recent spike was due to "some of this experimentation on brand that you see over here on the left of the page.  And again, we're constantly testing new marketing channels and we'll continue to do that short term.  But we believe – and we've seen long term – that we do have the ability to keep our customer acquisition costs much lower than our competitors."

93.    These statements were materially false and misleading because Timm failed to acknowledge that Root's customer acquisition costs had spiked, and would remain elevated, because the Company had substantially boosted its current and expected marketing expenditures as part of Root's planned national expansion.  Moreover, these statements incorrectly implied that Root's customer acquisition costs would remain below those of traditional insurers even when the Company's national expansion marketing plan took effect.

94.    Only following the IPO did investors begin receiving an accurate portrayal of Root's current and future customer acquisition costs, and the reasons for it, when analysts began initiating coverage of the Company in late November 2020.  For example, on November 23, 2020, an analyst reported that Root's customer acquisition costs for the third fiscal quarter of 2020, which

---

[2]    A "roadshow" refers to a sales presentation held across a series of meetings between the executives of an issuing company and potential investors.  The purpose of the roadshow is to enable the underwriters of an initial public offering and top executives of an issuer to make a pitch to investors to invest in the offering.  Timm and Rosenthal participated in Root's roadshow for the IPO and made statements to prospective investors in the Company.

ended on September 30, 2020 – meaning *before* the IPO – were $514 and would be even higher thereafter because "CAC is spiking to $660+ near term on the new national TV campaign."

95.    In other words, Root's actual customer acquisition cost as of the IPO was effectively no different than the costs incurred by traditional insurers like GEICO and Progressive who focus on direct-to-consumer marketing.  Thus, contrary to the Registration Statement, this meant Root had no competitive advantage on a customer acquisition costs basis over traditional insurers as of the IPO.

96.    Shortly thereafter, on December 1, 2020, in Root's first financial report as a publicly traded company, the Company acknowledged that its "amplified brand spend . . . will result in elevated customer acquisition cost levels for the next two quarters," which Rosenthal affirmed on the accompanying investor conference call held on December 1, 2020.

97.    On February 25, 2021, in Root's second financial report as a publicly traded company, the Company acknowledged that it "still ha[s] much work to do in the quarters and years ahead, particularly around . . . managing customer acquisition costs."

98.    On August 11, 2021, Root issued a press release post-market close and announced that Carvana, a leading e-commerce platform for buying and selling used vehicles, had entered into an exclusive partnership whereby Carvana will offer Root's insurance products to individuals who purchase vehicles through Carvana.

99.    In exchange for this exclusive partnership, Carvana invested $126 million in Root and received a 5% ownership interest in the Company, which amounts to approximately 14 million shares of Class A common stock in Root valued at $9.00 per share.  Stated differently, the shares acquired by Carvana amount to approximately *57%* of the shares of Class A common stock of Root that were offered in the IPO, albeit for *two-thirds less* than the IPO price of $27.00.

100.    Before the market opened on August 12, 2021, Root issued its shareholder letter for the second fiscal quarter of 2021, the quarter ended June 30, 2021, and revealed why Root agreed to the Carvana partnership – it was a desperate attempt to curtail Root's high customer acquisition costs.  According to Timm and Rosenthal: "We believe the partnership [with Carvana] will be accretive in multifaceted ways: ***by driving scalable customer acquisition at attractive costs*** and with improved customer characteristics and lifetime value."

101.    Indeed, in the same letter, Root admitted that the Company had to substantially reduce Root's top-line and profitability guidance for 2021 because Root needed "to take active steps to reduce our customer acquisition costs."

102.    In the accompanying pre-market open investor conference call that was held on August 12, 2021, Timm stated that: "Meeting customers where they are at the point of sale creates a natural onboarding experience that is likely to result in meaningful uptake with an attractive customer profile and ***attractive acquisition costs***. Carvana's investment in the company underscores their commitment to the partnership while providing Root with additional capital."

103.    In other words, Root's customer acquisition costs were in such dire straits by August 2021 that the Company was forced to rely on Carvana to provide a low cost source of customer acquisitions in exchange for a significant portion of the Company's equity at a cut-rate price compared to what investors paid in the IPO.

104.    Root's commentary in February 2021 and August 2021 demonstrates that the Company incurred significant customer acquisition costs well in excess of $332 as of the IPO and in the year following the IPO, meaning that Root did not have any competitive advantage based on customer acquisition costs over traditional insurers during that time.

**Materially False and Misleading Statements and Omissions in the Registration Statement**

**Misstatements and Omissions Pertaining to Sections 11 and 12(a)(2)**

105.    The Registration Statement for the Offering was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material information that was required to be disclosed therein and was not prepared in accordance with the regulations governing its preparation.

