**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ILIA KOLOMINSKY, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:21-cv-01197-EAS-CMV |
| Plaintiff, | JUDGE EDMUND A. SARGUS, JR. |
| v. | Magistrate Judge Chelsey M. Vascura |
| ROOT, INC., ALEXANDER TIMM, DANIEL ROSENTHAL, MEGAN BINKLEY, CHRISTOPHER OLSEN, DOUG ULMAN, ELLIOT GEIDT, JERRI DEVARD, LARRY HILSHEIMER, LUIS VON AHN, NANCY KRAMER, NICK SHALEK, SCOTT MAW, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC. and WELLS FARGO SECURITIES, LLC, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Root, Inc. ("Root" or "the Company"), Alexander Timm, Daniel Rosenthal, Megan Binkley, Christopher Olsen, Doug Ulman, Elliot Geidt, Jerri DeVard, Larry Hilsheimer, Luis von Ahn, Nancy Kramer, Nick Shalek and Scott Maw (collectively, the "Root Defendants"), jointly with Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc. and Wells Fargo Securities, LLC (the "Underwriter Defendants"; together with the Root Defendants, "Defendants"), move the Court to dismiss with prejudice the Amended Complaint For Violations Of The Federal Securities Laws ("AC" or "Complaint"), filed by Lead Plaintiff Plumbers Local #290 Pension Trust Fund ("Plumbers Local" or

"Plaintiff") on November 19, 2021, and designated as the operative complaint on March 21, 2022.

Pursuant to S.D. Ohio Civ. R. 7.1(b), Defendants respectfully request oral argument as it is essential to the fair resolution of the case and because of the public importance of the issues presented. Specifically, the standard for what qualifies as an actionable misstatement or omission under the federal securities laws and the significance of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA"), which Congress enacted to limit non-meritorious complaints alleging violations of federal securities laws.

In support of their motion, Defendants submit the following memorandum in support, the Declaration of J. Wesley Earnhardt and the exhibits attached thereto.

/s/ William D. Kloss, Jr., Trial Attorney
William D. Kloss, Jr. (0040854)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215-1008
Tel: (614) 464-6360
wdklossjr@vorys.com

J. Wesley Earnhardt (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1138
wearnhardt@cravath.com

*Attorneys for Defendants Root, Inc., Alexander Timm, Daniel Rosenthal, Megan Binkley, Christopher Olsen, Doug Ulman, Elliot Geidt, Jerri DeVard, Larry Hilsheimer, Luis von Ahn, Nancy Kramer, Nick Shalek and Scott Maw*

/s/ Gregory A. Harrison
Gregory A. Harrison, Trial Attorney (0029814)
Kelly E. Pitcher (0093678)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
Tel: (513) 977-8200
greg.harrison@dinsmore.com
kelly.pitcher@dinsmore.com

Sharon L. Nelles (*pro hac vice*)
Andrew J. Finn (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
nelless@sullcrom.com
finna@sullcrom.com

*Attorneys for Defendants Goldman Sachs & Co. LLC,*
*Morgan Stanley & Co. LLC, Barclays Capital Inc.*
*and Wells Fargo Securities, LLC*

iii

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................................1

STATEMENT OF FACTS ...............................................................................................................3

    A.    Root's Background ...........................................................................................3

    B.    Root's IPO & Registration Statement ..............................................................3

    C.    The Registration Statement Disclosed Root's Historical Customer Acquisition Costs ...........................................................................................4

    D.    The Registration Statement Disclosed Root's Plans for an Aggressive, Costly Nationwide Marketing Campaign That Would Raise Root's Customer Acquisition Costs in the Short Term ........................................................5

    E.    The Registration Statement Contained Forward-Looking Statements Disclosing That, Over the Long Term, Root Believed Its Customer Acquisition Costs Would Be Competitive ..........................................................6

    F.    The Registration Statement Cautioned Investors Against Relying on Forward-Looking Statements and Opinions and Disclosed Specific Risks Associated with Root's Customer Acquisition Costs ...............................7

    G.    Root's Roadshow ...........................................................................................8

    H.    Plaintiff's Claims ...........................................................................................9

ARGUMENT ..................................................................................................................................10

I.      STANDARD OF REVIEW ...........................................................................................10

II.    PLAINTIFF'S SECTION 11 CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION IN THE REGISTRATION STATEMENT .....12

    A.    Plaintiff's Claim that the Registration Statement Misstated or Omitted Material Information Regarding Root's Customer Acquisition Costs Fails as a Matter of Law ...........................................................................................13

          1.    The Registration Statement accurately disclosed Root's historical customer acquisition costs. ......................................................13

          2.    The Registration Statement disclosed that Root was engaging in a national marketing campaign that would invariably raise its customer acquisition costs in the short term and that its customer acquisition costs might remain elevated long term. ....................................17

          3.    The Registration Statement's forward-looking and opinion statements regarding Root's future customer acquisition cost goals are unactionable. ...........................................................................19

iv

      B.     Plaintiff's Claim that the Registration Statement Misstated or Omitted Material Information Regarding Root's Competitive Advantage in Customer Acquisition Costs Fails as a Matter of Law. ..........................................................27

**III.**    **PLAINTIFF'S SECTION 12 CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILED TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION** ....................................................................................................30

**IV.**    **PLAINTIFF'S SECTION 10(b) CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION AND FAILS ADEQUATELY TO ALLEGE SCIENTER** ...........................................................................................33

**V.**    **PLAINTIFF'S CONTROL-PERSON CLAIMS UNDER SECTION 15 OF THE SECURITIES ACT AND SECTION 20 OF THE EXCHANGE ACT SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE PREDICATE VIOLATIONS OF THE SECURITIES ACT OR EXCHANGE ACT** ...........................................................................................................36

**CONCLUSION** ................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985
(S.D. Ohio 2004)...................................................................................21, 33, 36

*Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993) ..........................................................36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................10

*Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461 (6th Cir. 2011).....................10, 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................10

*Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598 (6th Cir. 2005) ..............17, 30

*Bondali v. YumA Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015)...............................20

*Brennan v. Zafgen, Inc.*, 853 F.3d 606 (1st Cir. 2017) ...............................................35

*Callan v. Motricity Inc.*, 2013 WL 5492957 (W.D. Wash. Oct. 1, 2013) ...................18

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651
(6th Cir. 2005)................................................................................................26

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Tech. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)........................................................25, 29, 31

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811
(W.D. Mich. 2012)..........................................................................................13

*Doshi v. Gen. Cable Corp.*, 2015 WL 366644 (E.D. Ky. Jan. 27. 2015) ....................36

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393
(S.D.N.Y. 2018)..............................................................................................15

*Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011)....................................................36

*Garber v. Legg Mason, Inc.*, 347 F. App'x 665 (2d Cir. 2009)........................14, 16, 30

*Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y. 2018) ............27

*IBEW Loc. Union No. 58 Pension Tr. Fund v. Royal Bank of Scot. Grp.*,
783 F.3d 383 (2d Cir. 2015)............................................................................14

*IBEW v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609 (S.D. Ohio 2011) ............................26

*In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749 (E.D. Va. 2004) ............................................27

*In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214 (D.N.J. 2002) .....................................27, 29

*In re Downey Sec. Litig.*, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ........................................35

*In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254
    (M.D. Tenn. Nov. 19, 2019) ..........................................................................................26

*In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837 (S.D. Ohio 2016) ........................10

*In re Ford Motor Co. Sec. Litig.*, *Class Action*, 381 F.3d 563 (6th Cir. 2004).............................13

*In re Humana, Inc. Sec. Litig.*, 2009 WL 1767193 (W.D. Ky. June 23, 2009) ............................24

*In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951
    (S.D. Ohio 2009)...........................................................................................................36

*In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d. Cir. 2005).................................................24

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) .................................30

*In re Omnicare, Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014)............................................................12

*In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681 (M.D. Tenn. 2000) ....................................36

*In re Proshares Tr. II Sec. Litig.*, 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020)................................18

*In re ProShares Tr. Sec. Litig.*, 728 F.3d 96 (2d Cir. 2013) ........................................................21

*In re SCB Comput. Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334 (W.D. Tenn. 2001) ..................32

*In re Sofamor Danek Grp., Inc.*, 123 F.3d 394 (6th Cir. 1997) .....................................................13

*Ind. St. Dist. Council v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009)........................................33

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012)......................................................................22, 23

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third
    Bancorp.*, 731 F. Supp. 2d 689 (S.D. Ohio 2010) ....................................................11

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541 (4th Cir. 2017) ................................35

*Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
    22 F. Supp. 3d 669 (E.D. Ky. 2014) .......................................................................... *passim*

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Co.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018).......................................................................27, 29, 32

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..............................................................................25, 29, 31

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101
(W.D. Mich. 1996)..........................................................................................14

*Schoenhaut v. Am. Sensors, Inc.*, 986 F.Supp. 785 (S.D.N.Y. 1997) ...........................22

*Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387 (S.D.N.Y. 2014)...................................29

*Singh v. Schikan*, 106 F. Supp. 3d 439 (S.D.N.Y. 2015) .........................................21, 22

*Solow v. Citigroup, Inc.*, 2012 WL 1813277 (S.D.N.Y. May 18, 2012) ................................21, 29

*Stein v. U.S. Xpres Enters., Inc.*, 2020 WL 3584800 (E.D. Tenn. June 30, 2020) ............... *passim*

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148 (2008) ...........................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).........................33, 34

*Thomas v. Citigroup Glob. Mkts. Holdings Inc.*, 2022 WL 1051158
(S.D.N.Y. Mar. 1, 2022) ..............................................................................19

*Werbowsky v. Am. Waste Servs., Inc.*, 172 F.3d 51 (6th Cir. 1998) ............................16

*Y-GAR Capital LLC v. Credit Suisse Grp. AG*, 2020 WL 71163
(S.D.N.Y. Jan. 2, 2020)..............................................................................19

**Statutes & Rules**

15 U.S.C. § 77k..............................................................................................12

15 U.S.C. § 77*l*..........................................................................................30, 31

15 U.S.C. § 78u-4 ........................................................................................1, 34

## SUMMARY OF PRINCIPAL ARGUMENTS PURSUANT TO L.R. 7.2

Plaintiff alleges that Defendants violated the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") in connection with Root's initial public offering ("IPO").  Specifically, Plaintiff asserts that Root's Registration Statement and roadshow materials misdescribed Root's "customer acquisition costs", thereby giving rise to the following causes of action:  (i) violations of Section 11 of the Securities Act (against all Defendants); (ii) violations of Section 12(a)(2) of the Securities Act (against Root, Mr. Timm, Mr. Rosenthal and the Underwriter Defendants); (iii) violations of Section 15 of the Securities Act (against the Root Defendants); (iv) violations of Section 10(b) of the Exchange Act (against Root, Mr. Timm and Mr. Rosenthal); and (v) violations of Section 20(a) of the Exchange Act (against Mr. Timm and Mr. Rosenthal).

