UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| ILIA KOLOMINSKY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:21-cv-01197-EAS-CMV |
| Plaintiff, | ) ) ) | <u>CLASS ACTION</u> |
| | ) | Judge Edmund A. Sargus, Jr. |
| vs. | ) ) | Magistrate Judge Chelsey M. Vascura |
| ROOT, INC., ALEXANDER TIMM, DANIEL ROSENTHAL, MEGAN BINKLEY, CHRISTOPHER OLSEN, DOUG ULMAN, ELLIOT GEIDT, JERRI DEVARD, LARRY HILSHEIMER, LUIS VON AHN, NANCY KRAMER, NICK SHALEK, SCOTT MAW, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC. and WELLS FARGO SECURITIES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | ORAL ARGUMENT REQUESTED |
| Defendants. | ) ) ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND .................................................................................................5

      A.    The IPO.........................................................................................................5

      B.    Root's CAC Is Highly Material to Investors .........................................................6

      C.    Investors Belatedly Learn That Root Has No CAC Competitive Advantage..........7

III.  ARGUMENT.......................................................................................................8

      A.    Legal Standards.............................................................................................8

In assessing a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). In general, a complaint "does not need detailed factual allegations," but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (holding that this pleading standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]").

            1.    Rule 8(a) Applies to Plaintiff's 1933 Act Claims........................................9

Because the 1933 Act claims alleged in the AC are not fraud claims, they need only satisfy the pleading standard in Rule 8(a). Sections 11 and 12(a)(2) of the 1933 Act subject violators to strict liability for false or misleading statements or the omission of material facts required to be disclosed. 15 U.S.C. §77k(a); 15 U.S.C. §77l(a)(2). Plaintiff is not required to allege scienter, loss causation, or reliance for these 1933 Act claims, and in fact expressly disclaimed allegations of fraud against the 1933 Act Defendants. *See In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *27 (M.D. Tenn. Nov. 19, 2019). In any event, Plaintiff has sufficiently alleged the 1933 Act claims under any standard by detailing the time, place and contents of the misrepresentations and omissions made by the 1933 Act Defendants in connection with Root's IPO.

      B.    The AC Adequately Alleges Violations of the 1933 Act .....................................11

Defendants do not dispute that the AC adequately explains which of their misrepresentations and omissions are being challenged, or the reasons why each statement is alleged to be false and misleading. Instead, Defendants argue that the challenged statements and omissions are not materially misleading. But materiality is a fact-intensive inquiry, and a court may only find a lack of materiality on a motion to dismiss if "reasonable minds cannot differ on the question." *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *4 (S.D. Ohio Sept. 27, 2021) (Sargus, J.) ("*LSPRF*"). Materiality is clearly established here because: (i) Root admits that CAC is critical to the Company's profitability; and (ii) the Registration Statement repeatedly discusses CAC.

**Page**

1.      The Materially Misleading Statements and Omissions Regarding
        Root's CAC ...............................................................................................13

The Registration Statement repeatedly states that Root's purportedly low CAC afforded the Company a "cost of acquisition advantage" over traditional insurers, but misleadingly omitted that Root's CAC had significantly increased as of the IPO and would remain elevated thereafter because Root had substantially boosted its marketing costs for its planned national expansion. The Registration Statement's risk warning that Root "may struggle to maintain cost-effective marketing strategies, and [its] customer acquisition costs could rise substantially" is also materially misleading because the risk was not hypothetical and had already materialized as of the IPO. Since Defendants chose to speak repeatedly about Root's CAC and national marketing plans, they had a duty to disclose the full truth, which they did not. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001). By arguing that only two of the challenged statements are puffery, Defendants acknowledge that the remainder are material. The two statements challenged by Defendants are also material, and not puffery, because they involved Root's CAC and national marketing plans, matters of "central importance" to the Company. *See LSPRF*, 2021 WL 4397946, at *7 .

a.      The 1933 Act Defendants' Historical Accuracy Argument
        Fails ...............................................................................................17

Plaintiff does not allege that Root's historical average CAC of $332 was false. Rather, Plaintiff alleges that Defendants' statements about Root's purported CAC advantage created a duty to disclose that there was no longer a CAC advantage in the near or long term. The fact that a statement contains some accurate financial results is not a dispositive defense to an omission claim. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015); *see also LSPRF*, 2021 WL 4397946, at *13.

b.      The 1933 Act Defendants' Argument that the Allegedly
        Omitted Information Was Disclosed Fails .....................................20

Defendants' argument that the disclosure of the planned national expansion meant investors knew that CAC had and would remain materially increased post-IPO fails because the Registration Statement does not state that this campaign would increase marketing expenditures or increase CAC. If anything, investors would not have expected Root's CAC to rise with increased marketing expenditures because Root had increased its marketing spend in the first fiscal half of 2020 by over 35% and yet maintained its CAC below $270, thereby preserving Root's CAC advantage. Further, this amounts to a factual argument that is improper on a motion to dismiss. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005).

c.      The 1933 Act Defendants' Forward-Looking and Opinion
        Arguments Fail .............................................................................27

        (1)     The Bespeaks Caution Doctrine Does Not Apply ............27

**Page**

None of the statements challenged in the AC are forward-looking because they are specific, verifiable representations about past or current facts. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018). Defendants fail to assess each statement to ascertain whether it is forward-looking. *Id.* at 983-84. Even if any of the challenged statements were forward-looking, Defendants' cited risk warnings are inadequate either because they are generic or because they warn of risks that have already materialized. *See Envision*, 2019 WL 6168254, at *16; *see also LSPRF*, 2021 WL 4397946, at *10.

(2)     The Challenged Statements Are Not Inactionable Opinions ............................................................................30

Defendants' statements are not inactionable opinions because they express certainty about Root's purported CAC advantage and the planned national expansion. Even if they were opinions, they are actionable under all three of the disjunctive prongs of opinion liability from *Omnicare*, 575 U.S. at 184-85, 196, because: (i) the 1934 Act Defendants were aware the statements were false when made by virtue of Timm's roadshow statements; (ii) the statements implied that a CAC advantage for Root was attainable when it was not; and (iii) a reasonable investor would find misleading the nondisclosure of Root's loss of a CAC advantage because of the national expansion.

2.     The Materially Misleading Statements and Omissions Regarding Root's CAC Competitive Advantage.........................................................31

In separately addressing the failure to disclose Root's lost CAC advantage because of the planned national expansion, Defendants reiterate their deficient puffery, forward-looking, opinion, and falsity by hindsight arguments. Further, Plaintiff alleges that Defendants admitted less than 40 days after the IPO that Root's CAC had spiked to a level at least on par with traditional insurers in the fiscal quarter before the IPO because of the planned national expansion, meaning Defendants understood as of the IPO that Root no longer had a CAC advantage over traditional insurers.

3.     The Registration Statement Violates Items 303 and 105, and Rule 408................................................................................................32

Plaintiff's allegations that Defendants failed "to state a material fact that was required to be disclosed" (15 U.S.C. §77k(a) and 15 U.S.C. §77l(a)(2)) provide a separate basis for a finding of falsity even if the Court were to hold that the challenged statements and omissions are not actionable. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016).

a.     Item 303 ...........................................................................32

Root's materially increased CAC due to the planned national expansion, and its concomitant lack of competitive advantage on this basis, were material events or uncertainties that Root was required to disclose under Item 303. *See SAIC*, 818 F.3d at 95-96.

b.     Item 105 ...........................................................................33

**Page**

Root's CAC had significantly increased as of the IPO because of the planned national expansion, which negatively impacted its present and future profitability. Thus, these were material factors that made an investment in Root's IPO "speculative or risky," and should therefore have been disclosed under Item 105. *See Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *22 (M.D. Tenn. Feb. 28, 2022); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 715 (3d Cir. 2020).

c.      Rule 408 ..........................................................................................34

Defendants violated Rule 408, which requires disclosure of material information necessary to render statements in a prospectus not misleading, because the Registration Statement did not disclose the spike in Root's CAC or the reasons therefor. *See In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 522 (S.D.N.Y. 2013).

4.      The Materially Misleading Misstatements and Omissions
        Regarding CAC Made During Root's Roadshow Are Actionable
        Under Section 12(a)(2) ...............................................................................35

During Root's roadshow, the Company's CEO, Timm, acknowledged the significant increase in Root's CAC before the IPO. Instead of admitting that the marketing costs associated with Root's planned nationwide expansion had materially elevated CAC as of the IPO, and that CAC would remain inflated thereafter for the same reason, Timm misleadingly stated that the spike was caused by short-term marketing experiments. Thus, these statements further misled investors. *See Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *17 (M.D. Tenn. Apr. 8, 2021); *see also Strougo v. Tivity Health, Inc.*, 2021 WL 3209567, at *4 (M.D. Tenn. July 29, 2021).

5.      Section 15 Control Person Liability is Adequately Alleged .....................40

Because Defendants have failed to establish sufficient grounds to support dismissal of the Section 11 and 12(a)(2) claims, their argument for dismissal of the Section 15 claims must also be rejected. *See In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 691-92 (M.D. Tenn. 2000).

C.      The AC Adequately Alleges Violations of the 1934 Act ......................................40

The 1934 Act Defendants only contest the falsity and scienter elements of Plaintiff's Rule 10b-5(b) claim. The 1934 Act Defendants reiterate the falsity arguments made by the 1933 Act Defendants regarding the 1933 Act claims, which should be rejected for the same reasons.

1.      Plaintiff's Scheme Liability Claims Are Unchallenged by the 1934
        Act Defendants...........................................................................................41

Defendants failed to seek dismissal of Plaintiff's scheme liability claims and, therefore, have waived their opportunity to do so. *See AAC*, 2021 WL 1316705, at *4; *see also St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at *2 n.1 (M.D. Tenn. Jan. 20, 2021).

2.      The 1934 Act Defendants' Scienter Is Adequately Alleged .....................42

**Page**

Plaintiff has stated with particularity facts which holistically raise a strong inference of scienter that is at least as compelling as any opposing inference. 15 U.S.C. §78u-4(b)(2).

a.  The 1934 Act Defendants Understood "the Most Current Factual Information" About Root's CAC, but Disregarded It When Speaking to Investors ......................................................45

Timm and Rosenthal's own statements throughout the Class Period, their roles at Root, and the overall significance of CAC to Root's profits and core business raise a strong inference that the 1934 Act Defendants knew the "most current factual information" about Root's CAC, but persistently disregarded it when speaking to investors. *Helwig*, 251 F.3d at 552; *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at \*20 (M.D. Tenn. Dec. 18, 2017); *Envision*, 2019 WL 6168254, at \*22; *Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at \*9 (M.D. Tenn. Mar. 31, 2016); *LSPRF*, 2021 WL 4397946, at \*16.

b.  The Closeness in Time of Defendants' Admissions Supports a Strong Inference of Scienter ........................................47

The fact that less than 40 days passed between the IPO and the initial disclosures by the 1934 Act Defendants that Root's CAC had materially risen before the IPO due to the planned national expansion strongly supports scienter. *See Dougherty*, 905 F.3d at 981.

c.  The 1934 Act Defendants' Self-Interested Motivation Supports a Strong Inference of Scienter ........................................48

The 1934 Act Defendants' motivation to increase the size and share price of Root's IPO to serve their own financial interests supports a strong inference of scienter. *Helwig*, 251 F.3d at 552.

d.  Timm's False Statements About Root's CAC Demonstrate Scienter ........................................................................49

Timm's incomplete roadshow disclosures support a compelling inference that he made these statements with scienter. *See Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 846 (E.D. Mo. 2019).

e.  Timm and Rosenthal's Scienter Is Imputed to Root.....................49

Timm and Rosenthal's scienter is imputed to Root. *See Envision*, 2019 WL 6168254, at \*21.

3.  Section 20(a) Control Person Liability Is Adequately Alleged ................50

Because the 1934 Act Defendants have failed to establish sufficient grounds to support dismissal of the Rule 10b-5(b) claims, their argument for dismissal of the Section 20(a) claims must also be rejected. *See Prison Realty*, 117 F. Supp. 2d at 691-92.

IV.  CONCLUSION..............................................................................50

## TABLE OF AUTHORITIES

**Page**

### CASES

*Abramson v. NewLink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020) ................................................................31

*Albert Fadem Tr. v. Am. Elec. Power Co.*,
  334 F. Supp. 2d 985 (S.D. Ohio 2004) ...................................9, 12, 47

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993) ...............................................................47

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................9

*Benzon v. Morgan Stanley Distributors, Inc.*,
  420 F.3d 598 (6th Cir. 2005) .............................................................23

*Bond v. Clover Health Invs., Corp.*,
  2022 WL 602432
  (M.D. Tenn. Feb. 28, 2022) ...............................................................34

*Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*,
  2016 WL 9413421
  (S.D. Fla. June 29, 2016) ...................................................................16

*Callan v. Motricity Inc.*,
  2013 WL 5492957
  (W.D. Wash. Oct. 1, 2013) .................................................................23

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ...........................................11, 15, 22, 31

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755
  (S.D.N.Y. Mar. 25, 2013) ..................................................................27

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................34

*Dougherty v. Esperion Therapeutics, Inc.*,
  905 F.3d 971 (6th Cir. 2018) .................................................28, 43, 47

**Page**

*Fidel v. AK Steel Holding Corp.*,
2002 WL 31545952
(S.D. Ohio Sept. 19, 2022)..................................................................24, 28

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ...........................................................11, 43

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ...................................................42, 44, 47

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018).....................................................24

*Garber v. Legg Mason Inc.*,
347 F. App'x 665 (2d Cir. 2009) ............................................................20

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803
(M.D. Tenn. Mar. 31, 2011)..............................................................41, 46

*Gauquie v. Albany Molecular Rsch., Inc.*,
2016 WL 4007591
(E.D.N.Y. July 26, 2016) ........................................................................45

*Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*,
320 F. Supp. 3d 910 (E.D. Mich. 2018)..................................................41

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145
(M.D. Tenn. Dec. 18, 2017)..............................................................43, 45

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018)......................................................17

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ....................................................... *passim*

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)...................................................................................9

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland
Group*,
783 F.3d 383 (2d Cir. 2015)......................................................................18

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .................................................................20

**Page**

*In re Cable & Wireless, PLC Sec. Litig.*,
321 F. Supp. 2d 749 (E.D. Va. 2004) .......................................................................17

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ...............................................................12, 49

*In re CBL & Assocs. Prop., Inc. Sec. Litig.*,
2022 WL 1405415
(E.D. Tenn. May 3, 2022) ........................................................................................20