106.    The Registration Statement repeatedly discusses that one of Root's competitive advantages is its purported ability to acquire customers at an average cost below the amount paid by traditional insurers.  The Registration Statement stated, in pertinent part, as follows:

> Within digital marketing we use data science models to dynamically bid on the basis of expected lifetime value. Over time we believe the ongoing data we accumulate through growth will fuel a pricing advantage for target customers, driving improved conversion and *a cost of acquisition advantage in all channels*.
>
> \*        \*        \*
>
> Engaging our customers and prospective customers directly through the mobile device gives us access to an underutilized distribution channel, mobile, through which many incumbents have historically had difficulty profitably acquiring customers. Through our hyper-targeted, data-driven and ever-improving performance marketing capabilities, *we have been able to acquire customers for below the average cost of doing so through each of the direct and agent-based channels*.
>
> \*        \*        \*
>
> Mobile is the fastest growing retail channel in the United States, as customers spend less time in front of computers and utilize smart phones for more convenient shopping. We therefore designed a mobile-directed customer acquisition strategy, *delivering customer acquisition costs below the average cost of doing so through each of the direct and agent channels* . . . .
>
> \*        \*        \*
>
> *The efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels.* While our customer acquisition costs can vary by channel mix, by state or due to seasonality, over the period from August 2018 to August 2020 our average customer acquisition cost

was $332. In the near term, as we expand our licensed footprint to 50 states, we will invest in our national brand, which will increase awareness, build credibility and support all four of our distribution channels.

107.     By speaking about the topic of Root's customer acquisition costs in the statements in ¶106 above, Defendants had a duty to speak fully and truthfully.  Instead of discharging that duty, Defendants failed to disclose that Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, thereby negatively impacting Root's operations and financial performance, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States.  Furthermore, Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers, thereby negatively impacting Root's financial operations and performance.  Accordingly, these statements omitted material information from investors in Root Class A common stock in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

108.     The Registration Statement also discusses that Root planned as of the IPO to substantially boost its marketing expenditures as part of the Company's expansion throughout the United States.  The Registration Statement stated, in pertinent part, as follows:

Our long-term growth will depend, in large part, on our continued ability to attract new customers to our platform. We intend to continue to drive new customer growth by leveraging our differentiated consumer experience and our telematics-based pricing. Additionally, our proprietary dataset will continue to scale as we grow, enabling us to enhance our predictive models that will further improve pricing and attract potential new customers. We will also continue to target attractive potential customer segments through our digital marketing channels and strategic partnerships. ***Similarly, we intend to increase our presence in digital and traditional channel media and launch a national advertising campaign to build our brand awareness.***

\*     \*     \*

- 22 -

In the near term, *as we expand our licensed footprint to 50 states, we will invest in our national brand*, which will increase awareness, build credibility and support all four of our distribution channels. Furthermore, we continue to invest in the technology and data science behind our distribution with A/B tests, dynamic bidding models, and rapid updates and iterations, supporting differentiated cost of customer acquisition over the long term.

109.   By speaking about the topic of Root's national advertising efforts in the statements in ¶108 above, Defendants had a duty to speak fully and truthfully.  Instead of discharging that duty, Defendants failed to disclose that Root's plan to expand throughout the United States had already caused Root's customer acquisition costs to significantly increase as of the IPO, which would remain elevated thereafter, thereby negatively impacting Root's operations and financial performance.  Accordingly, these statements omitted material information from investors in Root Class A common stock in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

110.   Instead of accurately describing the present risks to Root posed by the significant increase in customer acquisition costs experienced by the Company at the time of the IPO, the Registration Statement only discussed a *hypothetical* risk.  Specifically, the Registration Statement stated, in pertinent part, as follows:

As we grow, we *may* struggle to maintain cost-effective marketing strategies, and our customer acquisition costs *could* rise substantially.

111.   The statement referenced above in ¶110 was an inaccurate statement of material fact because Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, thereby negatively impacting Root's operations and financial performance, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States.  In other words, the hypothetical risk recited in the Registration Statement had already materialized as of the IPO, but was not disclosed to investors in the IPO.

- 23 -

112. In addition to the Registration Statement negligently failing to advise investors about significant, then-existing matters that made the IPO speculative or risky, the Registration Statement was also negligently prepared because it omitted to disclose material information that was required to be disclosed pursuant to the regulations governing the preparation of the Registration Statement.

**Item 303**

113. The Registration Statement was required to furnish the information called for under Item 303 of Regulation S-K (17 C.F.R. §229.303), *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").

114. As set forth in the December 29, 2003 interpretative release to Item 303 of Regulation S-K issued by the SEC (the "2003 Interpretive Release"), the purpose of MD&A is to provide investors with information necessary to an understanding of a company's results of operations, including the identification and disclosure of known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on a company's operating performance.

115. The instructions to Item 303(a) of Regulation S-K required that the Registration Statement provide disclosure about, and "focus specifically" on, material events and uncertainties that would cause Root's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past" stating, in pertinent part, as follows:

> The discussion and analysis shall ***focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results*** or of future financial condition. ***This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past***, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

- 24 -

116.     The 2003 Interpretive Release also provides that the Registration Statement was required to provide disclosure about known demands, events or uncertainties, except for those that management determined: (i) were not reasonably likely to occur; or (ii) would not have a material effect on Root's operating results.   The 2003 Interpretive Release states, in pertinent part, as follows:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty ***is required unless*** a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

117.     Accordingly, Defendants had an affirmative obligation to disclose facts in the Registration Statement required by Item 303, including information regarding known uncertainties or events.