All of Plaintiff's claims fail as a matter of law and the Complaint should be dismissed in its entirety.  As a threshold matter, all of Plaintiff's claims are subject to the heightened pleading standards of Rule 9(b) because the allegations underlying Plaintiff's claims are based on a theory of fraud.  *See Stein v. U.S. Xpres Enters., Inc.*, 2020 WL 3584800, at *7-8 (E.D. Tenn. June 30, 2020).  Plaintiff's Exchange Act claims are additionally subject to the heightened pleading standards of the PSLRA, which requires Plaintiff to state with particularity the facts underlying its allegations of fraud.  *See Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) (citing 15 U.S.C. § 78u-4(b)(1)-(2)); *infra* pp. 11-12.

Plaintiff's Section 11 claim (Count I) should be dismissed because Plaintiff has failed to allege any actionable misstatement or omission in the Registration Statement for at least four reasons.

*First*, there is no dispute that the Registration Statement accurately disclosed Root's historical customer acquisition costs.  *See infra* pp. 13-17.  Plaintiff asserts that the

Registration Statement needed to disclose an updated September 2020 customer acquisition cost figure because it accurately disclosed Root's average customer acquisition costs between August 2018 and August 2020.  Plaintiff is incorrect.  It is well established that (i) there is no "duty to update" historically accurate financial information and (ii) a federal securities claim cannot be based on a company's accurate disclosure of historical data.  *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997); *IBEW Loc. Union No. 58 Pension Tr. Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 390 (2d Cir. 2015); *infra* pp. 13-17.

 *Second*, the Registration Statement accurately disclosed that Root was engaging in a national marketing campaign, which invariably would raise its customer acquisition costs in the short term, and that its customer acquisition costs might remain elevated in the long term. *See infra* pp. 22-25.  Thus, the Registration Statement disclosed precisely the information Plaintiff alleges was omitted; this is fatal to Plaintiff's Section 11 claim.  *See In re Proshares Tr. II Sec. Litig.*, 2020 WL 71007, at *7 (S.D.N.Y. Jan. 3, 2020); *infra* pp. 17-19.

 *Third*, the Registration Statement's prospective assessments about Root's customer acquisition costs in the long term are unactionable because:  (i) Plaintiff has failed to allege any facts suggesting that these statements were misleading, *see Singh v. Schikan*, 106 F. Supp. 3d 439, 449 (S.D.N.Y. 2015); *infra* pp. 20-23; (ii) they are protected under the bespeaks caution doctrine as forward-looking statements accompanied by meaningful cautionary language, *see Stein*, 2020 WL 3584800, at *9; *infra* pp. 23-25; (iii) they are protected as statements of opinion, *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 182-84 (2015); *infra* p. 25; and (iv) they are protected as statements of corporate optimism, *i.e.*, puffery, *see City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005); *infra* pp. 26-27.

*Fourth*, Plaintiff's allegation that the Registration Statement needed to disclose that Root purportedly no longer had a competitive advantage vis-à-vis its customer acquisition costs fails because Plaintiff failed to allege any facts suggesting that Root no longer had a competitive advantage at the time of the IPO. Furthermore, to the extent Plaintiff alleges that the Registration Statement should have predicted that Root lacked a competitive advantage in the future, that allegation also fails because the federal securities laws do not require companies to speculate on future negative results. *See Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1026 (S.D. Ohio 2004); *infra* pp. 25-27. Instead, the Registration Statement's forward-looking assessments about Root's cost advantage are unactionable under the bespeaks caution doctrine, as statements of opinion, and as puffery. *See infra* pp. 27-29.

Plaintiff's Section 12 claim (Count II) largely rests on the same alleged misstatements and omissions as with Plaintiff's Section 11 claim and, accordingly, should be dismissed for the same reasons outlined above. With respect to the allegations unique to Section 12—*i.e.*, that certain Defendants misled investors during Root's roadshow presentations—those allegations fail as a matter of law because they do not identify any actionable misstatement or omission. *See infra* pp. 30-32. Specifically, the statements made by Mr. Timm during Root's roadshow were not misleading. As Plaintiff concedes, Mr. Timm accurately disclosed to investors that Root experienced a "recent spike" in customer acquisition costs leading up to the IPO, and Mr. Timm accurately attributed that spike to the national marketing campaign similarly disclosed in the Registration Statement. *See infra* p. 31. Also, Mr. Timm stated his *belief* that Root could achieve competitive customer acquisition costs in the long term, and Plaintiff fails to allege any facts suggesting that statement was false or misleading. *See In re SCB Comput. Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 355

(W.D. Tenn. 2001).  In any case, Mr. Timm's beliefs about Root's long-term prospects are unactionable under the bespeaks caution doctrine, as statements of opinion statements, and as puffery.  *See infra* p. 32.

Plaintiff's Section 10(b) claim (Count IV) is based on the same alleged misstatements and omissions as Plaintiff's Section 11 and Section 12 claims and should be dismissed for the same reasons explained above.  *See infra* p. 33.  Plaintiff's Section 10(b) claim also fails for the independent reason that Plaintiff did not adequately allege scienter, a necessary element.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *infra* pp. 33-36.  Plaintiff's scienter allegations are no different from Plaintiff's insufficient misstatement allegations and, therefore, are deficient for the same reasons as Plaintiff's misstatement allegations are.  *See infra* p. 34.  Moreover, Plaintiff alleges no *facts*, as opposed to conclusions, suggestive of any Defendant's state of mind, let alone plausibly demonstrating culpable intent.  *See infra* pp. 34-36.  Plaintiff's reliance on the short period of time between the statements in the Registration Statement and the first post-IPO analyst reports that discussed Root's increased customer acquisition costs to attempt to suggest culpable intent fails as a matter of law because (i) those post-IPO analyst reports merely parroted what Defendants disclosed prior to the IPO and, in any case, (ii) Courts routinely reject such theories of "fraud by hindsight".  *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 959 (S.D. Ohio 2009); *infra* pp. 35-36.

Finally, because Plaintiff has failed to allege any predicate violation of the Securities Act or Exchange Act, Plaintiff's control-person claims under Section 15 of the Securities Act (Count III) and Section 20 of the Exchange Act (Count V) should be dismissed.  *See Frank v. Dana Corp.*, 646 F.3d 954, 962 (6th Cir. 2011); *infra* pp. 36-37.

## MEMORANDUM IN SUPPORT

Defendants respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4.

## PRELIMINARY STATEMENT

Root provides personal lines insurance, focused primarily on automobile insurance. Unlike traditional insurance companies, Root has a "mobile-first", data-driven business model that makes risk assessments, in part, based on complex behavioral data, including an individual's actual driving behavior. Root completed an IPO on October 28, 2020. In connection with the IPO, Root issued a Registration Statement ("RS") filed with the Securities & Exchange Commission ("SEC") and gave a series of "roadshow" presentations to potential investors. Plaintiff filed a series of securities law claims related to the IPO, each premised on the erroneous assertion that statements from the Registration Statement and/or roadshow regarding Root's marketing expenditures somehow materially misled investors as to Root's customer acquisition costs ("CAC"), *i.e.*, how much Root spends on sales and marketing to acquire each new customer.

Plaintiff's legal theories directly conflict with Plaintiff's own factual allegations and the very documents on which the Complaint relies. As Plaintiff's Complaint shows, Root accurately disclosed its historical customer acquisition costs. There can be no dispute on that point. Root also disclosed that it intended to increase marketing costs and had launched an aggressive national marketing campaign, which, Root explained, would require it to incur substantial near-term marketing expense—which, in turn, would raise Root's customer acquisition costs in the short term. That point, too, is beyond dispute. Customer acquisition cost is simply a fraction in which the numerator is marketing spend and the denominator is customers

1

acquired.  As such, by definition, aggressively raising marketing spend in an attempt to acquire new customers and create brand awareness necessarily raises customer acquisition costs in the short term.  Finally, Root expressed optimism and a "belief" that the Company would have competitive customer acquisition costs in the future, but did not guarantee any result.  Thus, any such statement was a forward-looking statement of Root's long-term business goals, which Root repeatedly warned were subject to myriad risks, including that Root "may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially".  (Ex. A to the Declaration of J. Weasley Earnhardt dated May 20, 2022 at 27 ("RS").)  The Company even warned investors that it had never turned a profit and may never do so.