*In re Cybershop.com Sec. Litig.*,
189 F. Supp. 2d 214 (D.N.J. 2002) ..........................................................................17

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254
(M.D. Tenn. Nov. 19, 2019) ............................................................................. *passim*

*In re EveryWare Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom., IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) ...........................................10

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................24, 35

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004)...................................................................9, 11

*In re Grand Casinos, Inc., Sec. Litig.*,
988 F. Supp. 1273 (D. Minn. 1997).........................................................................48

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ...................................................................15

*In re Huntington Bancshares Inc. Sec. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009) ...................................................................47

*In re MobileMedia Sec. Litig.*,
28 F. Supp. 2d 901 (D.N.J. 1998) ...........................................................................16

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)..................................................10, 11, 40, 50

*In re Proshares Tr. II Sec. Litig.*,
2020 WL 71007
(S.D.N.Y. Jan. 3, 2020)............................................................................................23

**Page**

*In re PTC Therapeutics, Inc. Sec. Litig.*,
   2017 WL 3705801
   (D.N.J. Aug. 28, 2017).................................................................................45

*In re Regions Morgan Keegan Sec., Deriv., & ERISA Litig.*,
   743 F. Supp. 2d 744 (W.D. Tenn. 2010).....................................................11

*In re Sofamor Danek Group, Inc.*,
   123 F.3d 394 (6th Cir. 1997) ......................................................................17

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)........................................................................14

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
   2021 WL 1316705
   (M.D. Tenn. Apr. 8, 2021).....................................................................36, 42

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)....................................................................32, 33

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010)........................................................................27

*Jackson Cnty. Emps' Ret. Sys. v. Ghosn*,
   510 F. Supp. 3d 583 (M.D. Tenn. 2020)......................................................42

*Jaroslawicz v. M&T Bank Corp.*,
   962 F.3d 701 (3d Cir. 2020)........................................................................34

*Kyrstek v. Ruby Tuesday, Inc.*,
   2016 WL 1274447
   (M.D. Tenn. Mar. 31, 2016).........................................................................46

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
   2021 WL 4397946
   (S.D. Ohio Sept. 27, 2021).................................................................. *passim*

*Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012)..........................................................27

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*,
   731 F. Supp. 2d 689 (S.D. Ohio 2010) ..................................................10, 37

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019)................................................................................41

**Page**

*Martin v. Altisource Residential Corp.*,
  2017 WL 1068208
  (D.V.I. Mar. 16, 2017) ...............................................................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ......................................................................................................40

*Miller v. Thane Int'l. Inc.*,
  519 F. 3d 879 (9th Cir. 2008) ....................................................................................20

*Mingbo Cai v. Switch, Inc.*,
  2019 WL 3065591
  (D. Nev. July 12, 2019) ..............................................................................................34

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*,
  2003 WL 22882137
  (S.D.N.Y. Dec. 4, 2003) .............................................................................................34

*Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
  22 F. Supp. 3d 669 (E.D. Ky. 2014) ..........................................................................16

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ...........................................................................8, 18, 40

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Co.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018) ........................................................................17

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015) ......................................................................................17, 30, 39

*P. Stolz Fam. P'Ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) .................................................................................27, 38

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) .......................................................................................33

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562
  (C.D. Cal. Feb. 27, 2015) ...........................................................................................45

*Ross v. Abercrombie & Fitch Co.*,
  501 F. Supp. 2d 1102 (S.D. Ohio 2007) ....................................................................46

*S. Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009)..................................................................46

**Page**

*Sanborn v. Parker*,
  629 F.3d 554 (6th Cir. 2010) ...............................................................11

*Sanchez v. Centene Corp.*,
  407 F. Supp. 3d 831 (E.D. Mo. 2019)...................................................49

*Schuh v. HCA Holdings, Inc.*,
  947 F. Supp. 2d 882 (M.D. Tenn. 2013)...............................................33

*SEC v. Mozilo*,
  2010 WL 3656068
  (C.D. Cal. Sept. 16, 2010)............................................................20, 49

*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020)..................................................................49

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
  707 F.3d 95 (1st Cir. 2013).............................................................33, 34

*Singh v. Schikan*,
  106 F. Supp. 3d 439 (S.D.N.Y. 2015)....................................................26

*St. Clair Cnty. Emps.'s Ret. Sys. v. Acadia Healthcare Co.*,
  2021 WL 195370
  (M.D. Tenn. Jan. 20, 2021)...................................................................42

*Stein v. U.S. Xpress Enters., Inc.*,
  2020 WL 3584800
  (E.D. Tenn. June 30, 2020).......................................................10, 27, 29

*Strougo v. Tivity Health, Inc.*,
  2021 WL 3209567
  (M.D. Tenn. July 29, 2021)....................................................................37

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Hldgs., Inc.*,
  2022 WL 989240
  (M.D. Tenn. Mar. 31, 2022)..................................................................42

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..................................................................... *passim*

*Thomas v. Citigroup Glob. Mkts. Holdings Inc.*,
  2022 WL 1051158
  (S.D.N.Y. Mar. 1, 2022) .......................................................................24

**Page**

*Werbowsky v. Am. Waste Servs., Inc.*,
   1998 WL 939882
   (6th Cir. Dec. 22, 1998) ........................................................................................20

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
   2010 WL 4184465
   (E.D. Mich. Oct. 21, 2010) ............................................................................18, 20

*Willis v. Big Lots, Inc.*,
   2016 WL 8199124
   (S.D. Ohio Jan. 21, 2016) ....................................................................16, 28, 42

*Y-GAR Cap. LLC v. Credit Suisse Grp. AG*,
   2020 WL 71163
   (S.D.N.Y. Jan. 2, 2020)........................................................................................24

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k.................................................................................................... *passim*
   §77k(a) ...............................................................................................9, 32
   §77l .............................................................................................................10
   §77l(a)(2) ............................................................................................ *passim*
   §77o...............................................................................................1, 40, 50
   §78j(b).................................................................................1, 12, 40, 41
   §78t(a) ...............................................................................................1, 50
   §78u-4(B)(1) ................................................................................................41
   §78u-4(b)(2)............................................................................................41, 42

17 C.F.R.
   §230.408(a) ................................................................................................35
   §240.10b-5(a), (b), (c).................................................................................41

Federal Rules of Civil Procedure
   Rule 8(a)......................................................................................9, 10, 40
   Rule 9(b) ..............................................................................9, 10, 40, 41

Private Securities Litigation Reform Act of 1995 ..........................................40, 41, 42

Lead plaintiff Plumbers Local #290 Pension Trust Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] motion to dismiss Plaintiff's Amended Complaint for Violations of the Federal Securities Laws (the "AC") (ECF Nos. 31, 54).[2]

## I.    INTRODUCTION

This securities class action – alleging strict liability and negligence claims under the 1933 Act, and securities fraud claims under the 1934 Act – concerns Defendants' materially false and misleading statements and omissions made in connection with Root's IPO about one of the Company's most critical financial metrics, customer acquisition cost ("CAC").  Root is a start-up automotive insurance company that focuses on reaching customers through mobile apps to differentiate itself from traditional insurers.  The IPO was a key part of Root's strategy to raise money to support Root's expansion from being a regional insurer to having nationwide availability.  To complete this strategy, Defendants needed the market to believe that Root had a low CAC, *i.e.*, that Root was able to acquire new customers more profitably than traditional insurers.

CAC is closely monitored by automotive insurance companies because it reflects how much money it costs to obtain new customers.  The lower Root's CAC is, the more profits the Company

---

[1]    "Defendants" or "1933 Act Defendants" are Root, Inc. ("Root" or the "Company"), Root's CEO Alexander Timm ("Timm"), Root's CFO Daniel Rosenthal ("Rosenthal"), Megan Binkley, Christopher Olsen, Doug Ulman, Elliot Geidt, Jerri DeVard, Larry Hilsheimer, Luis von Ahn, Nancy Kramer, Nick Shalek, Scott Maw, and Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., and Wells Fargo Securities, LLC (the "Underwriter Defendants").  "1934 Act Defendants" are Root, Timm, and Rosenthal.  "Def. Mem." refers to Defendants' memorandum of law, dated May 20, 2022.  ECF No. 57.  "Def. Ex. A" refers to the exhibit submitted therewith by Defendants.  ECF No. 57-2.  Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotation marks are omitted.

[2]    The AC alleges claims under: (i) Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act") on behalf of all purchasers or acquirers of Root Class A common stock pursuant to the Registration Statement (AC, ECF No. 31 at PageID 724, ¶2) issued for Root's October 28, 2020 initial public offering ("IPO") (*id.* at 758-64, ¶¶153-84); and (ii) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") on behalf of all purchasers of Root Class A common stock between October 28, 2020 through August 12, 2021, inclusive (the "Class Period") (*id.* at 772-73, ¶¶215-22).  "¶_" refers to paragraphs in the AC.

will earn. Because Root's average CAC was $332 for the two years preceding the IPO – well below the range of $500 to $800 spent by traditional insurers on CAC – Defendants repeatedly told investors that Root had a CAC "advantage." In other words, investors were led to believe that Root could add customers more profitably than traditional insurers like GEICO or Progressive.

But Defendants concealed from investors that Root had no CAC advantage as of the IPO or thereafter. Thus, Defendants' statements were materially inaccurate because they failed to disclose three critical facts that existed as of the IPO: (i) Root's CAC had risen above $500 in the quarter preceding the IPO and would remain materially elevated following the IPO; (ii) this increase was caused by substantial marketing costs incurred to support Root's planned national expansion; and (iii) this increase meant Root had no CAC advantage over traditional insurers as of, or after, the IPO.

During Root's roadshow, the Company's CEO, Timm, acknowledged the significant increase in Root's CAC before the IPO. Instead of admitting that the marketing costs associated with Root's planned nationwide expansion had materially elevated the Company's CAC as of the IPO, and that CAC would remain inflated thereafter for the same reason, Timm misleadingly stated that the cause of the spike was short-term marketing experiments. Thus, the roadshow statements only served to further mislead investors.

On October 28, 2020, Defendants' materially false and misleading statements and omissions allowed Root to complete their strategy to raise significant funds when the IPO closed at $27.00 per share of Root Class A common stock, raising over $600 million in the largest initial public offering ever by a company headquartered in Ohio. Almost immediately thereafter, the previously concealed truth became known to investors. In late November 2020, analysts began initiating coverage on Root and disclosed that CAC had spiked as of the IPO, which would weigh on profits through 2023. Then, on December 1, 2020, in Root's first financial report as a publicly traded company, Root admitted that the planned national expansion had caused CAC to materially increase *before* the IPO

- 2 -

– a fact repeatedly and previously concealed from investors.  In Root's next financial report, on February 25, 2021, Defendants admitted that Root would be unable to efficiently manage CAC for "years."  Finally, on August 12, 2021, the last day of the Class Period, Root slashed its 2021 earnings guidance because it needed to take "active steps to reduce our customer acquisition costs." Each disclosure relating to Root's CAC resulted in an ***over 10%*** decline in Root's Class A common stock price, demonstrating that this information was material, and that investors were surprised and disappointed by the true state of Root's CAC as of the IPO and thereafter.

Despite these well-pleaded facts, Defendants contend that Plaintiff fails to allege: (i) a materially false or misleading statement or omission for the AC's 1933 Act and 1934 Act claims; or (ii) scienter for the AC's 1934 Act claims.  These arguments fail.

With respect to materiality, Defendants cannot plausibly dispute that Root's CAC was critical to investors.  Defendants repeatedly stated that CAC is a key profit metric and that Root's lower CAC made the Company best in class compared to traditional insurers.  Indeed, Defendants only assert that two of the challenged statements are immaterial puffery, implicitly conceding that the remaining statements are material.  The two challenged statements are also material because they concern Root's CAC "advantage" and the planned national expansion.

With respect to falsity, Defendants purposefully misread the AC in asserting that Plaintiff contends that Root's historical CAC average of $332 was false.  But that is not Plaintiff's claim. Rather, Plaintiff plainly alleges that Defendants' repeated emphasis on Root's purported then-existing CAC "advantage" and Root's post-IPO marketing plans were materially false and misleading by failing to disclose that Root's CAC would be materially elevated for years – a fact that was revealed only after the IPO raised over $600 million.  Defendants next incorrectly argue that investors must have known that Root's marketing efforts would materially increase CAC.  To the contrary, Root's marketing costs increased by over 35% in the first fiscal half of 2020, but Root's

CAC was under $270 for that period. Moreover, Defendants ignore Timm's false reassurance that Root's purported "short term" marketing experimentations had left Root's CAC advantage intact and unlikely to decline any time soon. Thus, investors reasonably believed that Root's CAC advantage would persist post-IPO despite additional marketing costs from the planned national expansion.

Likewise, Defendants' argument that the challenged statements are all forward-looking and immunized by cautionary language ignores that these are statements of currents facts that are not forward looking, meaning they cannot be protected by the bespeaks caution doctrine. In addition, the main risk disclosure Defendants rely upon is wholly insufficient because it is ***itself*** materially false and misleading. It portrays the risk of CAC increasing due to elevated marketing costs as hypothetical when, in fact, this had already occurred. Similarly, Defendants' argument that the challenged statements are nonactionable opinions ignores that these statements were verifiably untrue statements about CAC, and that it was material to investors whether CAC had increased.

With respect to scienter, Defendants fail to provide an alternative inference at all, let alone one more plausible than the AC's allegations of fraud. Instead, Defendants cursorily argue that Plaintiff alleges fraud by hindsight, supplying no facts to support that contention. Not so. Here, Defendants sought to ensure a lucrative IPO for Root, and repeatedly spoke ***before*** the IPO directly about Root's CAC "advantage" being key to the Company's continued success – demonstrating their intimate knowledge of this metric. Indeed, less than 40 days after the IPO, Defendants began to disclose that Root's CAC advantage had evaporated and would remain impaired for years. Considered in totality, the AC adequately alleges that Defendants, with scienter, made numerous materially false or misleading statements and omitted material facts they had a duty to disclose, which, once revealed, negatively impacted Root's Class A common stock price.

Finally, Defendants have waived contesting numerous aspects of the AC, precluding dismissal on these issues. They do not address the AC's scheme liability claims under the 1934 Act

at all.  Nor do Defendants contest the statutory seller requirement of Section 12(a)(2), and instead only address falsity for the statements that the AC challenges under Section 12(a)(2).  Moreover, Defendants provide no distinct arguments concerning the AC's allegations that the Registration Statement violated SEC regulations Items 303 and 105, and Rule 408.  These SEC regulations provide a separate basis for falsity under both the 1933 Act and 1934 Act that exists, even if the Court were to find that the challenged misrepresentations and omissions from the Registration Statement and roadshow are not actionable.  Likewise, Defendants do not contest loss causation, thereby conceding that the over 10% declines in Root's Class A common stock price were directly related to the revelations of the truth concerning Root's CAC.