118.     As detailed above, in violation of the disclosure obligations required by Item 303 of Regulation S-K, the Registration Statement failed to disclose that: (i) Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States; and (ii) Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers.

**Item 105**

119.     The Registration Statement similarly failed to disclose information on two of the most material risks facing Root at the time of the IPO.   The Registration Statement was required to furnish the necessary information required by Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky."

120.    Specifically, Item 105 requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."

121.    Root's customer acquisition costs were among the most significant factors making an investment in Root risky at the time of the IPO.  Defendants violated Item 105 by failing to disclose that: (i) Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States; and (ii) Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers.

**Rule 408**

122.    Pursuant to SEC Regulation C, registrants have an overarching duty to disclose material information necessary to ensure that representations in a registration statement are not misleading.  Specifically, Rule 408 requires that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. §230.408(a).

123.    The Registration Statement violated Rule 408 because Defendants failed to disclose that: (i) Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States; and (ii) Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers.

**Additional Misstatements and Omissions Pertaining to Section 12(a)(2) Only**

124.    In the roadshow that occurred before the IPO, Timm acknowledged that Root's customer acquisition costs had spiked by September 2020 far in excess of the amount incurred by the average traditional insurer.  Nonetheless, Timm misleadingly told prospective investors that this increase would be temporary and was due to marketing experimentation.  Timm stated, in pertinent part, as follows:

> On slide 19 you'll also see we do believe that becoming a national brand is important and we do believe we can do that in a very differentiated way that is not gimmicky. So really Root is based on fairness. What you see here, on the left side of slide 19, is a bit of a taste for our brand. *Judge me by the way I drive, not my job. Age is just a number. Phillip isn't. Root's all about you.* Those are some brand campaigns that ***we're going to be experimenting with***. We don't believe we will ever be at the level of brand spend of a Geico or Progressive. We think we'll always be more performance oriented, but we also believe that there still is value to becoming a recognized brand and so ***we will intelligently experiment with the brand channel***.

> And you can see the results on the right-side of the page. Our customer acquisition cost has maintained well below the direct average and so we really are more competitive. ***You see the recent spike? That is from some of this experimentation on brand that you see over here on the left side of the page***. And again, we're constantly testing new marketing channels and ***we'll continue to do that short term***. But we believe -- and we've seen long term -- that we do have the ability to keep our customer acquisition costs much lower than our competitors.

(Italics only in original).

125.    The statements "we're going to be experimenting with [marketing campaigns]," "we will intelligently experiment with the brand channel," "[y]ou see the recent spike? That is from some of this experimentation on brand that you see over here on the left side of the page," and "we'll continue to do that short term" referenced above in ¶124 were inaccurate statements of material fact because Root's increased customer acquisition costs were not caused by marketing experimentation, but instead were caused by a sustained increase in marketing expenditures as part of the Company's expansion throughout the United States that was set to continue as Root became

a publicly-traded company and thereafter and had increased, and would cause to remain elevated, Root's customer acquisition costs beyond those incurred by traditional insurers.

126.    In addition, by speaking about the topic of Root's customer acquisition costs in the statements in ¶124 above, Defendants had a duty to speak fully and truthfully.   Instead of discharging that duty, Defendants failed to disclose that Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, thereby negatively impacting Root's operations and financial performance, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States. Furthermore, Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers, thereby negatively impacting Root's financial operations and performance.   Accordingly, these statements omitted material information from investors in Root Class A common stock in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

127.    During the roadshow, Timm also misleadingly informed investors that Root had the ability to keep its customer acquisition costs much lower compared to traditional insurers notwithstanding the Company's purported "experimentation on brand."   Timm stated, in pertinent part, as follows:

> And you can see the results on the right-side of the page. Our customer acquisition cost has maintained well below the direct average and so we really are more competitive. You see the recent spike? That is from some of this experimentation on brand that you see over here on the left side of the page. And again, we're constantly testing new marketing channels and we'll continue to do that short term. But we believe -- and we've seen long term -- that *we do have the ability to keep our customer acquisition costs much lower than our competitors*.

128.    The statement "we do have the ability to keep our customer acquisition costs much lower than our competitors" referenced above in ¶127 was an inaccurate statement of material fact

because by September 2020 Root possessed no competitive advantage over traditional insurers in terms of customer acquisition costs.

129.    In addition, by speaking about the topic of Root's customer acquisition costs in the statements in ¶127 above, Defendants had a duty to speak fully and truthfully.  Instead of discharging that duty, Defendants failed to disclose that Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, thereby negatively impacting Root's operations and financial performance, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States.  Furthermore, Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers, thereby negatively impacting Root's financial operations and performance.  Accordingly, these statements omitted material information from investors in Root Class A common stock in or traceable to the IPO, thereby rendering these statements materially incomplete and misleading.