Plaintiff fails to allege facts suggesting, let alone plausibly demonstrating, that Root's disclosures about its customer acquisitions costs were materially misleading.  To the contrary:  (i) all statements about past customer acquisition costs were demonstrably and indisputably true and (ii) the risk of rising customer acquisition costs in the future, due to Root's marketing efforts and otherwise, were well known and repeatedly disclosed in the Registration Statement itself.  Put simply, all of Plaintiff's claims fail because Plaintiff did not (and cannot) identify the bedrock element of any securities claim:  an actionable material misstatement or omission.

Plaintiff's Complaint is also fundamentally defective for three additional reasons:.

*First*, Root's statements about the competitive positioning of its future customer acquisition costs are unactionable as a matter of law.  Each is a forward-looking statement accompanied by meaningful cautionary language, a statement of opinion or, at best, a mere statement of corporate optimism.

*Second*, with respect to Plaintiff's fraud claims against the Company and

2

Messrs. Timm and Rosenthal, the Complaint does not allege particularized facts sufficient to plead a strong inference of scienter. Both the PSLRA and Federal Rule of Civil Procedure 9(b) require a showing of a strong inference of scienter as a matter of law. The Complaint makes no such showing.

*Third*, because Plaintiff has failed to allege a predicate violation of the federal securities laws, its claims under a "controlling person" theory of liability against Messrs. Timm and Rosenthal fail as a matter of law.

## STATEMENT OF FACTS

### A. Root's Background

Founded in 2015, Root is a technology and insurance company that takes an innovative approach to automobile insurance services. (*See* RS at 1, 14, F-42; AC, ECF No. 31 at 733, ¶¶ 43-44.) Unlike many traditional insurers, Root's business relies heavily on mobile devices. (RS at 1-4; AC, ECF No. 31 at 734, ¶¶ 47-48.) Customers can download Root's mobile app and grant Root permission to collect behavioral data from a customer's driving habits partially in order to determine risk and pricing. (RS at 1; AC, ECF No. 31 at 734, ¶ 47.) While traditional insurance companies typically group people into risk pools and rely on aggregated data, Root often measures risk at the individual level in an effort to more accurately predict risk, which promotes fairness to the consumer. (RS at 1-2, 116; AC, ECF No. 31 at 733, ¶ 45.)

### B. Root's IPO & Registration Statement

In 2020, Root became a publicly traded company. Root executed its IPO on October 28, 2020, when Root Class A common stock began trading on the NASDAQ. (AC, ECF No. 31 at 735, ¶ 60.) The Underwriter Defendants acted as underwriters for the IPO. (*Id.* at 732, ¶ 39.)

In connection with its IPO, Root filed a draft Registration Statement containing

Form S-1 and the accompanying prospectus on October 5, 2020.  (*Id.* at 734, ¶ 53.)  The SEC

declared the Registration Statement effective on October 27, 2020.  (*Id.* at 735, ¶¶ 54-57.)  On

October 29, 2020, Root filed a detailed final prospectus on SEC Form 424B4.[1]

(*Id.* at 735, ¶ 61; RS.)

### C.   The Registration Statement Disclosed Root's Historical Customer Acquisition Costs

Among many other disclosures about the nature of Root's business, the

Registration Statement noted that Root's mobile-focused data model had historically enabled

Root to achieve competitive customer acquisition costs compared to traditional direct and

insurance agent sales channels.  (RS at 6, 113, 120.)  Put simply, customer acquisition cost is the

sum of sales and marketing expenditure for a given period, divided by new customers acquired

for the same period.  (AC, ECF No. 31 at 737, ¶ 74.)  If a company increases its sales and/or

marketing costs in any given period, its customer acquisition cost in that period necessarily

increases, unless and until the company proportionately increases its customer base.  The

Registration Statement includes detailed financial information on sales and marketing expenses,

which had increased more than 35% in the first six months of 2020 compared to the same period

in 2019.  (RS at 19.)

Root's historical customer acquisition costs also are described throughout the

179-page Registration Statement.  In discussing Root's focus on the mobile sales channel, the

Registration Statement explained the Company's historical customer acquisition costs as follows:

- "Through our hyper-targeted, data-driven and ever-improving performance marketing capabilities, we have been able to acquire customers for below the average cost of doing so through each of the direct and agent-based channels."

---

[1] All references to the "Registration Statement" are to this final filing.

(*Id.* at 6, 113.)  In discussing Root's four mobile-based distribution channels, the Registration Statement stated:

- "We therefore designed a mobile-directed customer acquisition strategy, delivering customer acquisition costs below the average cost of doing so through each of the direct and agent channels."

- "The efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels.  While our customer acquisition costs can vary by channel mix, by state or due to seasonality, over the period from August 2018 to August 2020 our average customer acquisition cost was $332.  In the near term, as we expand our licensed footprint to 50 states, we will invest in our national brand, which will increase awareness, build credibility and support all four of our distribution channels."

(*Id.* at 120.)  Thus, Root disclosed its actual average customer acquisition cost of $332 for the two-year period of August 2018 to August 2020 for all of its sales channels (*id.*) and indicated that those costs were below average for that period as compared to traditional direct and agent sales channels.  Those statements were true; Plaintiff does not allege otherwise.

In the sentence immediately following the statement about Root's historical costs, the Registration Statement disclosed a short-term investment to build Root's national brand. (*See id.* ("In the near term, as we expand our licensed footprint to 50 states, we will invest in our national brand, which will increase awareness, build credibility and support all four of our distribution channels."); *infra* Section D.)  And the Registration Statement repeatedly noted that Root's "historical results are not necessarily indicative of the results that may be expected in the future".  (RS at 19, 74, 76.)

D.      **The Registration Statement Disclosed Root's Plans for an Aggressive, Costly Nationwide Marketing Campaign That Would Raise Root's Customer Acquisition Costs in the Short Term**

After accurately describing Root's historical customer acquisition costs, the Registration Statement disclosed that the Company had never turned a profit (and warned that it might never do so) and explained that expansion plans would raise Root's customer acquisition

costs in the near term.  (*Id.* at 22.)  The very first "risk factor" disclosed in the Registration

Statement is that the Company had "incurred net losses on an annual basis since our

incorporation in 2015" and that the Company "may not achieve or maintain profitability in future

periods".  (*Id.*)  The Company disclosed its intention to aggressively expand its presence

throughout the United States despite its historic lack of profitability.  Specifically, at the time of

the Registration Statement, Root was licensed to sell insurance in 36 states (AC, ECF No. 31

at 734, ¶ 49; RS at 2), and the Registration Statement noted that Root's "goal [was] to be

licensed in all 50 states by early 2021"—*i.e.*, just a few months later.  (RS at 2.)

That rapid expansion required significant short-term investment and marketing

expenditures.  The Registration Statement repeatedly disclosed those increased costs.  It

explained that, as part of Root's growth strategy, Root planned to "[g]row [its] national auto

insurance presence" by "continu[ing] to aggressively invest in domestic growth by becoming

active in more states while creating brand awareness through a national marketing campaign".

(*Id.* at 9.)  It further stated:  "[w]e intend to increase our presence in digital and traditional

channel media and launch a national advertising campaign to build our brand awareness."

(*Id.* at 83.)  It was not guaranteed that this marketing campaign would be effective.  The

Registration Statement disclosed:  Root's "ability to attract new customers" depended on a

number of factors, including "the effectiveness of [Root's] marketing efforts".  (*Id.*)

> **E.**     **The Registration Statement Contained Forward-Looking Statements**
> **Disclosing That, Over the Long Term, Root Believed Its Customer**
> **Acquisition Costs Would Be Competitive**

In the "Overview" section, the Registration Statement stated:  "Over time we

believe the ongoing data we accumulate through growth will fuel a pricing advantage for target

customers, driving improved conversion and a cost of acquisition advantage in all channels."

(*Id.* at 2, 106.)  Similarly, in a sentence immediately following disclosure of Root's near-term

marketing investment, the Registration Statement noted that Root continued to make certain investments in order to "support[] differentiated cost of customer acquisition over the long term". (*Id.* at 120.)  The Company never guaranteed that those hoped-for cost improvements would actually materialize.  To the contrary, the Company repeatedly warned that they might fail. (*See id.* at 22, 26-29, 83; *infra* Section F.)

> **F.** **The Registration Statement Cautioned Investors Against Relying on Forward-Looking Statements and Opinions and Disclosed Specific Risks Associated with Root's Customer Acquisition Costs**

The Registration Statement went on explicitly to identify Root's statements of belief about its future customer acquisition costs as forward-looking and opinion statements that are inherently uncertain and should not be relied upon by investors as predictive of future events. (*See generally id.* at 22-65.)  For instance, the Registration Statement identified as forward-looking statements Root's "expectations regarding [its] future financial performance, including . . . marketing costs" and Root's "ability to drive improved conversion and decrease the cost of customer acquisition".  (*Id.* at 64.)

The Registration Statement also specifically disclosed numerous risks associated with its cost structure and acquisition of new customers:

- "As we grow, we may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially." (*Id.* at 27.)

- "[W]e will incur additional expenses to support our growth".  (*Id.* at 22.)

- "We may lose existing customers or fail to acquire new customers." (*Id.*)

- "Our expansion into new markets may place us in unfamiliar competitive environments and involve various risks." (*Id.*)

- "Our business model and technology is also still nascent compared to the established business models of the well-established incumbents in the insurance market." (*Id.* at 25.)

7

- "[D]ue to other factors beyond our control, we may be unable to attract new customers rapidly and cost-effectively".  (*Id.* at 26.)

- "Our expansion within the United States and any future international expansion strategy will subject us to additional costs and risks".  (*Id.* at 28.)

- "Expansion into new markets in the United States and abroad will also require additional investments by us both in marketing and with respect to securing applicable regulatory approvals."  (*Id.* at 29.)

- "[O]ur ability to attract new customers and retain existing customers, including in a cost-effective manner" may "contribute to the variability of our quarterly and annual results".  (*Id.* at 31.)