Accordingly, Plaintiff respectfully submits that the AC more than adequately alleges violations of the 1933 Act and the 1934 Act, and that this case should proceed to discovery.

## II.     BACKGROUND

### A.     The IPO

The IPO was conducted to: (i) raise capital for Root from public investors (like Plaintiff); and (ii) provide liquidity for the Root securities owned by the Company's pre-IPO venture capitalists, SVB Financial Group ("SVB") and DRD Contact, LLC ("DRD," and with SVB, the "Selling Stockholders").  AC, ECF No. 31 at PageID 733-34, ¶¶41, 51.

Of the 26,830,845 shares of Root Class A common stock sold in the IPO, Root offered 24,249,330 shares at $27.00 per share, generating approximately $618.7 million in net proceeds.  *Id.* at 735-37, ¶¶58-59, 64, 72.  The Selling Stockholders offered the remaining 2,581,515 shares at $27.00 per share, generating approximately $65.8 million in net proceeds.  *Id.*  In the weeks leading up to the IPO, both the IPO's offering price (a range between $22.00 and $25.00 per share as of October 20, 2020) and size (24,164,515 shares as of October 20, 2020) substantially increased.  *Id.* at 735, ¶¶55-59.  Post-IPO, the Underwriter Defendants declined to exercise their option to purchase 4,024,626 additional shares of Root Class A common stock at the IPO price.  *Id.* at 736-37, ¶¶66-68.

## B.      Root's CAC Is Highly Material to Investors

With virtually no previous experience running an insurance company, Timm co-founded Root in 2015 with the idea of using technology to "disrupt" the automotive insurance model used by traditional insurers for decades.  *Id.* at 733, ¶¶43-45.  Specifically, Root collects driving data from its clients by having them download the Company's app to their mobile phones and then drive their vehicles for a few weeks to allow the app to collect data.  *Id.* at 733-34, ¶¶46-47.  Root then uses the data to price and sell insurance to its clients through the Company's mobile app in an attempt to replace the traditional insurance model of using advertising and insurance agents to sell insurance. *Id.* at ¶¶46-48.  As of the IPO, Root was licensed to sell insurance in 36 states, was currently selling insurance in 30 states, and planned to expand nationwide by early 2021.  *Id.* at 734, ¶¶49-50.

CAC reflects the average cost of acquiring a new customer.  *Id.* at 737, ¶73.  CAC is calculated by dividing the sales and marketing expense for a given period by the new customers acquired during that time.  *Id.* at 737-38, ¶74.  CAC is a critical financial metric for new companies because it indicates how well they can improve profitability as they grow.  *Id.* at 738, ¶75.

Root is no exception – the Company lists efficiently managing CAC as one of Root's four profitability levers.  *Id.* at ¶76.  Unsurprisingly, the Registration Statement repeatedly explains the importance of CAC to Root's profits, stating, for example, that Root's average CAC of $332 during the period of August 2018 to August 2020 was below the typical CAC of traditional insurance companies.  *Id.* at ¶¶77-79.  Because the automotive insurance business is highly competitive, it typically costs between $500 and $800 on average to acquire a new customer.  *Id.* at 739, ¶80.

Throughout October 2020, investors and analysts were keenly focused on Root's CAC.  *Id.* at ¶81.  Specifically, Root's purportedly low average CAC of $332 was favorably compared with the fact that "it typically costs [companies in the automobile insurance industry] between $500-800 to

- 6 -

acquire a new customer." *Id.* at ¶¶82-85.  Thus, the statements about Root's CAC in the Registration Statement and roadshow were highly material to investors.  *Id.* at ¶86.

### C. Investors Belatedly Learn That Root Has No CAC Competitive Advantage

During the roadshow, Timm acknowledged that Root's CAC had increased by October 2020 to at least a level commensurate with that of traditional insurers.  *Id.* at 741, ¶92.  Instead of admitting that the marketing costs associated with Root's planned nationwide expansion had materially elevated the Company's CAC as of the IPO, and that CAC would remain inflated thereafter for the same reason, Timm misleadingly stated that the cause of the spike was short-term marketing experiments.  *Id.*  Timm was unequivocal that the spike in Root's CAC was temporary, stating that notwithstanding this significant increase "we do have the ability to keep our customer acquisition costs much lower than our competitors."  *Id.*

But as Root admitted – only after the IPO – the Company's increased marketing expenditures to support Root's planned national expansion to all fifty states, which began before the IPO, was the real cause of Root's materially elevated CAC.  *Id.* at ¶93.  Investors only began learning this when, in late November 2020, analysts initiated coverage on Root and reported that, *inter alia*, Root's CAC had spiked above $500 as of the IPO and that Root's "heavy customer acquisition costs will result in elevated cash burn and net losses through 2023."  *Id.* at 741-42, ¶¶94-95, 752-53, ¶¶130-33.

Then, on December 1, 2020, in Root's first financial report as a publicly traded company, Rosenthal confirmed that Root's CAC had materially increased during the third fiscal quarter of 2020 ("3Q20") – which closed on September 30, 2020, meaning before the IPO – and would remain elevated, stating that "amplified brand spend . . . will result in elevated customer acquisition cost levels for the next two quarters."  *Id.* at 742, ¶¶96, 754-55, ¶¶134-36.  In Root's second financial report as a publicly traded company, on February 25, 2021, Timm admitted that Root "still ha[s] much work to do in the quarters ***and years*** ahead, particularly around . . . managing customer

acquisition costs." *Id.* at 742, ¶97, 755, ¶137. In response, at least one analyst observed that Root was spending well over $332 on CAC and had marketing expenditures on par with those of traditional insurers. *Id.* at 755-56, ¶¶138-39.

Root's inability to efficiently manage the Company's CAC was a key reason why, on August 12, 2021, Root sold a 5% ownership interest to Carvana Co. ("Carvana") in exchange for Carvana agreeing to offer Root's insurance products to individuals who purchase vehicles through Carvana. *Id.* at 742-43, ¶¶98-100.[3] This deal provided Root with a source of new customers for which no marketing expenditures were necessary, *i.e.*, a CAC of $0. *Id.* As is to remove any doubt that Root's persistent and materially elevated CAC motivated this transaction, Timm also announced on August 12 that it was substantially reducing Root's 2021 profit guidance because Root needed "to take active steps to reduce our customer acquisition costs." *Id.* at 743, ¶¶101-02, 756 ¶¶140-42. Essentially, Root needed a no-cost source of customers because Root was unable to profitably add new customers since 3Q20. *Id.* at ¶¶103-04, 143. The price of Root's Class A common stock materially declined by at least 10% in response to each of these disclosures. *Id.* at 767-69, ¶¶200-07.

## III.   ARGUMENT

### A.   Legal Standards

In assessing a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382-83 (6th Cir. 2016) ("*OPERS*") (same). In general, a complaint "does not need detailed factual allegations," but only "enough facts to state a claim to relief that is plausible on

---

[3]   This sale allowed Carvana, not even one year after the IPO, to purchase approximately 14 million shares of Root Class A common stock for $9.00 per share, a **two-thirds** discount to the $27.00 per share IPO price. AC, ECF No. 31 at PageID 742, ¶99.

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 556 (holding that this pleading standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]").

### 1.    Rule 8(a) Applies to Plaintiff's 1933 Act Claims

To plead Section 11 and 12(a)(2) claims under the 1933 Act, Plaintiff need only allege that the Registration Statement: (i) contained an untrue statement of material fact; (ii) omitted to state a material fact that was necessary to make the statements not misleading; *or* (iii) omitted to state a material fact that was required to be disclosed. 15 U.S.C. §77k(a); 15 U.S.C. §77l(a)(2). Because the 1933 Act was designed to protect investors by requiring the full disclosure of material information concerning public offerings of securities, liability is "virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Plaintiff is not required to allege scienter, loss causation, or reliance for the 1933 Act claims alleged in the AC. *See Albert Fadem Tr. v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 996 n.15 (S.D. Ohio 2004). Rather, under the 1933 Act, Plaintiff "need only show a material misstatement or omission to establish his prima facie case." *Herman & MacLean*, 459 U.S. at 382.

Because alleged violations of the 1933 Act are not fraud claims, such allegations need only satisfy the pleading standard in Rule 8(a), *i.e.*, that a complaint merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a); *see also In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) ("Since fraud is not an element or requisite to a claim under [the 1933 Act], the claims are not subject to Rule 9(b) heightened pleading requirement."). The AC does this for each of the 1933 Act Defendants.

Nonetheless, the 1933 Act Defendants improperly seek to have the modestly enhanced Rule 9(b) standard applied by incorrectly arguing that "Plaintiff asserts that Defendants' actions were fraudulent." Def. Mem., ECF No. 57 at PageID 913. This preliminary argument misreads the AC, which only alleges 1934 Act claims against Timm, Rosenthal, and Root (AC, ECF No. 31 at PageID 772-73, ¶¶215-22), meaning Rule 9(b) cannot apply to the remaining 1933 Act Defendants – *i.e.*, the rest of the Root officer and director defendants and the Underwriter Defendants. *See In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 869 (S.D. Ohio 2016), *aff'd sub nom., IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) ("Plaintiffs are correct that as to Defendants against whom no fraud is alleged, the plausibility pleading requirements of Rule 8(a) apply.").

Moreover, Defendants do not explain how or why the AC lacks the requisite specificity under Rule 9(b) with respect to any of the 1933 Act Defendants. *See Stein v. U.S. Xpress Enters., Inc.*, 2020 WL 3584800, at *7, *18, *22 (E.D. Tenn. June 30, 2020) (noting that "Defendants expend more effort arguing that Rule 9(b) applies to all of Plaintiffs' claims than explaining why its heightened pleading standard makes any difference to their motions" and sustaining 1933 Act claims while dismissing 1934 Act claims for failing to allege scienter); *see also Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 710 (S.D. Ohio 2010) (rejecting argument that Rule 9(b) should apply where, as here, the defendants only make the "general assertion that the Section 11 claims do not comply with Rule 9(b).").

With respect to the 1933 Act claims alleged against Root, Timm, and Rosenthal, nowhere does the AC "mention fraud, except to expressly exclude any allegations which might sound in fraud" (AC, ECF No. 31 at PageID 758, ¶154, 760, ¶165, 763, ¶178), and therefore "the Court cannot read it into the statute, it need not be pled pursuant to Rule 9(b) in Plaintiffs' §11 or §12 claims." *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 688-89 (M.D. Tenn. 2000). The AC

expressly disclaims fraud for the 1933 Act claims made against the 1934 Act Defendants precisely because such allegations are unnecessary under the 1933 Act. *Id.* at 688 ("[B]ecause the plaintiffs specifically separated out their §11 claims into distinct counts at the end of the complaint, the allegations of fraud did not 'convert or contaminate the separate §11 claims.'"); *see also In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *27 (M.D. Tenn. Nov. 19, 2019) (finding that "Plaintiffs are not required to prove fraud to establish a claim under Sections 11 and 12(a)(2)" and that segregating the fraud claims meant that the 1933 Act claims were "based only on strict liability and negligence").

Regardless, Plaintiff has sufficiently alleged 1933 Act claims under any pleading standard because the AC details the precise "time, place and contents of the misrepresentations" made in connection with the IPO. *In re Regions Morgan Keegan Sec., Deriv., & ERISA Litig.*, 743 F. Supp. 2d 744, 759-60 (W.D. Tenn. 2010) (citing *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) ("*Dana I*") (finding 1933 Act claims satisfied Rule 9(b) because the plaintiff identified the material misrepresentations, stated when they were made, and explained why the statements were misleading)). Nowhere in Defendants' motion do they even attempt to explain how the AC does not meet these standards. *See* Def. Mem., ECF No. 57 at PageID 912-39.[4]

### B. The AC Adequately Alleges Violations of the 1933 Act

"Our securities laws . . . 'require an actor to "provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."'" *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005); *see also FirstEnergy*, 316 F. Supp. 2d at 595 (same). As the Sixth Circuit recognizes, "a company may choose silence or speech

---

[4] Defendants may not raise issues in their reply brief that were not addressed in their opening brief. *See, e.g.*, *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held . . . that arguments made . . . for the first time in a reply brief are waived.").

elaborated by the factual basis as then known – but it may not choose half-truths." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).[5]

As explained above, Defendants do not dispute that the AC adequately explains which of their misrepresentations and omissions from the Registration Statement are being challenged, or that the AC adequately explains the reasons why each statement is alleged to be false and misleading. *See supra* 10-11.  Instead, Defendants argue that the challenged statements and omissions are not **materially** misleading.  Def. Mem., ECF No. 57 at PageID 914-35.  But, as this Court recently recognized in denying falsity arguments made on a motion to dismiss, "a court may only determine that a statement or omission is not material as a matter of law 'if the alleged misrepresentations or omissions are so obviously unimportant to a "reasonable investor" that reasonable minds cannot differ on the question of materiality.'" *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *4 (S.D. Ohio Sept. 27, 2021) (Sargus, J.) ("*LSPRF*") (citing, *inter alia*, *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 747 (S.D. Ohio 2006)).

Here, Defendants do not meet this demanding standard because they cannot seriously contest materiality.  The challenged misstatements and omissions pertain to Root's CAC, which Root admits is critical to the Company's profitability.  AC, ECF No. 31 at PageID 738-39, ¶¶76-80; *cf. LSPRF*, 2021 WL 4397946, at *1 (finding statements about "a key part of Cardinal's business strategy" to be material).  Moreover, the Registration Statement repeatedly discussed, and analysts were highly focused on, Root's CAC (AC, ECF No. 31 at PageID 739, ¶¶81-86, 741-43, ¶¶94-104), further demonstrating its materiality to investors.  For these reasons, and because the materiality analysis is a fact-intensive inquiry, Defendants' materiality arguments do not support dismissal of the AC.

---

[5]    Defendants concede "that the test for materially misleading statements or omissions is the same under Section 10(b) [of the 1934 Act] as under Section 11 [of the 1933 Act.]"  Def. Mem., ECF No. 57 at PageID 935 (citing *Albert Fadem*, 334 F. Supp. 2d at 1019).