**Relevant Post-IPO Events**

130.    Less than a month after the IPO, analysts began alerting investors that Root's customer acquisition costs had significantly increased, and would continue to do so, because of the substantial marketing expenditures made by the Company as it sought to complete its national expansion throughout the United States.

131.    For example, in a pre-market opening November 23, 2020 report initiating coverage on Root, analyst Brian Meredith of UBS reported that Root's "***heavy customer acquisition costs*** will result in elevated cash burn and net losses through 2023 requiring additional capital raises (debt and/or equity) to maintain regulatory capital requirements."  The report includes the below chart, which indicates that Root's customer acquisition costs during the third fiscal quarter of 2020,

which ended on September 30, 2020 – meaning ***before*** the IPO – had spiked above $500 and was expected to be nearly $700 by the first fiscal quarter of 2021, the period ended March 31, 2021:



**Figure 15: Customer acquisition costs (CAC) quarterly forecast**

Source: Company reports, UBSe.

132.    Likewise, in a pre-market opening November 23, 2020 report initiating coverage on Root, analyst Ross Sandler of Barclays Capital Inc. ("Barclays") reported that one of the "risks to monitor" for Root is that "CAC is spiking to $660+ near term on the new national TV campaign" and that "CAC is spiking up right now, weighing on profits."

133.    According to the Barclays report, customer acquisition costs in the automobile insurer industry are approximately $700 for traditional insurers that employ direct to consumer marketing.  The Barclays report forecasted Root's customer acquisition costs to reach a level of "nearly $700 by 1Q21," an estimate that "could prove conservative," as a result of the Company's national advertising campaign.  The Barclays report includes the below chart, which indicates that Root's customer acquisition cost during the third fiscal quarter of 2020, which ended on September 30, 2020 – meaning ***before*** the IPO – was $514, and was expected to be $694 by the first fiscal quarter of 2021, the period ended March 31, 2021:



FIGURE 18

CAC Spiking Due to Brand Spend & Lower Conversion

Source: Barclays Research, Company Documents

134. After market close on December 1, 2020, Root made its first announcement of financial results as a publicly traded company on Form 8-K (the "12/1/20 Form 8-K"). The 12/1/20 Form 8-K provided Root's financial results for the third fiscal quarter of 2020, the quarter ending September 30, 2020. The 12/1/20 Form 8-K acknowledged that the analyst reports of significantly elevated customer acquisition costs as of the IPO were accurate and were caused by Root's increased marketing expenditures, stating, in pertinent part, that:

> In the near term, ***we expect the amplified brand spend will take time to drive acquisition efficiency and will result in elevated customer acquisition cost levels for the next two quarters***. However, the longer-term benefit will far outweigh any pressure, particularly as we expand our footprint nationally.

135. After filing the 12/1/20 Form 8-K, Root hosted its first investor earnings call as a publicly traded company during the evening of December 1, 2020 (the "12/1/20 Conference"). During the 12/1/20 Conference, Rosenthal confirmed the accuracy of the disclosures about customer acquisition costs made in the 12/1/20 Form 8-K, stating, in pertinent part, that:

Thanks, Ross [Sandler of Barclays]. And although this is our first earnings call, I have a feeling that wouldn't be an earnings call without a question from you on CAC. So I'm excited, and I'll look forward to that continuing quarter after quarter in a good way. ***CAC was in line with our expectations during the quarter. As we talked about in our shareholder letter, we're expecting elevated levels, not just in the third quarter, but in the fourth quarter, because we're testing – we're investing to support the state expansion plans that I was just talking about.***

136.    According to a December 1, 2020 report on Root, analyst Youssef Squali of Truist Securities reported that they were modeling "CAC in 4Q20 of $670, up 100% year over year, and in 1Q21 of $704, up 165% (though we note the company is not providing specific CAC measures)."

137.    After market close on February 25, 2021, Root filed a Form 8-K announcing the Company's financial results for the fourth fiscal quarter of 2020, the quarter ending December 31, 2020, and the full fiscal year of 2020, the period ending December 31, 2020 (the "2/25/21 Form 8-K").  The 2/25/21 Form 8-K acknowledged that Root "still ha[s] much work to do in the quarters and years ahead, particularly around . . . managing customer acquisition costs."

138.    Then, in a pre-market opening report on March 9, 2021 initiating coverage on Root, analyst Joshua Shanker of BofA Securities ("BofA") reported that "the Root model falls short" because, among other things, Root was "spending $640 per net new customer in sales and marketing spend in 2019."