\*       \*       \*       \*       \*

In sum, the Registration Statement (i) accurately disclosed Root's historical customer acquisition costs; (ii) cautioned investors that Root would be undertaking a nationwide marketing effort in the near term that would raise customer acquisition costs; (iii) stated that, *in the future*, Root believed it could achieve competitive customer acquisition costs; but that (iv) Root's hoped-for cost advantages might not come to fruition, and, instead, it "may lose existing customers or fail to acquire new customers" and "may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially."  (*Id.* at 22, 27.)

### G.    Root's Roadshow

In connection with the promotion of Root's IPO, Messrs. Timm and Rosenthal participated in a "roadshow" (*i.e.*, a series of meetings with prospective investors) in which they discussed Root's business.  (AC, ECF No. 31 at 729-30, 761, ¶¶ 24, 27, 168, 169.)  Consistent with the Registration Statement, Mr. Timm stressed Root's focus on "becoming a national brand".  (*Id.* at 750, ¶ 124.)  He explained that, as part of those efforts, Root was "experimenting" with "some brand campaigns".  (*Id.*)  He then noted that, while Root's "customer acquisition cost has maintained well below the direct average", making Root "competitive", there was a "recent spike" in customer acquisition costs arising "from some of

8

this experimentation on brand". (*Id.*) Thus, Mr. Timm disclosed that, in the period immediately leading up to the IPO, Root had experienced a spike in customer acquisition costs attributable to the national advertising campaign (just as Root had predicted in its Registration Statement).

Contrary to the insinuations in the Complaint, Mr. Timm did not describe the recent spikes as an anomaly or something that would immediately return to historical levels. Rather, Mr. Timm disclosed that Root is "constantly testing new marketing channels" and will "continue to do that short term". (*Id.*) As to the "long term", though, Mr. Timm expressed his future belief that Root would "have the ability to keep [its] customer acquisition costs much lower than its competitors". (*Id.*)

### H.    Plaintiff's Claims

Plaintiff filed the Complaint purportedly on behalf of itself and all other persons or entities who acquired Root Class A common stock from October 28, 2020, through August 12, 2021 (the "Class Period"). (*Id.* at 724, 728-29, ¶¶ 1, 22.) Plaintiff alleges violations of the Securities Act and the Exchange Act. (*Id.* at 724, ¶ 2.) Specifically, Plaintiff alleges: (i) violations of Section 11 of the Securities Act, against all Defendants, based on allegedly misleading statements about customer acquisition costs in the Registration Statement (Count I); (ii) violations of Section 12(a)(2) of the Securities Act, against Root, Mr. Timm, Mr. Rosenthal and the Underwriter Defendants, based also on the same allegedly misleading statements in the Registration Statement (Count II); (iii) violations of Section 15 of the Securities Act, against the Root Defendants (Count III); (iv) violations of Section 10(b) of the Exchange Act, against Root, Mr. Timm and Mr. Rosenthal (Count IV); and (v) violations of Section 20(a) of the Exchange Act, against Mr. Timm and Mr. Rosenthal (Count V). (*Id.* at 758-73, ¶¶ 153-222.) All claims are premised on purported pre-IPO misstatements and omissions concerning Root's customer acquisition costs.

9

## ARGUMENT

### I. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The pleading must contain more than mere "labels and conclusions". *Twombly*, 550 U.S. at 555. Only well-pleaded factual allegations must be accepted as true, and those factual allegations "must be enough to raise a right to relief above the speculative level". *Id.*

When considering a Rule 12(b)(6) motion to dismiss a complaint grounded in the Securities Act and Exchange Act, the Court "may consider the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment". *Stein*, 2020 WL 3584800, at *5 (quoting *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001)). More broadly, the Court "may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice". *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 850 (S.D. Ohio 2016), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017).

The PSLRA imposes additional, stringent, pleading requirements on Plaintiff's Exchange Act claims. Under the PSLRA, a plaintiff "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed". *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 469 (6th Cir. 2011) (quoting 15 U.S.C. § 78u-4(b)(1)). In addition, a plaintiff "shall, with respect to each act or omission alleged . . . , state with

10

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)) (alterations in original).

Securities claims involving allegations of fraud or mistake are further subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  Under Rule 9(b), the complaint "must state with particularity the circumstances constituting fraud or mistake".  Fed. R. Civ. P. 9(b).

Plaintiff tries to avoid the heightened pleading requirements of Rule 9(b) by disclaiming its allegations of fraud in connection with its Section 11, Section 12 and Section 15 claims.  But Plaintiff cannot have it both ways.  Because Plaintiff asserts that Defendants' actions were fraudulent, Rule 9(b) applies to all claims.  Stated differently, Plaintiff cannot allege that the same conduct, underlying both the Securities Act and Exchange Act claims, is simultaneously fraudulent and not fraudulent.  *See Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 709 (S.D. Ohio 2010) ("A blanket disavowal in the complaint that the claims do not allege fraud, however, is insufficient to rescue [plaintiffs] from the requirements of Rule 9(b).").

For example, in *Stein v. United States Xpres Enterprises, Inc.*, the Court held that the heightened pleading standards of Rule 9(b) applied to the plaintiffs' Section 11 claims despite the plaintiffs' express disclaimer that their Section 11 claims were not based in fraud.  2020 WL 3584800, at *7-8.  Because the complaint's "fulcrum" was that the defendants "intentionally concealed or misconstrued known [facts]", the Court determined that the plaintiffs' Section 11 claims were based on a fraud theory, and, thus, it applied the heightened pleading standard.  *Id.* at *8.

Here, similarly, because Plaintiff's "Securities Act claims rest on the same factual background . . . as the Exchange Act claims", and "the gravamen of the [amended] complaint is that Defendants knew" but misstated certain facts, Plaintiff's Section 11, 12 and 15 claims are based on a fraud theory and squarely subject to Rule 9(b)'s heightened pleading standards.

## II.     PLAINTIFF'S SECTION 11 CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION IN THE REGISTRATION STATEMENT

Count I of the Complaint, which is brought against all Defendants, alleges violations of Section 11 of the Securities Act.  The Court should dismiss Count I because Plaintiff fails to allege an actionable misstatement or omission.

Section 11 provides a cause of action to "any person acquiring [a] security when it is shown that any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading".  15 U.S.C. § 77k(a). An omission or misstatement is material if there is a substantial likelihood that a reasonable investor would have viewed the omitted or misrepresented fact as having "significantly altered the total mix of information available".  *In re Omnicare, Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997).

Plaintiff does not allege that any statement made in the Registration Statement was false, let alone materially so.  Rather, Plaintiff challenges two "topic[s]" discussed in the Registration Statement:  (i) "Root's customer acquisition costs"; and (ii) "Root's national advertising efforts".  (AC, ECF No. 31 at 745, 746, ¶¶ 107, 109.)  Plaintiff alleges that the Registration Statement should have disclosed:  (a) "that Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, thereby negatively impacting Root's operations and financial performance, because Root had substantially boosted

its marketing expenditures as part of the Company's expansion throughout the United States";
and (b) that "Root's elevated customer acquisition costs meant the Company possessed no
competitive advantage on this basis over traditional insurers, thereby negatively impacting
Root's financial operations and performance".  (*Id.* at 745, ¶ 107)[2]  The Registration Statement
was not misleading, and no additional disclosure was required for either category.

A.      **Plaintiff's Claim that the Registration Statement Misstated or Omitted
         Material Information Regarding Root's Customer Acquisition Costs Fails as
         a Matter of Law.**

The Registration Statement truthfully and fully disclosed the impact of Root's
nationwide marketing campaign on its customer acquisition costs.  A breakdown of the
"omission" alleged by Plaintiff reveals three components:  (i) "that Root's customer acquisition
costs had significantly increased *as of the IPO*"; (ii) that Root's customer acquisition costs
"would remain elevated *thereafter*" (*i.e.*, after the IPO); and (iii) that the reason for this increase
in customer acquisition costs was "because Root had substantially boosted its marketing
expenditures as part of the Company's expansion throughout the United States".  (*See, e.g.*, AC,
ECF No. 31 at 745, ¶ 107 (emphasis added)).  None of those qualifies as an actionable omission.

1.      The Registration Statement accurately disclosed Root's historical
         customer acquisition costs.

"It is clear that a violation of federal securities law cannot be premised upon a
company's disclosure of accurate historical data."  *In re Sofamor*, 123 F.3d at 401 n.3; *see also
In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) ("[T]he
disclosure of accurate historical data does not become misleading even if . . . [the company

---

[2] Plaintiff refers to these same two alleged omissions as alleged violations of disclosure
obligations under Item 303 of SEC Regulation S-K (AC, ECF No. 31 at 748, ¶ 118), Item 105 of
SEC Regulation S-K (*id.* at 749, ¶ 121) and Rule 408 of SEC Regulation C (*id.* at 749, ¶ 123).

might predict] less favorable results . . . in the future." (quoting *In re Sofamor*, 123 F.3d at

401 n.3); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 823

(W.D. Mich. 2012) ("[A]ccurately reported financial information is not rendered misleading by a

failure to disclose conditions that might render future results less favorable.").[3]

      Plaintiff asserts that Root was obligated to disclose that its marketing costs had

increased as of September 2020 because Root said in the Registration Statement that, ***between***

***August 2018 and August 2020***, its customer acquisition cost averaged $332, which was below

the average of the direct and agent channels over that time period.  (AC, ECF No. 31 at 744-45,

¶¶ 106-07; RS at 120.)  But that statement of historical fact indisputably was true.  It disclosed

what Root's customer acquisition cost actually was for a 24-month period.  No additional

information was needed to make this historical statement not misleading.  Plaintiff does not

allege otherwise.