### 1. The Materially Misleading Statements and Omissions Regarding Root's CAC

The Registration Statement repeatedly stated that Root's purportedly low CAC afforded the Company "a cost of acquisition advantage." AC, ECF No. 31 at PageID 744-45, ¶106. By speaking about Root's CAC, the 1933 Act Defendants were obligated to "provide complete and non-misleading information with respect to the subjects on which [they] undert[ook] to speak." *Helwig*, 251 F.3d at 561. Instead of fulfilling that obligation, the 1933 Act Defendants failed to disclose that Root's CAC had significantly increased as of the IPO, and would remain elevated thereafter, because Root had substantially boosted its marketing costs for the Company's planned nation expansion. AC, ECF No. 31 at PageID 745, ¶107.

While the Registration Statement does discuss Root's planned national expansion (*id.* at 745-46, ¶108), these statements were also materially misleading because they failed to disclose that these marketing efforts had already caused, and would continue to cause, Root's CAC to be comparable to those of traditional insurers. *Id.* at 746, ¶109. In other words, the Registration Statement never disclosed that the planned national expansion had caused Root to lose the Company's "cost of acquisition advantage" over traditional insurers. *Id.* at 745-46, ¶¶107, 109.

Instead, the Registration Statement falsely and incompletely warned investors that Root "***may*** struggle to maintain cost-effective marketing strategies, and our customer acquisition costs ***could*** rise substantially." *Id.* at 746, ¶110. But Root's CAC had ***already*** risen substantially as of the IPO, a direct result of the Company's inability to maintain a cost-effective marketing strategy for the planned national expansion. *Id.* at ¶111. Thus, the hypothetical risk provided to investors in the Registration Statement had already materialized, but was not disclosed. *Id.*

The 1933 Act Defendants do not contest that Root's CAC had significantly increased as of the IPO, or that this was a direct result of the planned national expansion. *See* Def. Mem., ECF No. 57 at PageID 915-31. Nor could they – Timm plainly admitted during the roadshow that Root's

CAC had materially increased by the IPO, even as he misleadingly portrayed its cause as "experimentation on brand" and its duration as "short term." AC, ECF No. 31 at PageID 741, ¶92.

Less than one month after the IPO, analysts reported that Root's CAC had materially risen above $500 before the IPO, which would "weigh[] on profits" through 2023. AC, ECF No. 31 at PageID 752-54, ¶¶131-33. Then, in Root's first financial report as a publicly traded company on December 1, 2020, the Company admitted that during 3Q20 that Root was "expecting elevated [CAC] levels, not just in the third quarter, but in the fourth quarter, because we're testing – we're investing to support the state expansion plans that I was just talking about." *Id.* at 754-55, ¶¶134-36. Root's second financial report as a publicly traded company, on February 25, 2021, admitted that the Company's inability to keep CAC at the level disclosed in the Registration Statement would persist for years, stating that Root "still ha[s] much work to do in the quarters and years ahead, particularly around . . . managing customer acquisition costs." *Id.* at 755, ¶137. Ultimately, by August 2021, Root needed "to take active steps to reduce our customer acquisition costs" because Root could not achieve its 2021 earnings guidance. *Id.* at 756, ¶¶140-42.

Defendants do not meaningfully contend that any of the challenged statements are immaterial, except for two statements that they argue are inactionable puffery: (i) that Root's investments in technology would support a "differentiated cost of customer acquisition over the long term" (Def. Mem., ECF No. 57 at PageID 928 (quoting the second block quotation in AC, ECF No. 31 at PageID 745-46, ¶108)); and (ii) that "over time" Root expected a "cost of acquisition advantage" (Def. Mem., ECF No. 57 at PageID 928 (quoting the first block quotation in AC, ECF No. 31 at PageID 744-45, ¶106)).[6]  Neither statement is puffery.

---

[6]  The 1933 Act Defendants' failure to challenge the remaining statements in ¶¶106, 108 and 110 as puffery implicitly concedes their materiality because a finding of puffery means the statement is immaterial. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (upholding jury verdict that the statement "[t]he results produced by Vivendi Universal in the second quarter are well ahead of market consensus" was not puffery because, in context, it was material to investors).

As an initial matter, courts in the Sixth Circuit are cautious when addressing puffery arguments. *See, e.g.*, *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1006 (S.D. Ohio 2008) (noting that the court "should proceed cautiously when addressing Defendants' assertion that certain statements are not actionable, because they were puffery"). Accordingly, the "context in which a statement is made is essential in determining whether a statement is puffery." *LSPRF*, 2021 WL 4397946, at *5; *see also City of Monroe*, 399 F.3d at 671-72 ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). Statements that are "capable of verification," like those concerning Root's "cost of acquisition advantage" (AC, ECF No. 31 at PageID 744-45, ¶106), cannot be puffery. *LSPRF*, 2021 WL 4397946, at *7.

The 1933 Act Defendants misread the AC in challenging the "differentiated cost of customer acquisition over the long term" sentence from the second block quotation in ¶108 as puffery. Plaintiff included that sentence to provide the context for the words in the second block quotation in ¶108 that are alleged to be materially false and misleading: "as we expand our licensed footprint to 50 states, we will invest in our national brand." AC, ECF No. 31 at PageID 745-46, ¶108. Defendants do not challenge these bold and italicized words from ¶108 as being puffery, nor could they given the importance of Root's planned national expansion to investors. *Id.* at 746, ¶109. In any event, a statement about Root's CAC in the context of making technology investments is a highly specific representation that is verifiable. *Id.* at 737-38, ¶¶73-77. Thus, this sentence is not puffery. *See LSPRF*, 2021 WL 4397946, at *7 (recognizing that statements about topics of "central importance" to a company are not puffery).

Likewise, the "over time . . . cost of acquisition advantage" sentence from the first block quotation in ¶106 is not puffery because Root's purported CAC advantage was highly material to investors in assessing whether Root could profitably compete with traditional insurers. AC, ECF

No. 31 at PageID 737-39, ¶¶73-80. Given the central importance of Root's CAC to the Company's profitability (*id.* at 738, ¶76), it was also material to investors that Root's CAC had significantly increased as of the IPO because of the increased marketing costs associated with the planned national expansion. *Id.* at 741-43, ¶¶94-104. Indeed, analysts and investors were keenly focused on Root's CAC and purported competitive advantage over traditional insurers on that basis in the weeks leading up to the IPO. *Id.* at 739, ¶¶81-86.

Because investors were misled about these adverse facts regarding Root's CAC, the first block quotation in ¶106 is material and not puffery. *See Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *17 (S.D. Ohio Jan. 21, 2016) ("Failing to accurately cite the progress of the merchandise category is material given the importance of the merchandising operations to Big Lots' business model."); *see also LSPRF*, 2021 WL 4397946, at *7 (finding that a statement was not puffery where, as here, it "appear[s] to be made to reassure investors" about an issue that "was of importance to investors"). In particular, the importance of Root's CAC to the Company's profitability rendered the Registration Statement's discussion of a "cost of acquisition advantage" highly material to investors. *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) (statement about the company's competitive position not puffery because, as here, it "draws a link between future success" and the alleged source of that success); *see also Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, 2016 WL 9413421, at *8 (S.D. Fla. June 29, 2016) (statement about compliance with regulations providing a competitive advantage was actionable because the company was not in compliance); *Martin v. Altisource Residential Corp.*, 2017 WL 1068208, at *6-*7 (D.V.I. Mar. 16, 2017) (statement about a competitive advantage was not puffery because the source of that purported advantage was impaired and would "risk rather than benefit RESI's bottom-line").[7]

---

[7] The cases cited by the 1933 Act Defendants all involved soft, unverifiable statements of "competitive advantage," unlike the mathematical advantage supposedly conferred by Root's CAC. *Cf. Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014)

a. **The 1933 Act Defendants' Historical Accuracy Argument Fails**

The 1933 Act Defendants argue that there can be no liability because the Registration Statement accurately disclosed Root's historical CAC average of $332 for the period between August 2018 and August 2020. Def. Mem., ECF No. 57 at PageID 915-19. This argument misreads the AC, however, which does not allege that Root's $332 CAC for that period was false. AC, ECF No. 31 at PageID 744-45, ¶¶106-07. Instead, the AC alleges that the repeated representations in the Registration Statement that Root presently had "a cost of acquisition advantage" due to the Company's purportedly low CAC created a duty to disclose that there was no CAC advantage in the near or long term because of the planned national expansion. *Id.* at 745-46, ¶¶107, 109, 111.[8]

Moreover, whether a statement contains some accurate historical financial results is not a legitimate defense to an omission claim. *See* Def. Mem., ECF No. 57 at PageID 916. As the Supreme Court held in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 192 (2015), "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* That aptly describes the AC's allegations, which, as in *LSPRF*, are "not a situation, as Defendants argue, where there was a disclosure of accurate historical data that Plaintiff alleges became misleading because less favorable

---

(generic discussion of competiveness untethered to specific metrics); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (unspecified and vague assertion of competitive advantage that did not ascribe it to any concrete metrics or sources); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Co.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (broad recital of a belief in a company's competitive advantage, without more, was too general to be material); *In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 768 (E.D. Va. 2004) (bland discussion of a generic competitive advantage is immaterial); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 232 (D.N.J. 2002) (excitement over potentially lower customer acquisition costs held immaterial). In any event, the actual language in the statements in ¶106 is "cost of acquisition advantage," not a generic "competitive advantage," further distinguishing Defendants' cases.

[8] The 1933 Act Defendants' reliance on *In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997) (Def. Mem., ECF No. 57 at PageID 915-16) is misplaced because in *Sofamor* the defendants stayed silent as to the alleged defects, so no duty to disclose existed. 123 F.3d at 401-02. That runs in stark contrast to the statements in ¶¶106, 108, and 110, which repeatedly discuss Root's CAC.

results might be predictable by the company in the future or an eventual public revelation that would adversely effect Cardinal's financial status." 2021 WL 4397946, at *13; *see also Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) ("Plaintiffs are right that once Defendants did make statements, they were obligated to share complete information. This is exactly what Plaintiffs plead that Defendants failed to do.").[9]

Likewise, the 1933 Act Defendants avoid the plain language of the statements in ¶¶106, 108, and 110 to argue that Root's disclosures about CAC "did not imply anything about the future or present customer acquisition costs." Def. Mem., ECF No. 57 at PageID 917. But that is precisely what these statements did by stating that Root had a then-existing "cost of acquisition advantage" that would purportedly continue "[o]ver time." AC, ECF No. 31 at PageID 744-45, ¶106. Thus, Defendants' reliance on the Registration Statement's disclaimer that "historical results are not necessarily indicative of the results that may be expected in the future" is irrelevant. Def. Ex. A at 19. So too is the "[CAC] can vary . . . due to seasonality" language from the Registration Statement (*id.* at 120), which is preceded by the sentence "[t]he efficiency of our customer acquisition strategy ***has resulted*** in a cost of acquisition advantage versus direct and agent channels." AC, ECF No. 31 at PageID 744-45, ¶106. Clearly, this statement directly implicated Root's then-current CAC. *Id.*

The 1933 Act Defendants then proceed to distort the AC's allegations in arguing that the 3Q20 increase in Root's CAC above $500 was temporary and had not materially deviated from the $332 figure contained in the Registration Statement. Def. Mem., ECF No. 57 at PageID 917. This factual argument – improper on a motion to dismiss (*OPERS*, 830 F.3d at 382-83) – is belied by the AC's allegations that, *inter alia*: (i) a CAC of $500 or more is par for traditional insurers (AC, ECF

---

[9] The statements discussed in *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Group*, 783 F.3d 383 (2d Cir. 2015) that are cited by the 1933 Act Defendants (Def. Mem., ECF No. 57 at PageID 916) were found inactionable because, unlike here, they "were made prior to the start of the Class Period" and "did not imply anything about future circumstances." 783 F.3d at 390.

No. 31 at PageID 739, ¶83); (ii) Root's CAC exceeded $500 in 3Q20 because of the planned national expansion (*id.* at 752-55, ¶¶131-35); and (iii) Root's CAC continued to be materially elevated following the IPO through at least August 2021. *Id.* at 755-56, ¶¶136-43.  Defendants argue that there "is no indication from the Complaint that Root's September 2020 increase in customer acquisition costs deviated from the typical cost fluctuations" in Root's CAC (Def. Mem., ECF No. 57 at PageID 917), but this ignores that the November 2020 analyst charts demonstrate that Root's CAC never crossed the critical threshold of $500 before the IPO.  AC, ECF No. 31 at PageID 752-54, ¶¶131-34.  If anything, these charts highlight the materially negative difference between Root's CAC before and after 3Q20.  *Id.*

Finally, after arguing that the 1933 Act Defendants had no duty to disclose and that there was nothing for them to disclose even if there was such a duty, the 1933 Act Defendants reverse course for Plaintiff's Section 11 claims and argue that "the allegedly omitted information was in fact disclosed" because of Timm's roadshow statements.  Def. Mem., ECF No. 57 at PageID 918-19. But these statements were, in and of themselves, materially false and misleading because instead of admitting that the marketing costs associated with Root's planned nationwide expansion had materially elevated Root's CAC as of the IPO, and that CAC would remain inflated thereafter for the same reason, Timm misleadingly stated that the cause of the spike was short-term marketing experiments.  AC, ECF No. 31 at PageID 750-52, ¶¶124-29.

In addition, even if it were accurate that Timm's roadshow disclosures cured the omissions in the Registration Statement (and it is not), this argument is legally deficient as to Plaintiff's Section 11 claims[10] because the Registration Statement instructed investors to not rely on any statements "other than those contained in this prospectus or in any free writing prospectuses we have

---

[10]    Plaintiff separately explains why the roadshow statements are actionable under Section 12(a)(2) against each of the Section 12(a)(2) Defendants (defined below).  *See infra* 35-40.

prepared," including information on Root's website. AC, ECF No. 31 at PageID 736, ¶¶62-63. Defendants cannot have it both ways – instructing investors to limit their review of information solely to the Registration Statement, but then relying on materials outside the Registration Statement to attempt to remedy the deficient disclosures contained therein. *See Miller v. Thane Int'l. Inc.*, 519 F. 3d 879, 887 (9th Cir. 2008) ("Availability elsewhere of truthful information cannot excuse untruths or misleading omissions [in offering documents]"); *see also In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("[O]missions . . . are not rendered immaterial by the fact that the omitted facts are otherwise available to the public."); *SEC v. Mozilo*, 2010 WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010) ("[A] reasonable investor is not required to pore through all prior transcripts of earnings calls . . . or 'connect the dots' in a company's various SEC filings.").