139.    In addition, the BofA report further commented on Root's high customer acquisition costs, stating, in pertinent part, that:

We believe Root should be valued on a per customer basis. We note that Progressive has been spending about $2000 per net new customer for the past three years (sales & marketing spend / change in policy count). On a gross basis, it spends about $750. This compares with GEICO who has been spending about $2750 and $600 per new customer, net and gross, respectively. ***Root has been spending $1500 and $900 per new customer, net and gross, respectively.*** We expect that might ramp up in the next few quarters (it was anomalistic ally high in 4Q20 due to the lack of growth at the end of the year) as the new customers from the 2021 sales and

marketing spend will likely lag the spending. As a loose rule of thumb, we might argue that a good new customer (high renewal propensity, larger ticket) Is worth $2000 to acquire, while a lower value new customer (lower renewal propensity, smaller ticket) is worth $1000.

140.    After market close on August 11, 2021, Root announced that Carvana had entered into an exclusive partnership whereby Carvana will offer Root's insurance products to individuals who purchase vehicles through Carvana.  In exchange for this exclusive partnership, Carvana invested $126 million in Root for a 5% ownership interest in the Company, which amounts to approximately 14 million shares of Root Class A common stock valued at $9.00 per share.

141.    Before the open of trading on August 12, 2021, Root issued its shareholder letter for the second fiscal quarter of 2021, the quarter ending June 30, 2021, and stated, among other things, that: "We believe the partnership [with Carvana] will be accretive in multifaceted ways: *by driving scalable customer acquisition at attractive costs* and with improved customer characteristics and lifetime value."

142.    In the same letter, Root admitted that the Company had to substantially reduce Root's top-line and profitability guidance for 2021 because Root needed "to take active steps to reduce our customer acquisition costs."

143.    In other words, Root confirmed in August 2021 that Root's elevated customer acquisition costs had been negatively impacting the Company for almost one year after the IPO, meaning that Root had no competitive advantage over traditional insurers during this time.

144.    As of the filing of this action on March 19, 2021, Root's Class A common stock traded at $12.00 per share, an approximate 55.5% decline from the IPO price of $27.00 per share.

145.    Root's Class A common stock has continued to significantly decline since then, closing at $4.43 per share on November 18, 2021.

- 33 -

## CLASS ACTION ALLEGATIONS

146.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and the Class, *i.e.*, all persons or entities that purchased Root Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO, and all persons or entities that purchased Root Class A common stock during the Class Period, except all persons or entities that purchased directly from the Underwriter Defendants at the offering price in the IPO.

147.    Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

148.    The members of the Class are so numerous that joinder of all members is impracticable.  Root Class A common stock is actively traded on the NASDAQ and over 26 million shares of Class A common stock were sold in the IPO.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be: (i) identified from records maintained by Root or its transfer agent; (ii) notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions; and (iii) given an opportunity to exclude themselves from the Class.

149.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

150.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

151.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the 1933 Act;

(b)    whether the Registration Statement issued by Defendants to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Root and its business; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

152.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the 1933 Act
### Against All Defendants

153.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

154.    This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, against all Defendants.  Plaintiff does not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

155. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

156. Root was the registrant for the IPO. As an issuer of securities to the public, Root is strictly liable to Plaintiff and the Class for the misstatements and omissions contained in the Registration Statement.

157. The Individual Defendants each signed the Registration Statement either personally or through an attorney-in-fact and/or caused its issuance. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the Registration Statement contained all facts required to be stated therein. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained material misstatements and/or omissions of material facts. As such, the Individual Defendants are strictly liable to Plaintiff and the Class.

158. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to Plaintiff and the Class.

159. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement. None of the Defendants named herein made a

reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and/or were not misleading. By reason of the conduct herein alleged, each Defendant violated Section 11 of the 1933 Act.

160. Plaintiff and the other members of the Class acquired Root Class A common stock pursuant and/or traceable to the Registration Statement for the IPO and sustained damages when the price of Root Class A common stock declined substantially subsequent to and due to Defendants' violations.

161. At the time of their purchases of Root Class A common stock, Plaintiff and the other members of the Class were without knowledge of the facts described herein and could not have reasonably discovered those facts before the disclosures described herein.

162. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this claim is based to the time that Plaintiff commenced this action.

163. Less than three years have elapsed between the time that the securities upon which this claim is brought were offered to the public and the time that Plaintiff commenced this action.

## COUNT II

### Violations of Section 12(a)(2) of the 1933 Act
### Against Root, Timm, Rosenthal, and the Underwriter Defendants

164. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

165. This Count is brought pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C. §77l, against all Defendants. Plaintiff does not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

166. Each Defendant named in Count II was a seller, offeror, and/or solicitor of sales of the Root Class A common stock offered in the IPO pursuant to the Registration Statement.

167. Root was the issuer of 24,581,515 shares in the IPO for which it received approximately $619 million in net proceeds. Root solicited the purchase of shares by virtue of issuing the Registration Statement and facilitating the roadshow, and was motived at least in part to serve its own financial interests.

168. Timm solicited the purchase of shares by virtue of signing the Registration Statement, and making presentations and answering investor questions at Root's roadshow meetings. In making these solicitations, Timm was motivated in part to serve Root's financial interests and his own. The value of Timm's retained shares was approximately $518 million based on the IPO price.