      Because those statements referred only to costs in the past, there was no duty to

disclose any additional information.  "Making a historically accurate statement does not

fraudulently create the impression that such conditions will occur in the future."  *Picard Chem.*

*Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1117 (W.D. Mich. 1996).  For that

reason, there is no "duty to update" statements about the past, so long as those statements

"referred only to past events or conditions and did not imply anything about future

circumstances".  *IBEW Loc.*, 783 F.3d at 390.

---

[3] The "test for whether an alleged misstatement or omission is material under
section 12(a)(2) or section 11 is identical to that under section 10(b)".  *Garber v. Legg Mason,*
*Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32
(1988)).  For that reason, Defendants cite to Section 11, Section 12 and Section 10(b) cases
interchangeably in addressing Plaintiff's alleged material misstatements and omissions.

Those principles apply with particular force here because the Registration Statement specifically warned that Root's "historical results are not necessarily indicative of the results that may be expected in the future" (RS at 19), and that Root's customer acquisition costs "can vary . . . due to seasonality" (*id.* at 120).  In other words, Root made clear that disclosures concerning its historical customer acquisition costs did not imply anything about the future or present customer acquisition costs.  In fact, in the sentence immediately following the disclosure about Root's historical costs, the Registration Statement disclosed the anticipated ***increase*** in costs arising from its national marketing campaign.  (*Id.*)

Moreover, Plaintiff does not (and cannot) allege that a *one-month* increase in customer acquisition costs, during the month prior to the IPO, meant Root's *long-term average* customer acquisition costs had materially increased.  But that is the subject of the disclosure Plaintiff challenges.  As the Complaint demonstrates, Root's customer acquisition costs between August 2018 and August 2020 fluctuated significantly on a quarterly basis—for example jumping from $292 to $456 between the second and third quarter of 2019.  (AC, ECF No. 31 at 753, ¶ 133.)  The $332 figure was an "average".  There is no indication from the Complaint that Root's September 2020 increase in customer acquisition costs deviated from the typical cost fluctuations inherent in a long-term average calculation, which Root disclosed:  "our customer acquisition costs can vary by channel mix, by state or due to seasonality".  (RS at 12.)  Root's disclosure of its historical costs could not have been rendered misleading by the temporary September spike, *even if* Root had a duty to update the facts regarding the earlier period (which it had no duty to do).  *See DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 441-42 (S.D.N.Y. 2018) (explaining that company only had duty to disclose information insofar as the failure to disclose would render specific affirmative representations false or misleading).

Finally, Plaintiff's Section 11 claim fails for the additional and independent reason that the allegedly omitted information was in fact disclosed. Information is material to investors under the securities laws only if it would alter the "total mix" of information available; the total mix of information generally includes all information in the public domain. *See Werbowsky v. Am. Waste Servs., Inc.*, 172 F.3d 51, at *2 (6th Cir. 1998) (unpublished table decision) ("[r]easonable investors are presumed to have knowledge of the marketplace, including information available to the public"). In *Werbowsky*, for example, the Court held that information omitted from a prospectus regarding competitive restraints in the landfill industry would not have altered the "total mix" of information for a reasonable investor, and thus was not a material omission for purposes of Section 11, because information regarding competitors was publicly available. *Id.* at *3-4; *see also Garber*, 347 F. App'x at 668-69 (granting motion to dismiss Section 11 claim based on alleged omission of information from registration statement that was already in the public domain and reasonably available to investors).

Here, Plaintiff claims that the Registration Statement did not disclose the temporary customer acquisition cost spike in the days and weeks before the IPO, but, at the same time, Plaintiff acknowledges that Mr. Timm made statements during Root's roadshow explicitly acknowledging that very spike. The Complaint quotes Mr. Timm discussing Root's customer acquisition costs, stating: "You see the recent spike? That is from some of this experimentation on brand that you see over here on the left side of the page." (AC, ECF No. 31 at 750, ¶ 124.) In other words, like the publicly available information in *Werbowsky*, investors here were already aware of Root's recent spike because Mr. Timm disclosed it as part of Root's roadshow. (*See id.* at 750, ¶ 124 ("In the roadshow that occurred *before the IPO*" (emphasis added)).)

16

For the above reasons, Plaintiff's Section 11 claim that the Registration Statement misled investors by disclosing Root's historical customer acquisition costs for August 2018 to August 2020 fails as a matter of law.

> 2. The Registration Statement disclosed that Root was engaging in a national marketing campaign that would invariably raise its customer acquisition costs in the short term and that its customer acquisition costs might remain elevated long term.

Plaintiff asserts that the Registration Statement failed to disclose "that Root's customer acquisition costs . . . would remain elevated thereafter [the IPO] . . . because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States". (*Id.* at 745, ¶ 107.) But Root did disclose—in the Registration Statement itself—that its marketing costs had increased significantly in the first six months of 2020 and would increase in the short term because of a national marketing campaign. (*See, e.g.*, RS at 9, 19, 83.) The Registration Statement also disclosed that Root would be "increas[ing] [its] presence in digital and traditional channel media". (*Id.* at 83.)

Increasing marketing spend by launching a new nationwide marketing campaign and increasing investment in digital and traditional channels necessarily would increase customer acquisition costs in the near term. It is simple math, which reasonable investors understand. *See, e.g.*, *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 608 (6th Cir. 2005) ("The information needed to compare the relative merits of these three class shares is presented in easily-read tables and straightforward narratives describing those tables."); *see also id.* (noting that while omissions complained of by plaintiff "*might* have facilitated an investor's task" in assessing the disclosed information, the omissions were not material because plaintiff's proposed disclosures "are merely interpretations drawn from the facts presented in the prospectuses, and do not actually provide new information"). Indeed, as the Complaint itself notes, customer

17

acquisition cost is "commonly understood to be calculated" as the sum of "sales and marketing expenditures" divided by new customers acquired. (AC, ECF No. 31 at 737, ¶ 74.) Increasing marketing expenditures in one period, thus, necessarily increases the immediate customer acquisition costs unless and until the sum of new customers acquired catches up to the increase in marketing expenditures.[4] Analysts even explicitly recognized this phenomenon in their coverage of Root's customer acquisition costs. For example, in the March 9, 2021, BofA Securities report cited in the Complaint, an analyst noted his expectation that Root's customer acquisition costs "might ramp up in the next few quarters . . . as the new customers from the 2021 sales and marketing spend will likely lag the spending". (AC, ECF No. 31 at 755-56, ¶ 139.)

Accordingly, to the extent Plaintiff alleges that the Registration Statement needed to disclose that Root's customer acquisition costs would, in the near term following the IPO, "remain elevated thereafter", the Registration Statement did so. (*See* RS at 9, 19, 83.) Thus, "[t]he Registration Statement discloses the primary omission alleged by plaintiffs", which renders it nonactionable. *In re Proshares Tr. II Sec. Litig.*, 2020 WL 71007, at *7 (S.D.N.Y. Jan. 3, 2020); *see also Callan v. Motricity Inc.*, 2013 WL 5492957, at *3 (W.D. Wash. Oct. 1, 2013) (dismissing Section 11 claim where registration statement "clearly spell[ed] out the information that plaintiffs claimed was omitted").

To the extent Plaintiff alleges that the Registration Statement should have disclosed the risk that customer acquisition costs would remain elevated over the long term—

---

[4] For these same reasons, the Registration Statement's disclosures complied with disclosure obligations imposed by the SEC. *See* Item 303 of Regulation S-K (requiring issuers to disclose "matters that would have an impact on future operations"—*i.e.*, Root's marketing campaign); Item 105 of Regulation S-K (requiring disclosures of risks—*i.e.*, increased costs); Rule 408 of SEC Regulation C (requiring disclosure of any fact that makes a statement not misleading).

because, for example, the increased marketing spend may not result in the expected uptick in customers—that also fails because that risk, too, was disclosed. The Registration Statement disclosed that Root "may lose existing customers or fail to acquire new customers" and that, "[a]s [Root] grow[s], [it] may struggle to maintain cost-effective marketing strategies, and [its] customer acquisition costs could rise substantially". (RS at 22, 27; *id.* at 83 (Root's "ability to attract new customers" depends on "the effectiveness of [Root's] marketing efforts").)

Plaintiff cannot sustain an omission claim when the purportedly omitted information in fact was disclosed. *See, e.g.*, *Thomas v. Citigroup Glob. Mkts. Holdings Inc.*, 2022 WL 1051158, at *14-15 (S.D.N.Y. Mar. 1, 2022) (rejecting a Section 11 claim based on alleged misleading statement about future expected prices because the document warned of risks related to price fluctuation); *Y-GAR Capital LLC v. Credit Suisse Grp. AG*, 2020 WL 71163, at *4 (S.D.N.Y. Jan. 2, 2020) ("There cannot be a material misstatement or omission if [a] defendant's statements explicitly disclosed the very . . . risks about which [the] plaintiff claims to have been misled."). Accordingly, Plaintiff's allegation that Defendants violated Section 11 because the Registration Statement failed to disclose that Root's national marketing campaign would result in elevated customer acquisition costs fails as a matter of law.

3.  The Registration Statement's forward-looking and opinion statements regarding Root's future customer acquisition cost goals are unactionable.

Finally, Plaintiff's Section 11 allegations challenging Root's long-term, prospective assessments about customer acquisition costs are particularly deficient. (*See, e.g.*, AC, ECF No. 31 at 744-45, ¶ 106 (challenging statement that, "[o]ver time", Root expected a "cost of acquisition advantage in all channels").) Those prospective statements are unactionable for several reasons: (i) Plaintiff has not sufficiently alleged that any of them is misleading; (ii) each is a forward-looking statement accompanied by meaningful cautionary language;

(iii) each is a nonactionable opinion; and (iv) each is a statement of corporate optimism, *i.e.*, "puffery".