Indeed, the cases cited by the 1933 Act Defendants do not hold that investors should be charged with knowledge of non-prospectus disclosures where the prospectus directed them to ignore such information. *See Garber v. Legg Mason Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (relying on a prospectus supplement filed months before the prospectus became effective – ***not*** materials outside the registration statement – to find that the allegedly omitted information was disclosed); *Werbowsky v. Am. Waste Servs., Inc.*, 1998 WL 939882, at *2 (6th Cir. Dec. 22, 1998) (unpublished table decision) (granting summary judgment because the alleged omissions were not material and the prospectus was silent regarding whether investors should review outside materials).[11]

**b. The 1933 Act Defendants' Argument that the Allegedly Omitted Information Was Disclosed Fails**

The 1933 Act Defendants argue that the Registration Statement's disclosure of the national marketing campaign in the statements in ¶108 meant investors knew that Root's CAC had materially

---

[11] Furthermore, the 1933 Act Defendants' argument amounts to a "'truth-on-the-market' defense that courts routinely reject on motions to dismiss because they are 'intensely fact-specific.'" *In re CBL & Assocs. Prop., Inc. Sec. Litig.*, 2022 WL 1405415, at *15 (E.D. Tenn. May 3, 2022); *Wilkof*, 2010 WL 4184465, at *4 (same).

increased because calculating CAC "is simple math" and new insurance customers always lag marketing expenditures. Def. Mem., ECF No. 57 at PageID 919-21. Not so.

No component of the 1933 Act Defendants' hypothesis – none of which appears in the Registration Statement and instead consists of pure speculation – is accurate. The Registration Statement does discuss Root's planned national expansion (Def. Ex. A at 83, 120), but says nothing about this effort increasing Root's overall sales and marketing costs during 3Q20 or any of the following fiscal quarters. *Id.* The Registration Statement merely states that there are numerous components to Root's marketing costs and that the majority of those costs are in digital channels. *Id.* at 120 (noting that "over three-quarters of marketing spend is through digital performance channels" and that Root primarily obtains customers "through either our mobile app or mobile web platform").

Indeed, because investors were repeatedly told that Root possessed a CAC advantage, investors necessarily understood that the planned national expansion would require a moderation of other marketing costs so that Root's overall marketing expenditures would allow the Company to maintain that advantage. The Registration Statement states as much in representing that "the efficiency of [Root's] marketing spend through better data science and dynamic targeting in our digital channel, as well as greater investment in channel media" has led to a "cost of acquisition advantage" from these efforts. Def. Ex. A at 117, 120. That hardly informed investors that the planned national expansion would result in Root losing its "efficiency" in managing marketing costs by increasing marketing expenditures. *See* Def. Mem., ECF No. 57 at PageID 919-21.

Likewise, the 1933 Act Defendants' citation to the portion of the Registration Statement describing the increase in Root's marketing costs in the first six months of the 2020 fiscal year compared to the same time period in the 2019 fiscal year (Def. Ex. A at 19) is irrelevant because the spike in Root's CAC began in 3Q20, *i.e.*, after this time frame. If anything, this fact supports ***Plaintiff*** because Root's marketing costs increased by 35.7% in the first two fiscal quarters of 2020

(*id.*), and yet Root's CAC was only $266 and $270, respectively, for those two quarters. AC, ECF No. 31 at PageID 753-54, ¶133. In other words, the Company retained its CAC advantage in the first six months of 2021 despite increasing marketing costs by a significant amount. Based on this performance, investors would have reasonably expected that CAC would be unaffected by any increased marketing costs incurred as part of the planned national expansion.

Next, Defendants argue that because calculating CAC "is simple math," the fact of the planned national expansion meant that investors knew Root's CAC had risen to a level comparable to traditional insurers. Def. Mem., ECF No. 57 at PageID 919-20. But investors cannot calculate numbers unknown to them – the numerator (sales and marketing costs) and denominator (new customers acquired in a given period) needed to ascertain Root's CAC in 3Q20 were not disclosed in the Registration Statement. *See* Def. Ex. A at 19. Investors had to solely rely on the 1933 Act Defendants' statements for insight into Root's CAC as of the IPO and thereafter.

Even less compelling is the 1933 Act Defendants' argument that investors must have known that Root's CAC had increased because new customers "necessarily" lag increased marketing expenditures. Def. Mem., ECF No. 57 at PageID 920. As an initial matter, Defendants offer no support for this argument other than citing a post-IPO analyst report (*id.*),[12] meaning they concede there is no basis for concluding that investors were warned of a lag as of the IPO. *See City of Monroe*, 399 F.3d at 672-73 (rejecting factual arguments on a motion to dismiss as premature and more appropriate for summary judgment or trial). Furthermore, as the 1933 Act Defendants cannot dispute, Root's marketing costs substantially increased by over 35% in the first two fiscal quarters of 2020 (Def. Mem., ECF No. 57 at PageID at 919), when the Company achieved a CAC of $266 and $270, respectively (AC, ECF No. 31 at PageID 753-54, ¶133), meaning that there was no lag in new

---

[12] This analyst report offers no relief for the 1933 Act Defendants because it merely speculates, and does not substantiate, that "new customers from the 2021 sales and marketing spend *will likely* lag the spending." AC, ECF No. 31 at PageID 755-56, ¶139.

customers from those marketing efforts.  That is unsurprising – the Registration Statement explains that Root's focus on mobile devices means the Company's "customers can on-board through their mobile phone in as little as 47 seconds, without touching their keyboard."  Def. Ex. A at 2; *see also* AC, ECF No. 31 at PageID 744-45, ¶106 ("We therefore designed a mobile-directed customer acquisition strategy, delivering customer acquisition costs below the average cost of doing so through each of the direct and agent channels").  In other words, the Registration Statement described Root's value proposition as being able to quickly and efficiently adds new customers in response to marketing efforts – not one whose customer additions significantly lag such efforts.

Thus, the Registration Statement does not contain the "easily-read tables and straightforward narratives describing those tables" included in the prospectus at issue in *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 608-09 (6th Cir. 2005) (noting that, unlike here, "all of the information that Plaintiffs needed in order to support their claim . . . is available in the prospectus"); *see also In re Proshares Tr. II Sec. Litig.*, 2020 WL 71007, at *7 (S.D.N.Y. Jan. 3, 2020) (rejecting omission claim regarding the possibility that "the late-afternoon rebalancing of the Fund's portfolio could cause illiquidity in the VIX futures contract market" because the prospectus disclosed "that the Fund's <u>own conduct</u> in purchasing and selling VIX futures contracts could affect market liquidity and drive down the value of SVXY shares") (emphasis in original); *Callan v. Motricity Inc.*, 2013 WL 5492957, at *3 (W.D. Wash. Oct. 1, 2013) (finding that a prospectus adequately disclosed that "Apple and Google's new open access smartphone offerings presented a direct risk to Motricity's business model" because it included a detailed risk disclosure paragraph explaining the present existence of these competitors).

Moreover, the 1933 Act Defendants cite the risk disclosure in ¶110 that Plaintiff alleges is materially false and misleading as having "disclosed the risk that customer acquisition costs would remain elevated over the long term."  Def. Mem., ECF No. 57 at PageID 920-21; *compare* AC, ECF

No. 31 at PageID 746, ¶110 *with* Def. Ex. A at 27. As an initial matter, the 1933 Act Defendants'
failure to directly address Plaintiff's allegations pertaining to the risk disclosure in ¶110 means they
concede falsity for this statement. *See Fidel v. AK Steel Holding Corp.*, 2002 WL 31545952, at *13
(S.D. Ohio Sept. 19, 2022) (finding that defendants' "cursory treatment" of one of plaintiff's
challenged statements warranted denial of the motion to dismiss). In fact, the 1933 Act Defendants
entirely ignore that the hypothetical risk described in ¶110 had already materialized as of the IPO,
thereby rendering this risk disclosure materially false and misleading. AC, ECF No. 31 at PageID
746, ¶111. It is black-letter law that "risk disclosures are misleading where the company warns only
that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc.,
IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (finding "risk warnings"
actionable because they "represented that this revenue cut was merely possible when, in fact, it had
already materialized. The warnings only warned what might occur if certain contingencies were
met; the disclosures did not make clear that such contingencies had, in fact, already occurred."); *see
also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 290-91 (S.D.N.Y. 2018) (holding
that "risk factor disclosures" were actionable "because the risk . . . had already materialized").

Thus, because the risk disclosure in ¶110 did not disclose either that Root's CAC had
materially increased as of the IPO, or that its cause was the Company's planned national expansion,
it was affirmatively false and misleading and cannot preclude liability. *Cf. Thomas v. Citigroup
Glob. Mkts. Holdings Inc.*, 2022 WL 1051158, at *15 (S.D.N.Y. Mar. 1, 2022) (finding risk
disclosures adequate because "the Pricing Supplement made clear that, contrary to Plaintiff's
conclusory assertions, the daily trading price of the ETNs in the secondary market was determined
by outside market-conditions, not by CGMHI"); *Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, 2020
WL 71163, at *4 (S.D.N.Y. Jan. 2, 2020) ("The Pricing Supplement in this case explicitly disclosed

that '[b]ecause of the large and sudden price movement associated with futures on the VIX Index . . . the ETNs are intended specifically for short term trading.'").

The 1933 Act Defendants advance two additional arguments concerning the first statement in ¶106 (Def. Mem., ECF No. 57 at PageID 922-25) that additionally fail for the reasons discussed below, and because resolving these arguments would require "factual determinations on a motion to dismiss," which is not permitted. *Envision*, 2019 WL 6168254, at *16.

First, the 1933 Act Defendants dispute the AC's factual allegations by inaccurately arguing that there is no allegation "that any long-term increase in customer acquisition costs actually materialized." Def. Mem., ECF No. 57 at PageID 922-23. This is incorrect. The AC alleges that Root admitted as late as August 2021 that the Company's significantly increased CAC was hurting profitability so badly that Root was forced to reduce its earnings guidance for fiscal year 2021. AC, ECF No. 31 at PageID 756, ¶142. Indeed, Root's motivation for entering into the Carvana partnership was to obtain a no-cost source of customers. *Id.* at ¶¶140-41. Furthermore, the March 2021 analyst report explained that Root's then-existing CAC was at least $900 – much higher than the $500 to $800 average for traditional insurers (*id.* at 739, ¶80) – and Timm and Rosenthal admitted that Root had elevated CAC levels in February 2021 and would continue to struggle to manage CAC in the "years ahead." *Id.* at 755-56, ¶¶137-39. Thus, Root's "cost of acquisition advantage" did not exist as of the IPO or thereafter. *Id.* at 743, ¶104, 756, ¶143.

The 1933 Act Defendants' attempt to dispute these allegations is improper. *See supra* 18-19. It is also factually incorrect, as, for example, the 1933 Act Defendants ignore Root's February 2021 disclosures entirely, and that the August 2021 shareholder letter included a substantial reduction in Root's fiscal year 2021 earnings guidance because Root was unable to efficiently manage CAC. *Compare* Def. Mem., ECF No. 57 at PageID at 922 *with* AC, ECF No. 31 at PageID 755-56, ¶¶137, 142. Equally unavailing is the 1933 Act Defendants' recycled argument that the materially

false and misleading risk disclosure in ¶110 absolves them of liability (Def. Mem., ECF No. 57 at PageID 923), which fails for the reasons explained above. *See supra* 23-25.

Second, rehashing earlier arguments, the 1933 Act Defendants argue that Root was not required to make additional disclosures concerning CAC because all the necessary information was disclosed in the Registration Statement. Def. Mem., ECF No. 57 at PageID 923-25. For the reasons explained above, this argument fails. *See supra* 19-20. In addition, the 1933 Act Defendants' discussion of *Singh v. Schikan*, 106 F. Supp. 3d 439 (S.D.N.Y. 2015) (Def. Mem., ECF No. 57 at PageID 923-24), encapsulates why their motion should be denied. In *Singh*, the pharmaceutical company could not have known or predicted that its clinical trial for a drug would fail because, as the plaintiff in *Singh* did not dispute, a different company "had control over the study . . . [and] knew the study's actual composition." 106 F. Supp. 3d at 449. Thus, unlike here, where Root admitted that its CAC had materially increased as of 3Q20 (AC, ECF No. 31 at PageID 741, ¶92), in *Singh* it was impossible for any executive to have similar information before the offering.

Furthermore, it was undisputed in *Singh* that the prospectus disclosed all relevant details of the clinical study's design, including that the study at issue "had lessened enrollment criteria as compared to" an earlier study. 106 F. Supp. 3d at 443, 447-48 (explaining that this information was "easily located" in the prospectus). Here, by contrast, the Registration Statement provided no indication that Root's CAC had materially increased such that the Company had no competitive advantage over traditional insurers, and instead stated the opposite: that there was a then-existing "cost of acquisition advantage." AC, ECF No. 31 at PageID 744-46, ¶¶106-11.

Finally, the 1933 Act Defendants incorrectly portray the August 2021 Carvana partnership as an attempt to plead falsity by hindsight. Def. Mem., ECF No. 57 at PageID 924-25. As Plaintiff explained above, the Carvana partnership demonstrates that Root's CAC continued to be materially heightened almost one year after the IPO such that Root was forced to substantially reduce its

earnings guidance for fiscal year 2021 and exchange a significant portion of Root's equity for access to a no-cost source of customers. AC, ECF No. 31 at PageID 743, ¶¶100-04; *see supra* 8. This establishes the extent to which CAC was materially impaired when the 1933 Act Defendants issued the Registration Statement. *Id.* Moreover, this argument ignores that Timm admitted that Root's CAC had materially increased as of the IPO (*id.* at 741, ¶92), meaning Plaintiff is not wholly reliant on the Carvana partnership allegations to establish falsity. *Cf. Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 345 (S.D.N.Y. 2012) (recognizing that allegations of falsity contemporaneously in existence when the statement was made suffice to allege falsity).

### c.    The 1933 Act Defendants' Forward-Looking and Opinion Arguments Fail

#### (1)    The Bespeaks Caution Doctrine Does Not Apply

The 1933 Act Defendants mischaracterize the statements challenged in the AC and misstate the law in incorrectly arguing that each statement in ¶¶106, 108 and 110 is forward-looking and inactionable under the bespeaks caution doctrine. Def. Mem., ECF No. 57 at PageID 925-27.

Bespeaks caution protection "is available only when cautionary language relates to 'forward-looking, prospective representations.'" *Stein*, 2020 WL 3584800, at *9. "[M]isrepresentations of present or historical facts cannot be cured by cautionary language" and "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Id.* Bespeaks caution only immunizes forward-looking statements if the risk language "warns of the specific contingency that lies at the heart of the alleged misrepresentation." *P. Stolz Fam. P'Ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). The bespeaks caution doctrine does not apply to "material omissions" like those alleged in ¶¶106 and 108. *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *see also Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (same). The 1933 Act Defendants do not explain (and thus have waived) how the bespeaks caution doctrine applies to the AC's omission claims.