169. Rosenthal solicited the purchase of shares by virtue of signing the Registration Statement, and making presentations and answering investor questions at Root's roadshow meetings. In making these solicitations, Rosenthal was motivated in part to serve Root's financial interests and his own. The value of Rosenthal's retained shares was approximately $66 million based on the IPO price.

170. The Underwriter Defendants transferred title of Root Class A common stock to Plaintiff and other members of the Class who purchased shares in the IPO, and transferred title of Root Class A common stock to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants. The Underwriter Defendants also solicited the purchase of Root Class A common stock in the IPO by Plaintiff and other members of the Class who purchased shares in the IPO by means of the Registration Statement, motivated at least in part by their desire to serve the Underwriter Defendants' own financial interest and the interests of Root,

including, but not limited to, earning commissions on the sale of Root Class A common stock in the IPO.

171.    By means of the negligently prepared Registration Statement, Defendants promoted and sold Root Class A common stock to Plaintiff and other members of the Class.

172.    The Registration Statement contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff and the other members of the Class who purchased Root Class A common stock pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

173.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the misstatements and omissions contained in the Registration Statement at the time it acquired Root Class A common stock.

174.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the 1933 Act.

175.    As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Root Class A common stock pursuant to the Registration Statement sustained substantial damages in connection with their purchases.

176.    Accordingly, Plaintiff and the other members of the Class who hold the Root Class A common stock issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby tender their Class A common stock to

the Defendants sued herein. Class members who have sold their Root Class A common stock seek damages to the extent permitted by law.

### COUNT III

### Violations of Section 15 of the 1933 Act
### Against Root and the Individual Defendants

177.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

178.     This Count is brought pursuant to Section 15 of the 1933 Act, 15 U.S.C. §77o, against Root and the Individual Defendants. Plaintiff does not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

179.     Where a violation of Sections 11 or 12(a)(2) occurs, Section 15 gives rise to liability as to "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l [Section 11 or 12(a)(2)] . . . ." 15 U.S.C. §77o(a).

180.     Additionally, control persons under Section 15 are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." *Id.*

181.     As detailed herein, each of Defendants committed primary violations of the 1933 Act, are directly responsible and primarily liable for any such violations, or employed a primary violator.

182.     The Individual Defendants each were control persons of Root by virtue of their positions as directors and/or senior executive officers of Root at the time of the preparation of the Registration Statement and as of the IPO. The Individual Defendants each had a series of direct

- 40 -

and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Root.

183.     Root controlled all of the Individual Defendants.

184.     By reason of the conduct alleged herein, Root and the Individual Defendants violated Section 15 of the 1933 Act, and Plaintiff and the Class have suffered harm as a result.

## ADDITIONAL ALLEGATIONS IN SUPPORT OF 1934 ACT CLAIMS

### Scienter

185.     Timm was the CEO of Root during the Class Period, was a director on the Board, and co-founded the Company.  Rosenthal was the CFO of Root and also a director on the Board. Based on their roles at Root, Timm and Rosenthal would have been involved with, or knowledgeable about, the wrongdoing alleged herein, which centers on customer acquisition costs, one of Root's key measures of profitability.

186.     At a minimum, Root and Timm and Rosenthal failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems with customer acquisition costs at Root, the Company knew, or recklessly disregarded, the extent and scope of their statements during the Class Period.

187.     Root and Timm and Rosenthal knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Timm and Rosenthal.

188.     Likewise, Timm and Rosenthal, by virtue of their high-level positions with the Company and unique access as executives and directors, directly participated in the management

- 41 -

of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. Timm and Rosenthal had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

189.    Further, to ensure a lucrative IPO, Root and Timm and Rosenthal assured investors that the Company had a competitive advantage over traditional insurers in terms of customer acquisition costs. To that end, Root and Timm and Rosenthal assured participants in the roadshow that the Company's increased customer acquisition costs in the third fiscal quarter of 2020, the quarter ended September 30, 2020, was an anomaly that would not continue once the Company became publicly-traded.

190.    It is therefore unsurprising that Timm and Rosenthal knew, or recklessly disregarded, that: (i) the Company had and would continue to increase its marketing expenditures as part of Root's national expansion, which had and would continue to cause customer acquisition costs for Root to dramatically increase; and (ii) Root did not possess any meaningful competitive advantage over traditional insurers in terms of customer acquisition costs before or after the IPO.

191.    Indeed, it is unfathomable that Root and Timm and Rosenthal were unaware that: (i) the Company had and would continue to increase its marketing expenditures as part of Root's national expansion; or (ii) Root did not possess any meaningful competitive advantage over traditional insurers in terms of customer acquisition costs before or after the IPO.

192.    Moreover, the short period of time between the statements made by Root and Timm and Rosenthal in the Registration Statement about the Company's customer acquisition costs (October 28, 2020) and analysts disclosing to investors that these costs had materially risen due to the national marketing campaign and that Root's purported competitive advantage did not exist as of the IPO (November 23, 2020) demonstrates the knowledge or reckless disregard by Root and Timm and Rosenthal that these statements were materially false and misleading.