(a)   <u>The challenged statements were not misleading.</u>

Plaintiff fails to allege facts showing that the Registration Statement made a material misstatement or omission regarding Root's "cost advantage" and "differentiation" in its customer acquisition costs over the long term.

*First*, Plaintiff failed to allege that any long-term increase in customer acquisition costs actually materialized. The most recent allegation regarding Root's customer acquisition costs in the Complaint comes from an August 12, 2021, shareholder letter. (AC, ECF No. 31 at 756, ¶¶ 141-43.) But all that Plaintiff alleges about this shareholder letter is that it stated Root's intention to "reduce" and "driv[e] scalable" customer acquisition costs. (*Id.*) Plaintiff alleges nothing to say that Root's customer acquisition costs, at that time, were elevated above the national average of other channels, or were otherwise materially greater than investors expected. The preceding event cited in the Complaint—a March 9, 2021, BofA Securities analyst report— fares no better. (*Id.* at 755, ¶¶ 138-39.) Plaintiff's allegations regarding that report pertain to Root's customer acquisition costs in *2019 and 2020—i.e.*, extending no later than just a few months following the IPO. (*Id.*) And that analyst report indicated that it expected Root's costs to "ramp up in the next few quarters" as Root engaged in the "marketing spend" that was disclosed in the Registration Statement. (*Id.*) Thus, Plaintiff has not alleged any facts suggesting that Root's customer acquisition costs remained elevated above the national average, and certainly has not alleged any such facts with the particularity required by Rule 9(b), which is fatal to its misrepresentation claim. *See Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (rejecting allegations of materially misleading statements/omissions because "plaintiffs have not alleged facts showing any investment risk had already materialized").

20

Even if Plaintiff had alleged that predicate fact, its claim still would fail as a matter of law because the Registration Statement, again, disclosed precisely that risk.  It states: "[a]s we grow, we may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially."  (RS at 27.)  "[W]hen a registration statement warns of the exact risk that later materialized, a section 11 claim will not lie as a matter of law."  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013).

*Second*, in making disclosures to investors, a company is "not obligated to characterize its performance or future outlook in negative terms, speculate on future negative results or paint themselves in the most unflattering light possible".  *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012), *aff'd*, 507 F. App'x 81 (2d Cir. 2013). Rather, "[a]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects".  *Albert Fadem*, 334 F. Supp. 2d at 1026 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

In *Singh v. Schikan*, for example, the plaintiff alleged that a drug company misled investors in its registration statement by presenting an optimistic outlook about a drug's development, despite alleged flaws in the drug's clinical study, which ultimately failed. 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015).  The Court rejected plaintiff's arguments, holding that, "[i]n the absence of data establishing" that the clinical study would fail, "defendants were not required to predict negative results or to hypothesize its failure".  *Id.* at 449.  The Court went on to add that "[t]he conclusion that defendants were not required to posit that their study might fail is all the more appropriate where, as here, such speculation would have been based solely on facts disclosed in the Registration Statement".  *Id.*

21

So too here. Plaintiff fails to allege any facts establishing that, as of the dates of the challenged statements, Root had a reason to believe that its customer acquisition costs would be elevated in the long term compared to the previous two years. Any such negative "speculation [about Root's long-term customer acquisition costs] would have been based solely on facts disclosed in the Registration Statement", *id.*, namely, the disclosures that Root was engaging in an expensive nationwide marketing campaign, and that Root's "ability to attract new customers" and, in turn, reduce its customer acquisition costs, depended on "the effectiveness of [Root's] marketing efforts". (RS at 83.) Thus, as in *Singh*, Plaintiff failed to allege that Root had any reason to make the negative prediction Plaintiff complains was omitted, and, as in *Singh*, Root nonetheless did warn investors of that very risk. *See Singh*, 106 F. Supp. 3d at 449; *Schoenhaut v. Am. Sensors, Inc.*, 986 F.Supp. 785, 792 n.10 (S.D.N.Y. 1997) (dismissing Section 11 claim where "[t]here is no allegation that any defendant actually expected that sales . . . would decline following the offering" and "the Complaint merely alleges that the Prospectus failed to predict that the Company's future prospects were not going to be as bright as its past").

Plaintiff also points to the fact that Root entered into a partnership with Carvana in August 2021, allegedly in order to drive more scalable customer acquisition costs. (AC, ECF No. 31 at 743, ¶ 100.) That allegation fails because an action in August 2021 cannot demonstrate that statements made nearly a year earlier were misleading; rather, this allegation is an attempt to plead falsity by hindsight. In *Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*, the Court dismissed Sections 11 and 12(a)(2) claims related to the defendants' exposure in connection with the subprime mortgage crisis. 902 F. Supp. 2d 329, 345 (S.D.N.Y. 2012). With regard to the defendants' subprime exposure, the Court held that, "[w]ith the benefit of hindsight, Plaintiffs cannot establish falsity by simply pointing to the credit crisis

and making conclusory allegations that because [the defendant] ultimately was forced to take $11 billion in credit market write-downs, its earlier statements about portfolio risk were necessarily false". *Id.* Plaintiff's reliance on the Carvana partnership is unavailing for similar reasons. The fact that Root, almost a year after the IPO, entered into a partnership allegedly in order to reduce its customer acquisition costs does not make "its earlier statements about [customer acquisition costs] necessarily false". *Id.*

Because the statements about Root's prospective advantages in customer acquisition costs were not materially misleading in any way, those statements are unactionable. More broadly, because none of the statements regarding Root's customer acquisition costs were materially misleading, Plaintiff's Section 11 claim fails as a matter of law.

> (b) <u>The challenged statements are unactionable as forward-looking statements accompanied by meaningful cautionary language.</u>

In addition to being unactionable because they were not materially misleading, the statements regarding Root's future customer acquisition costs are unactionable because each was a forward-looking statement accompanied by meaningful cautionary language.

Alleged misrepresentations are unactionable under Section 11 if the bespeaks caution doctrine applies. *See Stein*, 2020 WL 3584800, at *9. Bespeaks caution applies when "cautionary language" accompanies "forward-looking, prospective representations", thereby informing investors that a company's predictions about the future might not come to fruition. *Id.* (quoting *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004)). Put differently, alleged misrepresentations about future events are "immaterial as a matter of law" where no reasonable investor "could consider them important in light of [the] adequate cautionary

language set out in the same offering". *Id.* (quoting *Albert Fadem*, 334 F. Supp. 2d at 1022).[5]

      Root's Registration Statement explicitly identified as forward-looking statements both categories of statements challenged by Plaintiff:  statements concerning (i) Root's customer acquisition costs and (ii) Root's future marketing costs.  (*See* RS at 64 (identifying as forward-looking statements "our expectations regarding our future financial performance, including . . . marketing costs" and "our ability to drive improved conversion and decrease the cost of customer acquisition").)  Each of those forward-looking statements was accompanied by specific, robust, and meaningful cautionary warnings.

      For example, the Registration Statement warned investors that "[y]ou should not rely on forward-looking statements as predictions of future events" and further stated that Root "may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially." (*Id.* at 27, 65.)  Those warnings are meaningfully cautionary because they convey "substantive information about factors that could realistically cause results to differ materially from those projected in the forward-looking statements".  *In re Humana, Inc. Sec. Litig.*, 2009 WL 1767193, at *12 (W.D. Ky. June 23, 2009) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001)).  Indeed, in one recent case, the Court found cautionary language stating that a company "cannot guarantee that [a given policy] will be effective or cost-efficient", and that its forward-looking assessments depended on the company's "ability to continue to develop or acquire new products, services and solutions", to be sufficiently

---

[5] While the PSLRA's safe harbor for forward-looking statements does not apply to statements made in connection with an IPO, *see In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d. Cir. 2005), the common-law bespeaks caution doctrine mirrors the PSLRA safe harbor and does apply to statements related to an IPO, *see Stein*, 2020 WL 3584800, at *14.

meaningful under the bespeaks caution doctrine.  *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Tech. Corp.*, 450 F. Supp. 3d 379, 398-99 (S.D.N.Y. 2020).  Those statements are very similar to the Registration Statement's disclosures that Root "may struggle to maintain cost-effective marketing strategies" (RS at 27), and that its "ability to attract new customers" depended on "the effectiveness of [Root's] marketing efforts" (*id.* at 83).  Thus, under the bespeaks caution doctrine, the disclosures Plaintiff challenges are unactionable.

    (c)  <u>The challenged statements are unactionable statements of opinion.</u>

    Honestly held statements of opinion typically are unactionable under Section 11. *Stein*, 2020 WL 3584800, at \*10 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 182-84 (2015)).  "[A] statement of fact . . . expresses certainty about a thing, whereas a statement of opinion . . . does not."  *Omnicare*, 575 U.S. at 183.

    The challenged statements regarding Root's future competitiveness and hoped-for long-term customer acquisition cost goals are unactionable opinions.  The Registration Statement did not express any "certainty" about Root's future customer acquisition costs.  *Id.*  Rather, the Registration Statement explicitly identified Root's views about its customer acquisition costs as a *belief*, rather than a projected fact.  (*See, e.g.*, RS at 106 ("Over time we *believe* the ongoing data we accumulate through growth will fuel a pricing advantage for target customers, driving improved conversion and a cost of acquisition advantage in all channels." (emphasis added)).)  Even if Root's expectation of competitive customer acquisition costs in the long term did not materialize (which is not the case), "[a] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong".  *Omnicare*, 575 U.S. at 186.