Likewise, the 1933 Act Defendants ignore that statements are not forward-looking when, as here, their "'veracity can be determined at the time the statement is made,'" meaning that the "'statement is not forward-looking' – even if the statement pertains to a future event." *LSPRF*, 2021 WL 4397946, at *12 (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018)).  Instead, the 1933 Act Defendants sweepingly argue that each of the statements in ¶¶106 and 108 are forward-looking, but do not specifically address them other than the first statement in ¶106 ("Over time we believe . . .").  Def. Mem., ECF No. 57 at PageID 925-27.  That failure is unsurprising because the other statements consist of specific representations about past or current facts that purported to convey to investors the current state of Root's CAC: "we ***have been able to acquire customers*** for below the average cost of doing so" (AC, ECF No. 31, at PageID 744-45, ¶106); "[w]e therefore ***designed*** a mobile-directed customer acquisition strategy, ***delivering*** customer acquisition costs below the average cost of doing so" (*id.*); "[t]he efficiency of our customer acquisition strategy ***has resulted*** in a cost of acquisition advantage" (*id.*); "we ***intend*** to increase our presence in digital and traditional channel media" (*id.* at 745-46, ¶108); "***as we expand*** our licensed footprint to 50 states" (*id.*).  Likewise, the first statement in ¶106 references Root's purported then-existing "cost of acquisition advantage in all channels." *Id.* at 744-45, ¶106.  These statements are not forward-looking because they "plainly relate to past or current, rather than future, performance." *Fidel*, 2002 WL 31545952, at *19; *see also Willis*, 2016 WL 8199124, at *18-*19 (assessing each challenged statement to ascertain whether they were, in fact, forward-looking).

The 1933 Act Defendants incorrectly argue that these statements are *per se* forward-looking because they involve the subjects of CAC and marketing costs.  Def. Mem., ECF No. 57 at PageID 926 (citing Def. Ex. A at 64).  But each statement must be individually assessed to ascertain whether the specific language used makes it forward-looking. *See Dougherty*, 905 F.3d at 983-84; *LSPRF*, 2021 WL 4397946, at *12.  It is not enough, as the 1933 Act Defendants attempt here, to declare that

every statement in the Registration Statement "other than statements of historical facts" are de facto forward-looking statements requiring no additional analysis. Def. Ex. A at 64.

Additionally, even if the statements in ¶¶106 and 108 were forward-looking (and they are not), the bespeaks caution doctrine cannot apply because the cautionary language cited by the 1933 Act Defendants is not "substantive and tailored" to the material increase in Root's CAC that existed as of the IPO and was expected to continue thereafter due to the planned national expansion. *See Helwig*, 251 F.3d at 559. Specifically, the 1933 Act Defendants cite two highly generic risk disclosures that could apply to any corporation and are unrelated to Root's CAC: (i) "[y]ou should not rely on forward-looking statements as predictions of future events" (Def. Mem., ECF No. 57 at PageID 926 (citing Def. Ex. A at 65)); and (ii) Root's "ability to attract new customers will depend on . . . the effectiveness of our marketing efforts." Def. Mem., ECF No. 57 at PageID 927 (citing Def. Ex. A at 83). Such boilerplate risk disclosures are insufficient. *See LSPRF*, 2021 WL 4397946, at *10 (rejecting cautionary language that, like here, "was a general warning to investors that results could differ materially from those projected anticipated or implied").

The only other cautionary language cited by the 1933 Act Defendants is the materially false and misleading risk disclosure challenged in ¶110, the falsity of which the 1933 Act Defendants do not address. Def. Mem., ECF No. 57 at PageID 926-27 (citing Def. Ex. A at 27); *see supra* 23-25. This argument, however, ignores that cautionary language "is only meaningful to the extent that [the risks warned of] have not already occurred." *Envision*, 2019 WL 6168254, at *16. Plaintiff alleges that this risk disclosure falsely warned of hypothetical events that had already occurred. AC, ECF No. 31 at PageID 746, ¶111. Thus, "these allegations further preclude bespeaks-caution protection, for '[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired,' which is precisely what Plaintiffs plead here." *Stein*, 2020 WL 3584800, at *16.

**(2)    The Challenged Statements Are Not Inactionable Opinions**

Like the 1933 Act Defendants' forward-looking argument, Defendants again sweepingly argue that all of the statements challenged in ¶¶106 and 108 are nonactionable opinions, yet recognize that non-opinion factual statements "express[] certainty about a thing." Def. Mem., ECF No. 57 at PageID 927.  Because each of the statements in ¶¶106 and 108 express certainty about Root's purported CAC advantage or the planned national expansion, they are not opinions.  *See Envision*, 2019 WL 6168254, at *11 (statements like "We have a track record of delivering strong growth through a combination of organic growth, new contract additions and selective acquisitions" were not opinions).  Moreover, although the first statement in ¶106 includes the phrase "we believe," that is not dispositive.  *See id.* ("[M]erely appending 'we believe' or 'we think' does not automatically render statements non-actionable.").

Even if these statements were opinions (and they are not), the 1933 Act Defendants completely ignore the Supreme Court's framework for evaluating whether opinion statements are actionable.  *Compare* Def. Mem., ECF No. 57 at PageID 927 *with Omnicare*, 575 U.S. at 184-85, 196 (statements of opinion are actionable where: (i) the speaker does not "actually hold[] the stated belief"; (ii) the opinion contains a materially false "embedded statement[] of fact"; *or* (iii) the omitted information shows that the speaker "lacked the basis for making those statements that a reasonable investor would expect").  Here, the AC adequately alleges liability under all three *Omnicare* prongs.  First, Plaintiff alleges that the 1934 Act Defendants were aware during the roadshow that Root's CAC had significantly increased to a level equivalent to that of traditional insurers, meaning Root no longer possessed any competitive advantage on this basis.  AC, ECF No. 31 at PageID 741, ¶¶92-93.  Second, the discussion of Root's "cost of acquisition advantage" inaccurately implied that such an advantage existed or was attainable, which it was not because of the significant increases in marketing costs associated with Root's planned national expansion.  *Id.* at

- 30 -

744-46, ¶¶106-111; *Envision*, 2019 WL 6168254, at *12.  Third, a reasonable investor would find

misleading the nondisclosure of Root's loss of a "cost of acquisition advantage" because of the

planned national expansion.  *See Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 174-76 (2d

Cir. 2020) (finding liability where, as here, an opinion statement "implie[d] . . . the absence of

contrary facts" to a reasonable investor).

### 2. The Materially Misleading Statements and Omissions Regarding Root's CAC Competitive Advantage

The 1933 Act Defendants separately address Root's non-existent post-IPO CAC advantage

component of falsity for the statements in ¶106 (Def. Mem., ECF No. 57 at PageID 929-31),

including reiterating their forward-looking statements, opinion, puffery, and falsity by hindsight

arguments.  *Id.* at 931.  For the reasons set forth above, these arguments lack merit.  *See supra* 14-30.

The lone new argument advanced by the 1933 Act Defendants also fails.  Again, the 1933

Act Defendants attempt to inaccurately recast the "cost of acquisition advantage" described in ¶106,

which was highly material to analysts and investors evaluating the IPO (AC, ECF No. 31 at PageID

739, ¶¶81-86), as a generic "competitive advantage."  Def. Mem., ECF No. 57 at PageID 929-30.  In

addition, citing no case law, the 1933 Act Defendants manufacture a non-existent standard in

arguing that Plaintiff is required to allege that "the rest of the automobile insurance industry's

average customer acquisition costs likewise did *not* rise together with Root's spike in customer

acquisition costs."  *Id.* at 930-31 (emphasis in original).  Such speculation has no place in a motion

to dismiss, however, where the AC's allegations must be presumed as true and factual argument is

improper.  *See, e.g.*, *City of Monroe*, 399 F.3d at 672-73.  Moreover, the 1933 Act Defendants ignore

Root's post-IPO disclosures, which made no distinction regarding "other channels" of customer

acquisition (Def. Mem., ECF No. 57 at PageID 930), and instead admitted that Root's overall CAC

had materially increased because of "the state expansion plans," which caused Root to struggle in

"managing customer acquisition costs" in the "years ahead" and forced the Company "to take active

steps to reduce our customer acquisition costs."  AC, ECF No. 31 at PageID 754-56, ¶¶135-42.  Likewise, an analyst noted that Root's CAC was $900 as of March 2021, much higher than GEICO's $600 and Progressive's $750.  *Id.* at 755-56, ¶139.  If Root could have legitimately blamed its disastrous CAC performance on rising CAC across the automobile insurance industry in 2021, Root would have made that clear in its Class Period disclosures.  Root did not do that.

### 3. The Registration Statement Violates Items 303 and 105, and Rule 408

Separate from the alleged misstatements and omissions challenged in the AC, the third manner of pleading liability under 15 U.S.C. §77k(a) and 15 U.S.C. §77l(a)(2) – the failure "to state a material fact that was required to be disclosed" – is adequately alleged because the Registration Statement violates Items 303 and 105 of SEC Regulation S-K, and Rule 408 of SEC Regulation C.  AC, ECF No. 31 at PageID 747-49, ¶¶112-23.  In other words, even if the Court were to find that the challenged statements are not actionable, Plaintiff can still plead falsity by establishing violations of Items 303 or 105, or Rule 408.  *See, e.g.*, *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (finding falsity based solely on the failure to disclose information required by regulations).

The 1933 Act Defendants barely address their liability under Items 303 and 105 and Rule 408, relegating their argument to two perfunctory footnotes, none of which provide any argument specifically addressing these SEC regulations.  *See* Def. Mem., ECF No. 57 at PageID 915 n.2, 920 n.4.  Thus, the 1933 Act Defendants have waived any specific arguments regarding these regulations.  *See supra* 11 n.4.  As explained below, the AC adequately alleges liability under each.

### a. Item 303

Item 303 of Regulation S-K requires disclosure "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations."  *SAIC*, 818 F.3d at 94; *see also*

*Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 888 (M.D. Tenn. 2013) (same); AC, ECF No. 31 at PageID 747-48, ¶¶114-17.

As of the IPO, as demonstrated by Timm's roadshow commentary (*id.* at 741, ¶92) and the Company's first earnings announcement following the IPO (*id.* at 754-55, ¶135 (discussing Root's CAC for 3Q20, before the IPO)), Root fully understood that: (i) the Company's CAC had significantly increased, and would remain elevated thereafter, because of the increased marketing expenditures made for the planned national expansion; and (ii) Root's elevated CAC meant that the Company possessed no competitive advantage on this basis over traditional insurers. *Id.* at 748, ¶118. At a minimum, Root's spike in CAC as of the IPO was a material event or uncertainty that courts routinely find must be disclosed under Item 303. *See Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 105 (1st Cir. 2013) (finding the failure to disclose "adverse events" concerning the company's main drug violated Item 303); *see also SAIC*, 818 F.3d at 95-96 (finding that the company violated Item 303 even where it could not quantify the precise negative impact that a known event or uncertainty would have on revenue); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (finding "factually-based uncertainties of which it was aware in the weeks leading up to the [offering]" to be actionable under Item 303).

### b.  Item 105

Item 105 of Regulation S-K requires an issuer to disclose "the most significant factors that make [the securities] speculative or risky." AC, ECF No. 31 at PageID 748-49, ¶¶119-20. Item 105 "is intended to provide investors with a  clear and concise summary of the material risks to an investment in the issuer's securities." *Silverstrand*, 707 F.3d at 103.[13] "[T]o withstand dismissal at the pleading stage, a complaint alleging omissions of Item [105] risks needs to allege sufficient facts to infer that a registrant knew . . . that (1) a risk factor existed; (2) the risk factor could adversely

---

[13]  The former Item 503 as referenced in *Silverstrand* was relocated to Item 105 on May 2, 2019.

effect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor." *Id.*

The 1933 Act Defendants cannot, and do not, dispute that Root understood as of the IPO that the Company's CAC had significantly increased or that having an increased CAC would negatively impact Root's present and future profitability. AC, ECF No. 31 at PageID 749, ¶121. Courts routinely find similar circumstances to constitute actionable violations of Item 105. *See Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *22 (M.D. Tenn. Feb. 28, 2022) (sustaining Item 105 claim where an investment was exposed to undisclosed risks that were not explained to investors); *see also City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 427 (S.D.N.Y. 2011) (upholding Item 105 claims where specific risks were not disclosed even though the "Registration Statement does include discussions of each of these topics"); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 715 (3d Cir. 2020) (finding Item 105 violation where a prospectus "failed to discuss just how treacherous jumping through those hoops would be"); *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (stating that Item 105 was violated because the prospectus did not "explain the risks of its new sales strategy" and instead included "over thirty pages" of "boilerplate risk factors").

### c. Rule 408

The AC also alleges that the Registration Statement failed to disclose material information required to be disclosed by Rule 408 of SEC Regulation C. AC, ECF No. 31 at PageID 749, ¶¶122-23. Rule 408 reflects the principle that an issuer's disclosures must be complete and accurate. *See Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*, 2003 WL 22882137, at *4 (S.D.N.Y. Dec. 4, 2003). Specifically, Rule 408 states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if

any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."  17 C.F.R. §230.408(a).

Accordingly, the 1933 Act Defendants had a duty to disclose the spike in CAC as of the IPO and the reasons therefor.  *See Facebook*, 986 F. Supp. 2d at 522 (sustaining Rule 408 claim "because known financial effects related to increasing mobile usage and certain product decisions were not disclosed" in an initial public offering prospectus).

### 4. The Materially Misleading Misstatements and Omissions Regarding CAC Made During Root's Roadshow Are Actionable Under Section 12(a)(2)

Section 12(a)(2) of the 1933 Act "imposes liability for selling a security by means of a prospectus or oral communication containing materially false or misleading statements or omissions of material fact."  *Envision*, 2019 WL 6168254, at *28; *see also* 15 U.S.C. §77l(a)(2).  As explained above, each of the statements challenged in ¶¶106-23 constitute materially false and misleading statements or omissions, meaning Plaintiff has adequately alleged Section 12(a)(2) liability against Root, Timm, Rosenthal, and the Underwriter Defendants (the "Section 12(a)(2) Defendants") (AC, ECF No. 31 at PageID 760-62, ¶¶164-76).[14]  *See supra* 11-32.