193.    As alleged herein, Root and Timm and Rosenthal acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly, or recklessly, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

194.    As set forth elsewhere herein in detail, Timm and Rosenthal, by virtue of their receipt of information reflecting the true facts regarding Root, their control over, and/or receipt and/or modification of Root's allegedly materially misleading statements and/or their association with the Company that made them privy to confidential proprietary information concerning Root, participated in the fraudulent scheme alleged herein.

195.    The allegations above also establish a strong inference that Root, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and

without a reasonable basis, for the purpose and effect of concealing Root's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, Root maintained and/or increased its artificially inflated Class A common stock price throughout the Class Period.

196.    As the CEO of Root and a director, Timm's scienter can be imputed to the Company.

197.    As the CFO of Root and a director, Rosenthal's scienter can be imputed to the Company.

## Loss Causation

198.    As detailed herein, Root and Timm and Rosenthal engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Root Class A common stock and operated as a fraud or deceit on Class Period purchasers of Root Class A common stock. When the prior misrepresentations and fraudulent conduct of Root and Timm and Rosenthal were disclosed and became apparent to the market, the trading price of Root Class A common stock fell precipitously as the artificial inflation was removed.

199.    As a result of their purchases of Root Class A common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The false and misleading statements and omissions made by Root and Timm and Rosenthal had the intended effect and caused Root Class A common stock to trade at artificially inflated levels throughout the Class Period.

200.    On November 23, 2020, before the open of trading, analysts began initiating coverage of the Company and reported that Root's customer acquisition costs had materially increased during the quarter before the IPO, the third fiscal quarter of 2020, the quarter ended September 30, 2020.

201. In response to the pre-market open revelations on November 23, 2020, the trading price of Root Class A common stock declined from a closing price of $19.00 per share on November 20, to a closing price of $17.02 per share on November 23 – a decline of $1.98 per share, or 10.4%.

202. On December 1, 2020, after the close of trading, Root issued its first financial report as a publicly-traded company.  Root acknowledged that the Company's customer acquisition costs had materially risen as of the IPO and would be elevated for at least the next two quarters due to Root's national marketing campaign.

203. In response to the post-market close revelations on December 1, 2020, the trading price of Root Class A common stock declined from a closing price of $17.00 per share on December 1, 2020, to a closing price of $14.70 per share on December 2, 2020 – a decline of $2.30 per share, or 13.5%.

204. On February 25, 2021, after the close of trading, Root issued its second financial report as a publicly-traded company.  Root acknowledged that the Company was not efficiently or effectively managing customer acquisition costs.

205. In response to the post-market close revelations on February 25, 2021, the trading price of Root Class A common stock declined from a closing price of $16.42 per share on February 25, 2021, to a closing price of $13.49 per share on February 26, 2021 – a decline of $2.93 per share, or 17.8%.

206. On August 11, 2021 and August 12, 2021, before the open of trading on August 12, Root announced its partnership with Carvana.  Root explained that a key motivation for this partnership was securing a low-cost source of customer acquisitions, and admitted that the

Company needed to take active steps to reduce Root's customer acquisition costs and could not meet its 2021 guidance for this reason.

207.    In response to these revelations on August 11 and August 12, 2021 before the market opened on August 12, 2021, the trading price of Root Class A common stock declined from a closing price of $6.87 per share on August 11, 2021, to a closing price of $5.54 per share on August 12, 2021 – a decline of $1.33 per share, or 19.4%.

208.    As shown above, the timing and magnitude of the price declines in Root Class A common stock negates any inference that the losses suffered by Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the fraud perpetrated by Root and Timm and Rosenthal.

**No Safe Harbor**

209.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements challenged herein. Many of the statements challenged herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Root and Timm and Rosenthal are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**Application of Presumption of Reliance: The *Basic* and *Affiliated Ute* Presumptions**

210.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

211.    With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)     Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b)     the misrepresentations and omissions were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Proposed Class purchased Root Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

212.    At all relevant times, the market for Root common stock was efficient for the following reasons, among others:

(a)     Root Class A common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Root filed periodic public reports with the SEC and the NASDAQ;

(c)     Root regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national

circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Root was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

213.    As a result of the foregoing, the market for Root Class A common stock promptly digested current information regarding Root from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Root Class A common stock during the Class Period suffered similar injury through their purchase of Root Class A common stock at artificially inflated prices and a presumption of reliance applies.

214.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims of the Class are grounded in Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Root's central business operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT IV

**Violations of Section 10(b) of the 1934 Act**
**Against Root and Timm and Rosenthal**

215.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

216.    During the Class Period, Root and Timm and Rosenthal disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

217.    Root and Timm and Rosenthal: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Root Class A common stock during the Class Period.

218.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Root Class A common stock. Plaintiff and the Class would not have purchased Root Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the misleading statements and/or omissions made by Root and Timm and Rosenthal.