       (d)    <u>The challenged statements are unactionable as statements of puffery.</u>

In addition to being protected under the bespeaks caution doctrine and as a statement of opinion, the Registration Statement's assessments of Root's long-term customer acquisition costs are protected as statements of corporate optimism, also known as puffery. "[C]ourts have consistently found immaterial a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *IBEW v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 632 (S.D. Ohio 2011) (quotation marks omitted).  In particular, "[v]ague predictions of positive future results cannot engender reasonable reliance by investors". *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *9 (M.D. Tenn. Nov. 19, 2019) (citing *Ind. St. Dist. Council v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009)); *see also Stein*, 2020 WL 3584800, at *10 (applying this rule in the Section 11 context).

Root's statement that it expected its marketing expenditures to support a "differentiated cost of customer acquisition over the long term", and its statement that, "over time" it expected a "cost of acquisition advantage", were "loosely optimistic statements insufficiently specific for a reasonable investor to 'find them important to the total mix of information available'". *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (quoting *In re Ford*, 381 F.3d at 570-71).  Root's statements regarding "advantages" and "differentiation" in Root's customer acquisition costs are "too squishy, too untethered to anything measurable".  *Id.*

In fact, courts routinely hold virtually identical statements to be unactionable puffery. *E.g.*, *Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014) (statement that company "strengthened [its] competitiveness]" is puffery); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (statement that nature of company's business gave it "competitive advantages" was puffery); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Co.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (company's belief in its "competitive advantage" was puffery); *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 768 (E.D. Va. 2004) (same); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 232 (D.N.J. 2002) (characterizing defendants' statement that new business relationship "will . . . driv[e] [their] top line growth and increas[e] margins by lowering [their] customer acquisition costs" as "puffery").

Because none of the statements regarding customer acquisition costs challenged by Plaintiff in connection with its Section 11 claim were in any way misleading (AC, ECF No. 31 at 744-51, ¶¶ 105-23), and because the prospective assessments about Root's customer acquisition costs are separately unactionable as forward-looking statements accompanied by meaningful cautionary language, statements of opinion and statements of puffery, Plaintiff's Section 11 claim fails as a matter of law.

## B. Plaintiff's Claim that the Registration Statement Misstated or Omitted Material Information Regarding Root's Competitive Advantage in Customer Acquisition Costs Fails as a Matter of Law.

Plaintiff separately alleges that the Registration Statement misled investors by failing to disclose that "Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers". (AC, ECF No. 31 at 745, 748, 751-52, ¶¶ 107, 118, 121, 123, 126, 128-29.) But Plaintiff's allegation regarding Root's "competitive advantage" is one and the same as Plaintiff's allegation related to customer

27

acquisition costs (discussed above).  (*Compare id.* at 745, ¶ 107 (alleging that the Registration Statement should have disclosed "that Root's customer acquisition costs had significantly increased as of the IPO, and would remain elevated thereafter, thereby negatively impacting Root's operations and financial performance, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States") *with id.* (alleging that the Registration Statement should have disclosed that "Root's elevated customer acquisition costs meant the Company possessed no competitive advantage on this basis over traditional insurers, thereby negatively impacting Root's financial operations and performance").)  Plaintiff's second purported omission does not allege anything new.

To the extent Plaintiff seeks to allege a discrete misstatement based on Root's "competitive advantage" disclosures, it would also fail because Root's customer acquisition cost disclosures were not misleading, *see supra* Section II.A, and for two additional reasons:

*First*, Plaintiff fails to allege any facts suggesting that Root did not have a competitive advantage in customer acquisition costs *as compared to other channels*.  The only purported basis for Plaintiff's allegation is that Root experienced a short-term increase *in its own* customer acquisition costs directly attributable to a disclosed marketing campaign.  But there is no indication in the Complaint that an increase in costs eliminated Root's advantage as compared to other channels.  In fact, there is no allegation about the costs associated with those other channels at all.

For instance, Plaintiff fails to allege that the rest of the automobile insurance industry's average customer acquisition costs likewise did *not* rise together with Root's spike in customer acquisition costs.  Ups and downs in Root's costs, considered in a vacuum, cannot establish that Root's customer acquisition costs through its channels were no longer

"a comparative advantage" vis-à-vis other channels in the industry.  This is especially true where the Registration Statement disclosed that Root's customer acquisition costs "can vary by channel mix, by state or due to seasonality".  (RS at 120.)

*Second*, to the extent Plaintiff alleges that the Registration Statement misled investors about Root's *future* competitive advantage in customer acquisition costs, Plaintiff fails to allege facts showing that Root's future predictions were incorrect or that Root should have made a differing prediction.  The fact that Root's own short-term customer acquisition costs rose does not mean that Root could not, in the long-term, maintain competitively low customer acquisition costs.  As noted above, a company is "not obligated to characterize its performance or future outlook in negative terms, speculate on future negative results or paint themselves in the most unflattering light possible".  *Solow*, 2012 WL 1813277, at *4.  Rather, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautio[u]s picture of current performance and future prospects".  *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 395 (S.D.N.Y. 2014).

Finally, for the same reasons explained above with respect to Plaintiff's first alleged category of omission, prospective assessments about competitive advantage are unactionable as forward-looking statements, statements of opinion, and statements of puffery.  *See, e.g.*, *City of Omaha Police*, 450 F. Supp. 3d at 398-99 (forward-looking statements); *Omnicare*, 575 U.S. at 186 (opinion); *Norfolk*, 22 F. Supp. 3d at 684 (puffery).  Again, Courts dismiss precisely this type of statement as puffery.  *See, e.g.*, *Okla. Firefighters*, 300 F. Supp. 3d at 569 (company's belief in its "competitive advantage" was puffery); *In re Cybershop.com*, 189 F. Supp. 2d at 232 (statement that new business relationship "will . . . driv[e] [their] top line growth and increas[e] margins by lowering [their] customer acquisition costs" is "puffery").

29

**III.     PLAINTIFF'S SECTION 12 CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILED TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION**

Plaintiff's Section 12 claim (Count II) is identical to its Section 11 claim (Count I) (*id.* at 744-49, ¶¶ 105-23), except that Plaintiff's Section 12 claim additionally relies upon statements made in connection with Root's roadshow (*id.* at 750-52, ¶¶ 124-29).  Plaintiff's Section 12 claim, like the Section 11 claim, fails as a matter of law.

Section 11 and 12(a)(2) are "Securities Act siblings" with "roughly parallel elements".  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  To state a Section 12(a)(2) claim, a plaintiff must establish that (i) the defendant is a "seller" as defined by Section 12; (ii) the sale was effectuated by means of a prospectus or oral communication; and (iii) the prospectus or oral communication included an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.  15 U.S.C. § 77*l*(a)(2).  The test for whether a statement is materially misleading under Section 12(a)(2) is identical to that under Sections 10(b) and 11:  whether representations, viewed as a whole, would have misled a reasonable investor.  *See Benzon*, 420 F.3d at 609 ("Materiality depends on the significance the reasonable investor would place on the withheld . . . information. . . .  [T]he critical question is whether they would have 'significantly altered the total mix of information made available.'"); *Garber*, 347 F. App'x at 668.

Plaintiff's Section 12(a)(2) claim regarding alleged misstatements or omissions in the Registration Statement should be dismissed for the same reasons explained with respect to Plaintiff's Section 11 claim.  In particular, as explained with respect to Plaintiff's Section 11 claim, Plaintiff failed to allege any actionable misstatements or omissions about customer acquisition costs in the Registration Statement and, thus, failed to allege the key element of a

Section 12 claim:  a material misstatement or omission.  15 U.S.C. § 77*l*(a)(2).

      The one set of statements unique to Section 12(a)(2) is those made during Root's roadshow regarding Root's "recent spike" in customer acquisition costs—and it applies only to Mr. Timm.  (AC, ECF No. 31 at 750, 751, ¶¶ 124, 127.)  As with the statements in the Registration Statement, the statements in the roadshow did not contain any material misstatements or omissions, and they are otherwise protected as forward-looking statements, statements of opinion and statements of puffery.  *See, e.g.*, *City of Omaha Police*, 450 F. Supp. 3d at 398-99 (forward-looking statements); *Omnicare*, 575 U.S. at 186 (opinion); *Norfolk*, 22 F. Supp. 3d at 684 (puffery).

      As the Complaint notes, Mr. Timm accurately disclosed to investors during the roadshow that Root experienced a "recent spike" in customer acquisition costs.[6]  (AC, ECF No. 31 at 750, ¶ 124.)  And, according to the Complaint, Mr. Timm directly attributed the increase in costs to "experimentation on brand" in connection with "becoming a national brand"—*i.e.*, Root's national brand marketing campaign plans.  (*Id.*)

      Plaintiff asserts that Mr. Timm's statements were false because the increases "were not caused by marketing experimentation, but instead were caused by a sustained increase in marketing expenditures as part of the Company's expansion throughout the United States".  (*Id.* at 750, ¶ 125.)  But Mr. Timm made clear that the costs were associated with Root's "becoming a national brand".[7]  (*Id.* at 750, ¶ 124.)  Thus, Mr. Timm did not misstate anything.

---

[6] The Complaint's allegations, in conclusory fashion, go beyond the language quoted from Mr. Timm's comments:  whereas Mr. Timm referred merely to a "recent spike" in customer acquisition costs, Plaintiff, without any specificity or explanation, claims that Mr. Timm characterized this spike as being "far in excess of the amount incurred by the average traditional insurer".  (AC, ECF No. 31 at 741, 750, ¶¶ 92, 124.)

[7] Throughout the Registration Statement, Root made clear that its national marketing plan could materially increase costs.  (*See, e.g.*, RS at 22 ("[W]e will incur additional expenses to

Plaintiff tries to save its allegations by pointing to Mr. Timm's next statement that "we believe -- and we've seen long term -- that we do have the ability to keep our customer acquisition costs much lower than our competitors". (*Id.* at 751, ¶ 127.)  But, as explained above with respect to the Registration Statement, it is not an actionable misstatement or omission for Mr. Timm to state his current belief regarding Root's ability to maintain a long-term competitive advantage in its customer acquisition costs.  Plaintiff alleges no facts to suggest that Mr. Timm did not believe the opinion he expressed when he expressed it.  *See In re SCB Comput. Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 355 (W.D. Tenn. 2001) ("[C]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." (quoting *Novak*, 216 F.3d at 309)).