In addition, Plaintiff adequately alleges Section 12(a)(2) liability against the Section 12(a)(2) Defendants for several false and misleading statements made during the roadshow.  AC, ECF No. 31 at PageID 750-52, ¶¶124-29.  First, Plaintiff alleges that Timm's description of the spike in Root's CAC in 3Q20 as being caused by "short term" marketing "experimentation" were inaccurate statements of material fact because Root's significantly increased CAC was not caused by marketing experimentation, but was instead caused by a sustained increase in marketing costs due to the

---

[14]   The Section 12(a)(2) Defendants concede that: (i) they are statutory sellers for whom Plaintiff has standing to sue under Section 12(a)(2); and (ii) the falsity analysis for Section 12(a)(2) mirrors that of Section 11.  *See* Def. Mem., ECF No. 57 at PageID 932-34.

planned national expansion that was set to continue long-term and had eliminated any competitive advantage Root had over traditional insurers regarding CAC.  *Id.* at 750-51, ¶¶124-26.

Likewise, Plaintiff alleges that Timm falsely and misleadingly informed investors that Root nonetheless had the ability to keep its CAC "much lower than our competitors" because the recent CAC spike was purportedly due to short term "experimentation on brand."  *Id.* at 751, ¶127. Timm's statement that "we do have the ability to keep our customer acquisition costs much lower than our competitors" was an inaccurate statement of material fact because Root had no competitive advantage over traditional insurers in terms of CAC as of the IPO, and would not have any such advantage following the IPO, because of the significant increase in the Company's marketing costs due to the planned national expansion.  *Id.* at 751-52, ¶¶128-29.

Almost immediately following the IPO, investors began learning that Timm's statements were untrue when analysts started reporting in November 2020 that, for example, Root's "heavy customer acquisition costs will result in elevated cash burn and net losses through 2023" (*id.* at 752-53, ¶131) and that Root's planned national expansion meant that a "conservative" estimate for Root's CAC by the first fiscal quarter of 2021 was "nearly $700."  *Id.* at 753-54, ¶133.  Indeed, Timm abandoned the word "experimentation" in Root's first financial report on December 1, 2020, stating that "the ***amplified*** brand spend will take time to drive acquisition efficiency and will result in elevated customer acquisition cost levels for the next two quarters."  *Id.* at 754, ¶134.  By the time the Company filed its second financial report in February 2021, Timm further admitted that Root's CAC spike was never going to be "short term," and instead the Company had "much work to do in the quarters ***and years ahead*** . . . [in] managing customer acquisition costs."  *Id.* at 755, ¶137.

Thus, the roadshow statements are actionable.  *See Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *17 (M.D. Tenn. Apr. 8, 2021) (statements about a company's marketing strategy were actionable because these "marketing practices, rather than being 'best in-class' and

giving AAC a competitive advantage, actually 'decimated' AAC's business"); *see also Strougo v. Tivity Health, Inc.*, 2021 WL 3209567, at \*4 (M.D. Tenn. July 29, 2021) (statements that a business "'performed well'" and performance was "'on track'" were actionable because the plaintiff alleged that the misstatements "were made in the face of contradictory evidence").

The Section 12(a)(2) Defendants raise several unavailing arguments in response. Def. Mem., ECF No. 57 at PageID 933-34. First, without citing any case law, the Section 12(a)(2) Defendants argue that the roadshow statements apply "only to Mr. Timm." *Id.* at 933. This misreads Section 12(a)(2), which subjects all statutory sellers for an offering to strict liability for materially false and misleading statements or omissions in a prospectus or oral statement. 15 U.S.C. §77l(a)(2); *see also* AC, ECF No. 31 at PageID 761, ¶166; *Fifth Third Bancorp*, 731 F. Supp. 2d at 704-05 ("Section 12(a)(2) of the Securities Act of 1933 is similar to Section 11 in that it imposes liability against a seller of securities by means of a prospectus or oral communications containing materially misleading statements or omissions."). Here, the Section 12(a)(2) Defendants have waived any argument concerning whether they are statutory sellers (*see supra* 35 n.14), meaning that the only element being contested is falsity. Def. Mem., ECF No. 57 at PageID 933-34. In other words, because the AC adequately alleges that the Section 12(a)(2) Defendants are statutory sellers (AC, ECF No. 31 at PageID 761-62, ¶¶167-70), each of them can be held liable under Section 12(a)(2) for the materially false and misleading roadshow statements.

Next, the Section 12(a)(2) Defendants argue that the statements in ¶¶124 and 127 are "protected as forward-looking statements" (Def. Mem., ECF No. 57 at PageID 933), but do not explain (and therefore have waived) how these present statements of fact are "forward-looking." *Id.* Timm discussed "the *recent* spike" in Root's CAC, which was "*from* some of this experimentation on brand that you see over here on the left side of the page" that Root would "***continue*** to do . . .

- 37 -

short term." AC, ECF No. 31 at PageID 750, ¶124. Timm also represented that "we **do have** the ability to keep our customer acquisition costs much lower than our competitors." *Id.* at 751, ¶127.

These are plainly not forward-looking statements. Even if they were, the Section 12(a)(2) Defendants concede that ***no cautionary language or warning about forward-looking statements accompanied Timm's roadshow statements*** (Def. Mem., ECF No. 57 at PageID 910-12, 933), meaning that the bespeaks caution doctrine, by definition, cannot apply to these statements. *See P. Stolz*, 355 F.3d at 96 (holding that cautionary language must be "within the same prospectus" as the alleged misrepresentations in order to qualify for bespeaks caution protection). Instead, the Section 12(a)(2) Defendants point to vague and boilerplate cautionary language that appeared in the Registration Statement only (Def. Mem., ECF No. 57 at PageID 933 n.7 (citing Def. Ex. A at 22, 27-29)), but fail to explain how such language could immunize statements made outside the Registration Statement. Moreover, the Section 12(a)(2) Defendants rely on the risk warning in ¶110 that Plaintiff alleges is false and misleading – which states that CAC **may** rise **if** Root cannot maintain cost-effective marketing strategies (Def. Ex. A at 27) – but again ignore that this is precisely the risk that had already materialized as of the IPO. *See Envision*, 2019 WL 6168254, at \*12 (finding falsity because the undisclosed information conflicted with what a reasonable investor would expect based on the company's statements). Thus, even if such cautionary language had accompanied the roadshow statements, the risk warnings cited by the Section 12(a)(2) Defendants are insufficient because they warn of risks that had already materialized. *See supra* 23-25.

The Section 12(a)(2) Defendants also challenge the statements in ¶¶124 and 127 for being inactionable opinions, but again fail to explain how any of these statements constitute opinions. Def. Mem., ECF No. 57 at PageID 933-34. CAC is a quantifiable metric whose "recent spike" was reported by Timm, and whose purported competitive advantage over traditional insures was portrayed as a mathematical certainty. AC, ECF No. 31 at PageID 750-51 ¶¶124-27. Thus, these are

- 38 -

not opinion statements. Even if they were, Defendants fail to address or acknowledge the three prongs of *Omnicare* liability. Def. Mem., ECF No. 57 at PageID 933. Nonetheless, for the reasons explained above, these statements are actionable under *Omnicare*. *See supra* 30-31.

Likewise, the Section 12(a)(2) Defendants reiterate the same puffery arguments (Def. Mem., ECF No. 57 at PageID 933-34) that are deficient for the reasons explained above. *See supra* 14-16. Moreover, because material statements cannot be puffery and Root's CAC was highly material to investors (AC, ECF No. 31 at PageID 737-39, ¶¶73-86), it is difficult to imagine how a "recent spike" in Root's CAC, and whether that spike had impacted Root's "ability to keep our customer acquisition costs much lower than our competitors," could be puffery. *Id.* at 750-51, ¶¶124-27. Indeed, such statements "were capable of verification," *i.e.*, not puffery, because calculating CAC is straightforward and produces a mathematical certainty. *LSPRF*, 2021 WL 4397946, at *7.

Finally, the Section 12(a)(2) Defendants mischaracterize the statements in ¶124 by arguing that because Timm mentioned that Root was planning on "becoming a national brand," this meant that Timm had disclosed the true source of Root's spike in CAC. Def. Mem., ECF No. 57 at PageID 933. But the reference to "becoming a national brand" was that doing so was "important" and that Root wanted to ensure that its marketing was done "in a very differentiated way that is not gimmicky." AC, ECF No. 31 at PageID 750, ¶124. In fact, Timm stated that such marketing expenditures would be kept reasonable – "[w]e don't believe we will ever be at the level of brand spend of a Geico or Progressive . . . we will intelligently experiment with the brand channel" – and would not detract from Root's purported CAC advantage over "our competitors." *Id.* But that is precisely the opposite of how Root was managing CAC in connection with the planned national

expansion – brand spend was "amplified" and would impair Root's CAC "for years." *Id.* at 750-52, ¶¶124-29, 754-55, ¶¶134, 137.[15]

### 5. Section 15 Control Person Liability is Adequately Alleged

The 1933 Act Defendants only contest Plaintiff's Section 15 control person claims (*id.* at 763-64, ¶¶177-84) by arguing that there is no primary violation of the 1933 Act. Def. Mem., ECF No. 57 at PageID 938-39. Essentially, the 1933 Act Defendants have conceded that Plaintiff has adequately alleged Section 15 claims so long as any of Plaintiff's Section 11 or 12(a)(2) claims are sustained. Accordingly, because each of the alleged Section 11 and 12(a)(2) claims are adequately alleged, the 1933 Act Defendants' motion to dismiss the Section 15 claims should be denied. *See, e.g.*, *Prison Realty*, 117 F. Supp. 2d at 691-92 (denying motion to dismiss Section 15 claims based on argument of no primary liability because the plaintiff had adequately alleged primary violations).

### C. The AC Adequately Alleges Violations of the 1934 Act

Under Section 10(b) of the 1934 Act and Rule 10b-5(b), Plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *OPERS*, 830 F.3d at 383-84 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)).

Plaintiff's 1934 Act claims, alleged only against the 1934 Act Defendants (AC, ECF No. 31 at PageID 772-73, ¶¶215-22), must also satisfy Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") in addition to Rule 8(a). *OPERS*, 830 F.3d at 383. Rule 9(b)

---

[15] The Section 12(a)(2) Defendants incorrectly argue that the AC's allegations "go beyond the language quoted from Mr. Timm's comments" in discussing the recent CAC spike. Def. Mem., ECF No. 57 at PageID 933 n.6. As the Section 12(a)(2) Defendants know, the roadshow statements were accompanied by presentation slides (which were referenced in Timm's oral statements and the Section 12(a)(2) Defendants chose not to submit) that, like the post-IPO analyst charts made public in November 2020, showed Root's CAC as of the IPO substantially exceeded the average CAC spent by traditional insurers. AC, ECF No. 31 at PageID 752-54, ¶¶131, 133.

provides the modest requirement that Plaintiff must "state with particularity the circumstances constituting fraud or mistake."  Rule 9(b).  Similarly, the PSLRA requires Plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter.  15 U.S.C. §§78u-4(B)(1)-(2).

The 1934 Act Defendants only contest the falsity and scienter elements.  Def. Mem., ECF No. 57 at PageID 935-38.  With respect to falsity, the 1934 Act Defendants reiterate the arguments made by the 1933 Act Defendants concerning Sections 11 and 12(a)(2).  *Id.* at 935.  Because Plaintiff has adequately alleged falsity for these claims, all of the statements and failures to comply with relevant regulations in ¶¶106-29 are actionable under Rule 10b-5(b).  *See supra* 11-40.

Further, as explained below, the AC adequately alleges scheme liability against the 1934 Act Defendants – which they do not address and have waived the right to contest – and scienter.

### 1.    Plaintiff's Scheme Liability Claims Are Unchallenged by the 1934 Act Defendants

The AC alleges that the 1934 Act Defendants engaged in a course of conduct that operated as a fraud on investors, otherwise known as "scheme liability."  AC, ECF No. 31 at PageID 728, ¶18, 764, ¶187, 766, ¶194, 767, ¶198, 772, ¶217.  Scheme liability is prohibited by 17 C.F.R. §240.10b-5(a), (c).  *See Lorenzo v. SEC*, 139 S. Ct. 1094 (2019); *see also Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *45 (M.D. Tenn. Mar. 31, 2011) ("The securities laws reach misleading conduct as well as misleading statements.").  Here, Plaintiff alleges that the 1934 Act Defendants engaged in a fraudulent scheme, that their actions affected the market for Root Class A common stock, and that they caused injury to Plaintiff and the proposed Class.  This is sufficient. *See Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 320 F. Supp. 3d 910, 923 (E.D. Mich. 2018) (denying motion to dismiss scheme liability claims even though Rule 10b-5(b) and Section 10(b) claims were dismissed).

The 1934 Act Defendants do not seek dismissal of Plaintiff's scheme liability claims. *See* Def. Mem., ECF No. 57 at PageID 912-39. Accordingly, any challenge on reply by the 1934 Act Defendants to such claims is waived, as numerous courts recognize. *See AAC*, 2021 WL 1316705, at *4 ("Defendants did not specifically challenge Plaintiffs' claims of scheme liability . . . . The Court finds that Defendants did not move to dismiss Plaintiffs' scheme liability claims and, therefore, it will not address Defendants' belated argument related thereto, which are deemed waived for purposes of the Motion."); *see also St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at *2 n.1 (M.D. Tenn. Jan. 20, 2021) ("declin[ing] to consider" defendants' scheme arguments raised for the first time in their reply); *Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Hldgs., Inc.*, 2022 WL 989240, at *15 (M.D. Tenn. Mar. 31, 2022) (same); *Jackson Cnty. Emps' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 610 n.7 (M.D. Tenn. 2020) (same).

## 2.    The 1934 Act Defendants' Scienter Is Adequately Alleged

The PSLRA requires a plaintiff to "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'" in making misrepresentations or omissions. *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011) ("*Dana II*") (citing 15 U.S.C. §78u-4(b)(2)). "[P]laintiff need only allege that defendant's behavior was reckless." *Willis*, 2016 WL 8199124, at *30-*31. "'Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care,"'" and "'"akin to conscious disregard."'" *Dana II*, 646 F.3d at 959.

In evaluating the sufficiency of scienter allegations, the Supreme Court has directed courts to "accept all factual allegations in the complaint as true," view the allegations "holistically" and consider whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322-26. "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that [requisite] standard." *Id*. at 310.  "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Dana I*, 547 F. 3d at 571.  In other words, *Tellabs* "'awards the draw to the plaintiff.'" *Id*.