219.    As a direct and proximate result of the wrongful conduct of Root and Timm and Rosenthal, Plaintiff and the other members of the Proposed Class suffered damages in connection with their purchases of Root Class A common stock during the Class Period.

## COUNT V

### Violations of Section 20(a) of the 1934 Act
### Against Timm and Rosenthal

220.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

221.    Timm acted as a controlling person of Root within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By reason of his position as an officer, director, and co-founder of Root, Timm had the power and authority to cause Root to engage in the wrongful conduct complained of herein.  By reason of such conduct, Timm is liable pursuant to Section 20(a) of the 1934 Act.

222.    Rosenthal acted as a controlling person of Root within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By reason of his position as an officer and director of Root, Rosenthal had the power and authority to cause Root to engage in the wrongful conduct complained of herein.  By reason of such conduct, Rosenthal is liable pursuant to Section 20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.    Determining this action to be a class action properly maintained pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative and designating proposed lead counsel for Plaintiff as Class Counsel;

B.    Awarding Plaintiff and the other members of the Class damages together with interest thereon;

C.    With respect to Count II, ordering that the IPO be rescinded or awarding a rescissory measure of damages;

- 50 -

D.     Awarding Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this litigation, including attorneys' fees, accountants' and experts' fees, and other costs and disbursements; and

E.     Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 19, 2021                    MURRAY MURPHY MOUL + BASIL LLP
                                             JOSEPH F. MURRAY, Trial Attorney
                                             (0063373)

                                             *s/ Joseph F. Murray*
                                             JOSEPH F. MURRAY
                                             1114 Dublin Road
                                             Columbus, OH 43215
                                             Telephone: 614/488-0400
                                             614/488-0401 (fax)
                                             murray@mmmb.com

                                             *Local Counsel for Plaintiff*

                                             ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             MICHAEL G. CAPECI (*pro hac vice*)
                                             58 South Service Road, Suite 200
                                             Melville, NY 11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com
                                             mcapeci@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JONAH H. GOLDSTEIN (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com

*Proposed Lead Counsel for Plaintiff*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Plumbers Local #290 Pension Trust Fund ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  18th  day of November, 2021.

Plumbers Local #290 Pension Trust Fund

By: _Edward J. Gormley_

Its: _Chairman_

- 2 -

ROOT

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 10/28/2020 | 85 | $27.00 |
| 11/10/2020 | 1,700 | $23.08 |
| 11/10/2020 | 3,919 | $22.92 |
| 01/04/2021 | 6,107 | $16.06 |
| 01/05/2021 | 2,587 | $16.85 |
| 01/06/2021 | 3,361 | $16.80 |
| 01/07/2021 | 4,428 | $18.15 |
| 01/08/2021 | 2,537 | $18.65 |
| 02/09/2021 | 883 | $21.55 |
| 02/09/2021 | 2,879 | $21.48 |
| 02/10/2021 | 4,017 | $21.45 |
| 02/10/2021 | 5,687 | $21.20 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 03/10/2021 | 19,410 | $11.36 |
| 04/21/2021 | 6,526 | $10.21 |
| 04/22/2021 | 7,615 | $10.36 |
| 04/23/2021 | 4,639 | $10.48 |

Prices listed are rounded up to two decimal places.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 19, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Joseph F. Murray

JOSEPH F. MURRAY (0063373)

MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

E-mail: murray@mmmb.com

# Mailing Information for a Case 2:21-cv-01197-EAS-CMV Kolominsky v. Root, Inc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Christina N Barreiro**
  cbarreiro@cravath.com

- **John C Camillus**
  jcamillus@camilluslaw.com,cdevaney@camilluslaw.com,camilluslaw@gmail.com,becky@camilluslaw.com

- **Michael Gerard Capeci**
  mcapeci@rgrdlaw.com,e_file_sd@rgrdlaw.com,mwaligurski@rgrdlaw.com

- **John L Chaney**
  chaney@chaneydrexel.com,rizzi@chaneydrexel.com,rizzi@gamblehartshorn.com

- **Damion M Clifford**
  dclifford@arnlaw.com,tashby@arnlaw.com,1614283420@filings.docketbird.com

- **Alison A. Doyle**
  adoyle@cravath.com

- **J. Wesley Earnhardt**
  wearnhardt@cravath.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Wenxuan Guo**
  chaney@chaneydrexel.com

- **J. Alexander Hood, II**
  ahood@pomlaw.com

- **Daniel Richard Karon**
  dkaron@karonllc.com,cgood@karonllc.com,bhollowell@karonllc.com

- **Andrew P Kimble**
  akimble@billerkimble.com,eparis@billerkimble.com,jlong@billerkimble.com

- **William Darrell Kloss , Jr**
  wdklossjr@vorys.com,jlmason@vorys.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **David R. Marriott**
  dmarriott@cravath.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Robert J Wagoner**
  Lainie@wagonerlawoffice.com,bob@wagonerlawoffice.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`