Moreover, as explained above, Mr. Timm's statements about competitive advantages are well-established statements of puffery and, thus, are unactionable as a matter of law.  *See, e.g.*, *Norfolk*, 22 F. Supp. 3d at 684; *Okla. Firefighters*, 300 F.Supp. 3d at 569.

For these reasons, Plaintiff's Section 12 claim fails as a matter of law.

---

support our growth"); *id.* at 27 ("As we grow, we may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially."); *id.* at 28 ("Our expansion within the United States and any future international expansion strategy will subject us to additional costs and risks"); *id.* at 29 ("Expansion into new markets in the United States and abroad will also require additional investments by us both in marketing and with respect to securing applicable regulatory approvals.").)

**IV.** **PLAINTIFF'S SECTION 10(b) CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION AND FAILS ADEQUATELY TO ALLEGE SCIENTER**

In addition to alleging violations of Sections 11 and 12 of the Securities Act (Counts I and II), Plaintiff alleges violations of Section 10(b) of the Exchange Act against Root, Mr. Timm and Mr. Rosenthal (Count IV). Plaintiff's 10(b) claim also fails as a matter of law.

Section 10(b) and Rule 10b-5 prohibit fraudulent, material misstatements in connection with the sale or purchase of securities. *Ind. St. Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund*, 583 F.3d 935, 942 (6th Cir. 2009). To state a claim for violation of Section 10(b) and Rule 10b-5, a plaintiff must allege: (i) a material misrepresentation or omission by the defendant; (ii) scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

Because Plaintiff relies on the same alleged misstatements and omissions for its Section 10(b) claim as for its Sections 11 and 12 claims, Plaintiff's Section 10(b) claim should be dismissed for the same reasons explained above as to Plaintiff's Sections 11 and 12 claims, namely that Plaintiff fails to allege an actionable misstatement or omission concerning customer acquisitions costs and, thus, fails to plead the first element of a Section 10(b) claim. *See, e.g.*, *Albert Fadem*, 334 F. Supp. 2d at 1019 (explaining that the test for materially misleading statements or omissions is the same under Section 10(b) as under Section 11).

Plaintiff's Section 10(b) and Rule 10b-5 claims also fail because Plaintiff does not sufficiently plead scienter. In determining the sufficiency of a plaintiff's scienter allegations, the Sixth Circuit applies the three-part test set forth in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). *First*, the Court must "accept all factual allegations in the complaint as

true". 551 U.S. at 322. *Second*, the Court "must consider the complaint in its entirety" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter". *Id. Third*, the Court "must take into account plausible opposing inferences". *Id.* With respect to this third inquiry, Courts specifically consider whether "a reasonable person would deem the inference of scienter cogent and at least *as compelling as any opposing inference* one could draw from the facts alleged". *Id.* (emphasis added); *see also* 15 U.S.C. § 78u-4(b)(2) (requiring a complaint to "state with particularity facts giving rise to a *strong inference* that the defendant acted with [scienter]").

Plaintiff's scienter allegations, similar to its Section 11 and 12 allegations, reduce to the following: (a) Messrs. Timm and Rosenthal were aware of Root's customer acquisition costs leading up to the IPO; and (b) Messrs. Timm and Rosenthal knowingly, or with reckless disregard, failed to disclose two so-called omissions: (i) that Root had and would continue to increase its marketing expenditures as part of Root's national expansion, thus causing increased customer acquisition costs; and (ii) Root did not possess any meaningful competitive advantage over traditional insurers in terms of customer acquisition costs before or after the IPO. (AC, ECF No. 31 at 764-66, ¶¶ 188-91.)

But those allegations are no different from Plaintiff's misstatement allegations, paired with the threadbare assertion that Messrs. Timm and Rosenthal "knew" that the purported statements were misleading. The scienter allegations are, thus, deficient for the same reasons as the misstatement allegations—the challenged statements were true and the allegedly omitted information was, in fact, disclosed.

Moreover, Plaintiff alleges no ***facts***, as opposed to conclusions, even suggestive of Mr. Timm's or Mr. Rosenthal's state of mind, let alone plausibly demonstrating culpable

intent.  That failure is an independent reason to dismiss Plaintiff's Section 10(b) and Rule 10b-5 claims.  "The key question . . . is not whether defendants had knowledge of certain undisclosed facts, but rather whether the defendants knew or should have known that their failure to disclose those facts' risked misleading investors."  *See, e.g.*, *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 614 (1st Cir. 2017); *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017) (rejecting plaintiff's theory "that an inference that [defendant] knew his statement was false is sufficient to show that [defendant] acted intentionally or recklessly to deceive, manipulate or defraud").

The Complaint does not allege any facts to suggest that Root, Mr. Timm or Mr. Rosenthal acted with the intent to deceive.  Plaintiff's conclusory assertions state that the purported omissions were made "for the purpose and effect of concealing Root's true" financial circumstances.  (AC, ECF No. 31 at 766-67, ¶ 195.)  But those are precisely the type of conclusory assertions forbidden by the heightened pleading standards of the PSLRA and Rule 9(b).  *See In re Downey Sec. Litig.*, 2009 WL 736802, at *13 (C.D. Cal. Mar. 18, 2009) (rejecting "vague and conclusory" allegation of scienter "not supported by any facts").

The closest Plaintiff comes to alleging a ***fact*** relevant to scienter is to point out the "short period of time" between the statements in the Registration Statement (October 28, 2020) and the first post-IPO analyst reports that discussed Root's increased customer acquisition costs (November 23, 2020).  (AC ECF No. 31 at 766, ¶ 192.)  But those analyst reports largely parroted what Mr. Timm and Root disclosed ***before*** the IPO:  a short term spike in customer acquisition costs attributable to Root's attempted national expansion.  (*Compare id.* at 750, ¶ 124 ("You see the recent spike [in customer acquisition costs]?  That is from some of this experimentation on brand [campaigns]") *with id.* at 752, ¶ 131 (showing November 23, 2020

UBS analyst report chart which indicates a spike in customer acquisition costs during the last quarter of 2020 and 2021); *and* 753, ¶ 132 (quoting November 23, 2020 Barclays analyst report ("CAC is spiking to $660+ near term on the new national TV campaign")); *and* 755, ¶ 136 (quoting December 1, 2020 Truist Securities analyst report (CAC in 4Q20 of $670, up 100% year over year, and in 1Q21 of $704, up 165%)).  Thus, those analysts' reports do not reveal any falsity of the pre-IPO statements, let alone that anyone ***intentionally*** misstated the facts.

Plaintiff's intended argument seems to be that Root's business performed poorly after the IPO so Defendants must have been intentionally hiding something.  That argument fails. Courts have repeatedly rejected efforts to show "fraud by hindsight"; "proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent".  *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993); *In re Huntington Bancshares Inc.*, 674 F. Supp. 2d at 959; *Albert Fadem*, 334 F. Supp. 2d at 1026.

## V.  PLAINTIFF'S CONTROL-PERSON CLAIMS UNDER SECTION 15 OF THE SECURITIES ACT AND SECTION 20 OF THE EXCHANGE ACT SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE PREDICATE VIOLATIONS OF THE SECURITIES ACT OR EXCHANGE ACT

Plaintiff also asserts claims against the Root Defendants as "controlling persons" under Section 15(a) of the Securities Act (Count III) and Section 20(a) (Count V).  (AC, ECF No. 31 at 763-64, 773, ¶¶ 177-84, 220-22.)  In order to state a control person claim, Plaintiff must plead a predicate violation of the Securities Act or Exchange Act.  *See Doshi v. Gen. Cable Corp.*, 2015 WL 366644, at *11 (E.D. Ky. Jan. 27. 2015) ("Section 20(a) claims 'are predicated upon at least one underlying violation committed by a controlled party.'" (quoting *Frank*, 646 F.3d at 962)); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000) (addressing Section 15 and Section 20 claims and explaining that, to state a

claim for control person liability, a plaintiff must plead a "primary securities law violation"). Because Plaintiff fails to state a predicate violation for the reasons discussed above, *see supra* Sections II-IV, the control-person claims must be dismissed as well.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety and with prejudice.

Respectfully submitted,

<u>/s/ William D. Kloss, Jr., Trial Attorney</u>
William D. Kloss, Jr. (0040854)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215-1008
Tel: (614) 464-6360
wdklossjr@vorys.com

J. Wesley Earnhardt (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
wearnhardt@cravath.com

*Attorneys for Defendants Root, Inc., Alexander Timm, Daniel Rosenthal, Megan Binkley, Christopher Olsen, Doug Ulman, Elliot Geidt, Jerri DeVard, Larry Hilsheimer, Luis von Ahn, Nancy Kramer, Nick Shalek and Scott Maw*

/s/ Gregory A. Harrison
Gregory A. Harrison, Trial Attorney (0029814)
Kelly E. Pitcher (0093678)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
Tel: (513) 977-8200
greg.harrison@dinsmore.com
kelly.pitcher@dinsmore.com

Sharon L. Nelles (*pro hac vice*)
Andrew J. Finn (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
nelles@sullcrom.com
finna@sullcrom.com

*Attorneys for Defendants Goldman Sachs & Co. LLC,*
*Morgan Stanley & Co. LLC, Barclays Capital Inc.*
*and Wells Fargo Securities, LLC*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was electronically filed with the Court on May 20, 2022. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

<u>/s/ William D. Kloss, Jr.</u>
William D. Kloss, Jr. (0040854)