The Sixth Circuit analyzes scienter "with reference to nine ***non-exhaustive*** factors" identified in *Helwig*, 251 F.3d at 552, that are probative of scienter, consistent with *Tellabs*:

> (1) insider trading at a suspicious time or in an unusual amount;
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
>
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
>
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.[16]

*Dougherty*, 905 F.3d at 979 (citing *Helwig*, 251 F.3d at 552) (holding plaintiff adequately pleaded scienter where three of the *Helwig* factors weighed in its favor); *see also Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *20 (M.D. Tenn. Dec. 18, 2017) (scienter adequately alleged where two of

---

[16]  *Helwig*'s "'most plausible' standard . . . is no longer good law." *Dana I*, 547 F.3d at 571.  The approach mandated by *Tellabs* is more lenient than the heightened pleading standard previously imposed under *Helwig*.  *Id*.

nine factors were present). In analyzing scienter, courts are not limited to the *Helwig* factors, and may consider other probative facts. *See, e.g.*, *Dana II*, 646 F.3d at 960-61.

Plaintiff pleads the following facts, including three of the *Helwig* factors, which collectively raise a strong inference of scienter on the part of each 1934 Act Defendant:

- The 1934 Act Defendants' disregard of the most current factual information about Root's CAC before making the Registration Statement and roadshow statements;

- Timm and Rosenthal, by virtue of their high-level positions within the company and participation in the roadshow, understood that Root did not possess any meaningful competitive advantage over traditional insurers in terms of CAC as of, or after, the IPO;

- The closeness in time of the alleged misstatements and omissions made on October 28, 2020 and Root's disclosures of contrary information beginning on December 1, 2020;

- Root's disclosures concerning the Company's true CAC and lack of competitive advantage over traditional insurers caused numerous substantial declines of over 10% each in the price of Root Class A common stock;

- The importance to Root's profits of having a low CAC below that of traditional insurers; and

- The alleged misstatements and omissions were made to ensure a lucrative IPO, *i.e.*, for the 1934 Act Defendants' own financial interests.

The inference these facts and circumstances raise is at least as plausible as any non-culpable inference. *Tellabs*, 551 U.S. at 323-24. Indeed, the 1934 Act Defendants do not offer any "plausible opposing inferences," *id.* at 323, and instead argue that there is no scienter because the 1934 Act Defendants met their disclosure obligations. Def. Mem., ECF No. 57 at PageID 936-37. That the 1934 Act Defendants cannot articulate a specific non-culpable inference is unsurprising – based on their roadshow and post-IPO disclosures, they obviously knew as of the IPO that Root's CAC had materially increased and the Company would have no competitive advantage over traditional insurers on this basis because of the planned national expansion.

### a. The 1934 Act Defendants Understood "the Most Current Factual Information" About Root's CAC, but Disregarded It When Speaking to Investors

A defendant's "disregard of the most current factual information before making statements" is probative of scienter. *Helwig*, 251 F.3d at 552. Both in the Registration Statement and roadshow, Timm and Rosenthal spoke repeatedly to investors about Root's CAC. *E.g.*, AC, ECF No. 31 at PageID 738-39, ¶¶77-79, 740-41, ¶¶87-88, 92, 743-45, ¶¶100-102, 106, 754-55, ¶¶134-135. The 1934 Act Defendants' specific statements about Root's CAC means they necessarily understood the undisclosed adverse facts concerning this financial metric. *Id.* at 764-65, ¶¶188-91. Thus, Timm and Rosenthal's own statements and the significance of CAC to Root's profitability support the inference that the 1934 Act Defendants knew the "most current factual information" about Root's CAC, but disregarded it in making the alleged misstatements and omissions. *See Grae*, 2017 WL 6442145, at *20 (holding scienter was adequately alleged because a defendant's "own public statements" about alleged misrepresentations "go a long way toward" pleading scienter).[17]

Additionally, Timm and Rosenthal necessarily had a full understanding of the problems with Root's CAC as of the IPO by virtue of their roles with the Company.  AC, ECF No. 31 at PageID 764-66, ¶¶185-86, 188, 190-91, 194.  Timm is Root's co-founder, CEO and a director (*id.* at 729, ¶24), while Rosenthal was Root's CFO and is a director (*id.* at 730, ¶27), meaning they would have understood then-existing problems with an important financial metric like CAC. *See Envision*, 2019 WL 6168254, at *22 (finding scienter adequately alleged because it was reasonable to presume that a company's executives were aware of problems at a subsidiary because of their high-level positions

---

[17]   *See also Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about [an] issue demonstrates defendants' sensitivity to it."); *Roberti v. OSI Sys., Inc.*,, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("[A]n inference of scienter can be established by the fact that the Defendants touched on [a] specific issue . . . in their public statements."); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *17 n.28 (D.N.J. Aug. 28, 2017) ("Through their public statements, [defendants] demonstrated personal knowledge of the ACT DMD results and PTC's conversations with the [agency].").

and the importance of that subsidiary to the company's profits); *see also Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016) (holding that scienter was adequately alleged because, as here, "[c]ommon sense dictates that disclosing the good while withholding the bad, especially when the bad is so readily known, suggests deliberate concealment").

In fact, courts may presume that high-level executives, like Timm and Rosenthal, are aware of matters, like CAC, that are central to the business's operations. *See LSPRF*, 2021 WL 4397946, at *16 (holding that scienter was adequately alleged where, as here, the subject of the misstatements and omissions was important to the company's "core business"); *see also Envision*, 2019 WL 6168254, at *21-*22 ("[H]igh-level executives can be presumed to be aware of matters central to their business's operation."); *Psychiatric Sols.*, 2011 WL 1335803, at *57 (same).

Even if the 1934 Act Defendants did not know the alleged undisclosed problems regarding Root's CAC, they were reckless in persistently speaking about Root's CAC and the competitive advantage it purportedly provided. *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (when a defendant speaks, but does not have actual knowledge about a subject, "it would be at least actionably reckless to reassure the public about these matters at all").

In response, the 1934 Act Defendants ignore these allegations and weakly postulate that "Root's business performed poorly after the IPO" so Plaintiff must be alleging "fraud by hindsight." Def. Mem., ECF No. 57 at PageID 938. Effectively, the 1934 Act Defendants provide no response to the AC's allegations that the roadshow statements mean that Timm and Rosenthal necessarily understood that Root's CAC was spiking as of the IPO. AC, ECF No. 31 at PageID 741, ¶92. Thus, the 1934 Act Defendants' characterization of Root's CAC problems as being mere poor performance fails to overcome the AC's cogent allegations of scienter. *See, e.g.*, *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (Sargus, J.) (rejecting the defendant's counter-

inference of scienter that "overall 2005 financial results were quite good" because "[w]hile these allegations cannot be discounted . . . Plaintiffs' allegations are at least as compelling").[18]

### b. The Closeness in Time of Defendants' Admissions Supports a Strong Inference of Scienter

The "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" is probative of scienter. *Helwig*, 251 F.3d at 552; *accord Dana II*, 646 F.3d at 960 (temporal proximity of positive and corrective statements is probative). "This factor is viewed as potentially probative of scienter because a 'short turnaround ma[kes] it less likely that the corporation did not know that its statement was misleading.'" *Dougherty*, 905 F. 3d at 981. This *Helwig* factor strongly supports the 1934 Act Defendants' scienter.

Here, following the issuance of the Registration Statement on October 28, 2020, it took just: (i) 26 days for investors to learn that Root's CAC had spiked as of the IPO and would weigh on profits through 2023 (on November 23, 2020) (AC, ECF No. 31 at PageID 752-54, ¶¶130-33); (ii) 34 days for investors to learn that increased marketing costs associated with the planned national expansion caused Root's CAC to spike in 3Q20 (December 1, 2020) (*id.* at 754-55, ¶¶134-35); and (iii) 120 days for investors to learn that Root has "much work to do in the quarters *and years ahead* . . . [in] managing customer acquisition costs." *Id.* at 755, ¶137. This short turnaround further supports the inference that Defendants acted recklessly at a minimum. *See Dougherty*, 905 F.3d at 981 (six-week gap between inconsistent statements supported scienter); *see also LSPRF*, 2021 WL 4397946, at *15 (56 days between inconsistent statements contributed to strong inference of scienter

---

[18]   By contrast, the cases cited by the 1934 Act Defendants involve situations where, unlike here, there were no allegations stating specifically when the company learned of the allegedly undisclosed information. *See Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) (rejecting scienter allegations because "the 'who, what, where, and when' are missing"); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 959 (S.D. Ohio 2009) (finding no scienter because there were no specific facts demonstrating why a financial metric was problematic); *Albert Fadem*, 334 F. Supp. 2d at 1026 (holding that scienter must be assessed at the time the alleged misstatements and omissions were made, not after the fact as alleged by the plaintiff).

for each defendant); *In re Grand Casinos, Inc., Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) (finding approximately seven-month period between offering and revelations to be a "short time frame" supportive of scienter).

The 1934 Act Defendants do not squarely address this *Helwig* factor.  *See* Def. Mem., ECF No. 57 at PageID 937-38.  Instead, they argue that the November 2020 analyst reports contained no corrective information, and therefore cannot support scienter, because they were supposedly consistent with the roadshow statements.  *Id.*  This argument merely recasts the 1934 Act Defendants' deficient falsity contentions. *See supra* 11-40.  Moreover, if the 1934 Act Defendants truly believed that these analyst reports provided no new information to investors regarding Root's CAC, they would have moved to dismiss on loss causation grounds.  *Cf. LSPRF*, 2021 WL 4397946, at *17 (finding loss causation adequately alleged where, as here, "Plaintiff alleged a causal connection between Defendants' alleged misleading statements and omissions inflating Cardinal's stock price and the stock price declines when negative material information related to the statements and omissions was disclosed.").  The 1934 Act Defendants did not contest loss causation precisely because these analyst reports began revealing their fraud to investors mere weeks after the IPO.  AC, ECF No. 31 at PageID 767-68, ¶¶200-01.  These circumstances strongly support scienter.

### c.     The 1934 Act Defendants' Self-Interested Motivation Supports a Strong Inference of Scienter

The "self-interested motivation of defendants in the form of saving their salaries or jobs" provides additional support for Plaintiff's scienter allegations.  *Helwig*, 251 F.3d at 552.  As the Supreme Court has noted, "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.

Here, Plaintiff alleges that the IPO – the largest ever for a company headquartered in Ohio (AC, ECF No. 31 at PageID 725, ¶3) – generated enormous amounts of wealth for Root and the Company's executives and directors, allowed the Selling Shareholders to cash out their pre-IPO

equity in Root, and instantly made Timm a multimillionaire.  *Id.* at 734-37, ¶¶51-72, 761, ¶¶167-69.
Indeed, Defendants substantially increased the IPO's size – both in terms of cost per share and
number of shares issued – before the IPO to make it as lucrative as possible.  *Id.* at 735, ¶¶54-59.

These specific facts tying the 1934 Act Defendants' interests to the IPO's success support an
inference of scienter.  *See Cardinal Health*, 426 F. Supp. 2d at 737 ("By presenting specific facts
tying the Individual Defendants' compensation to company performance, Plaintiffs do more than just
present 'bare allegations.'").

### d.    Timm's False Statements About Root's CAC Demonstrate Scienter

Timm's failure during the roadshow to disclose the true reason for the spike in CAC as of the
IPO, while falsely stating that Root had the "ability to keep [its] customer acquisition costs much
lower than [its] competitors," (AC, ECF No. 31 at PageID 750-52, ¶¶124-29), provides further
"evidence of a strong inference of fraudulent intent."  *Sanchez v. Centene Corp.*, 407 F. Supp. 3d
831, 846 (E.D. Mo. 2019).  In other words, Timm's incomplete disclosures "create a compelling
inference that [he] made a conscious decision to not disclose" the whole truth as it related to Root's
CAC.  *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) (finding scienter
adequately alleged where, as here, the defendant "had to know that revealing the full extent of [a
major tenant's] performance problems would have been troubling news to its investors"); *see also
Sanchez*, 407 F. Supp. 3d at 846 (holding that defendants' choice to discuss "'concerns'" regarding
company's reserves supported scienter); *Mozilo*, 2010 WL 3656068, at *19 (stating that a
defendant's incomplete disclosures did not negate an inference of scienter as a matter of law).

### e.    Timm and Rosenthal's Scienter Is Imputed to Root

Because "Plaintiff[] has adequately pleaded scienter as to the individual officers, [it] has also
pleaded scienter as to [Root]."  *Envision*, 2019 WL 6168254, at *21.  Defendants do not argue
otherwise.  *See* Def. Mem., ECF No. 57 at PageID 935-38.

The AC holistically alleges a strong inference that the 1934 Act Defendants knew, or were reckless in not knowing, that Root's CAC was, and would remain, significantly increased as of the IPO because of the planned national expansion, and that Root concomitantly did not possess a competitive advantage over traditional insurers on that basis. The 1934 Act Defendants offer no cogent or compelling response other than to argue (incorrectly) that these facts were disclosed and that Root's business performed poorly post-IPO. Neither contention comes close to outweighing the AC's numerous, cogent scienter allegations. Accordingly, Plaintiff has raised a strong inference of scienter that is more plausible than any opposing inference. *Tellabs*, 551 U.S. at 323-24.

### 3. Section 20(a) Control Person Liability Is Adequately Alleged

The 1934 Act Defendants only contest Plaintiff's Section 20(a) claims against Timm and Rosenthal (AC, ECF No. 31 at PageID 773, ¶¶220-22) by arguing that there is no primary violation of the 1934 Act. Def. Mem., ECF No. 57 at PageID 938-39. As with Plaintiff's Section 15 claim, Plaintiff's Section 20(a) claim is adequately alleged. *See supra* 40; *see also Prison Realty*, 117 F. Supp. 2d at 691-92 (applying the same logic regarding Section 15 to Section 20(a)).

## IV. CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion in its entirety.

DATED: July 1, 2022                              Respectfully submitted,

                                                 MURRAY MURPHY MOUL + BASIL LLP


                                                 */s/ Joseph F. Murray*
                                                 JOSEPH F. MURRAY (0063373)
                                                 1114 Dublin Road
                                                 Columbus, OH 43215
                                                 Telephone: 614/488-0400
                                                 614/488-0401 (fax)
                                                 murray@mmmb.com

                                                 *Local Counsel for Lead Plaintiff*

- 50 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL G. CAPECI (*pro hac vice*)
T. ALEX B. FOLKERTH (*pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
mcapeci@rgrdlaw.com
afolkerth@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JONAH H. GOLDSTEIN (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, Joseph F. Murray, hereby certify that on July 1, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



_/s/ Joseph F. Murray_

JOSEPH F. MURRAY