## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ILIA KOLOMINSKY,** *Individually and On Behalf of All Others Similarly Situated*,

        **Plaintiff,**

  **v.**

**ROOT, INC., et al.,**

        **Defendants.**

**Case No. 2:21-cv-1197**

**Judge Michael H. Watson**

**Magistrate Judge Vascura**

## <u>OPINION AND ORDER</u>

Defendants Root, Inc. ("Root"), Alexander Timm, Daniel Rosenthal, Megan Binkley, Christopher Olsen, Doug Ulman, Elliot Geidt, Jerri DeVard, Larry Hilsheimer, Luis von Ahn, Nancy Kramer, Nick Shalek, and Scott Maw (collectively, the "Root Defendants"), jointly with Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., and Wells Fargo Securities, LLC's (the "Underwriter Defendants"; together with the Root Defendants, "Defendants") move to dismiss the Amended Complaint.  ECF No. 57.  For the reasons below, the Court **GRANTS** Defendants' motion.

## I.     BACKGROUND

### A.   **Factual Background**

Plumbers Local #290 Pension Trust Fund ("Plaintiff") brings this putative class action on behalf of all who purchased Root's Class A common stock traceable to the Registration Statement issued in connection with Root's initial

public offering ("IPO") between October 28, 2020 (the date of the IPO) and August 12, 2021.

Root, a Columbus-based holding company founded in 2015, operates a technology company that "seeks to disrupt the traditional automobile insurance model by pricing and quoting insurance through a mobile phone app and using the app to collect driving data from Root's customers." Am. Compl. ¶¶ 4, 23, ECF No. 37. Through this model, Root believes it is better able to screen risky drivers compared to traditional automobile insurers like GEICO, Allstate, and Progressive. *Id.* Defendant Alexander Timm co-founded Root and served as Root's CEO and as a member of Root's board of directors (the "Board"); Defendant Daniel Rosenthal was Root's Chief Financial Officer at the time of the IPO, as well as a director on the Board; Defendant Megan Binkley was Root's Chief Accounting Officer at the time of the IPO; Defendants Christopher Olsen, Doug Ulman, Elliot Geidt, Jerri DeVard, Larry Hilsheimer, Luis von Ahn, Nancy Kramer, Nick Shalek, and Scott Maw were all directors on the Board at the time of the IPO. *Id.* ¶¶ 24, 27–37. Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., and Wells Fargo Securities, LLC served as underwriters and co-lead book running managers of the IPO. *Id.* ¶ 39.

On October 28, 2020, Root executed its IPO, and Root Class A common stock began trading on the NASDAQ. *Id.* ¶ 60. Leading up to its IPO, Root filed a Registration Statement with the SEC, becoming effective on October 27, 2020. *Id.* ¶¶ 53–57.

Much of this case revolves around the language of the Registration Statement and certain public statements (and omissions) made by the Root Defendants preceding the IPO.  Particularly important to Root, and central to this case, is Root's customer acquisition cost ("CAC"), which reflects the average cost of acquiring a new customer.  *Id.* ¶¶ 73, 75–79, 106.  CAC is a critical performance metric for newer companies like Root because it measures how well a company can improve its profitability as it continues to grow.  *Id.* ¶ 75.  A company's CAC is also critical to investors.

As articulated in the Registration Statement, Root's purportedly low CAC compared to traditional automobile insurance companies provided Root with a competitive advantage.  *Id.* ¶¶ 79.  Examples from the Registration Statement include:

- Within digital marketing we use data science models to dynamically bid on the basis of expected lifetime value.  Over time we believe the ongoing data we accumulate through growth will fuel a pricing advantage for target customers, driving improved conversion *and a cost of acquisition advantage in all channels*.

- Engaging our customers and prospective customers directly through the mobile device gives us access to an underutilized distribution channel, mobile, through which many incumbents have historically had difficulty profitably acquiring customers.  Through our hyper-targeted, data-driven and ever-improving performance marketing capabilities, *we have been able to acquire customers for below the average cost of doing so through each of the direct and agent-based channels*.

- The efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels.  While our customer acquisition costs can vary by channel mix, by state or due to seasonality, over the period from August 2018 to

> August 2020 our average customer acquisition cost was $332. In the
> near term, as we expand our licensed footprint to 50 states, we will
> invest in our national brand, which will increase awareness, build
> credibility and support all four of our distribution channels.

*Id.* ¶¶ 106 (alteration in original).

But Root's CAC as of the IPO was higher—and would continue to be

higher—than the $332 average disclosed in the Registration Statement. This

cost increase was allegedly triggered by Root's planned nationwide expansion

(at the time of the IPO, Root was licensed to sell insurance in 36 states). *Id.*

¶¶ 89–91; Registration Statement at 2, ECF No. 57-2. As alleged, Root's

"increased marketing expenditures had caused Root's customer acquisition cost

as of the IPO to be virtually the same as those of the traditional insurers that the

Registration Statement stated the Company had a competitive advantage over in

terms of customer acquisition costs." Am. Compl. at ¶ 91, ECF No. 31. Thus,

Root's elevated CAC signaled the loss of its competitive advantage. *Id.* ¶ 107.

This nationwide marketing rollout began prior to the IPO, but Root

allegedly did not disclose its increased marketing expenditures until after the

IPO. *Id.* ¶¶ 93–94. Defendants Timm and Rosenthal did, however, participate in

a "roadshow" (*i.e.*, a series of meetings with prospective investors) prior to the

IPO in which Defendant Timm discussed Root's focus on "becoming a national

brand" and explained that, as part of those efforts, Root was "experimenting" with

"some brand campaigns." *Id.* ¶ 124. Mr. Timm then noted that there was a

"recent spike" in CAC arising "from some of this experimentation on brand." *Id.*

In addition to Defendant Timm's comments, Root's Registration Statement also indicated Root's intention to expand nationwide:

- [W]e intend to increase our presence in digital and traditional channel media and launch a national advertising campaign to build our brand awareness.

- We will continue to aggressively invest in domestic growth by becoming active in more states while creating brand awareness through a national marketing campaign.

- In the near term, as we expand our licensed footprint to 50 states, we will invest in our national brand, which will increase awareness, build credibility and support all four of our distribution channels.

- We are licensed in 36 states, of which we are currently active in 30 states, and our goal is to be licensed in all 50 states by early 2021.

- [W]e will incur additional expenses to support our growth[.]

- Our expansion within the United States and any future international expansion strategy will subject us to additional costs and risks, and our plans may not be successful.

Registration Statement at 2, 9, 22, 28, 83, 120, ECF No. 57-2.

Along with the above representations, the Registration Statement included the following risk disclosures:

- You should not rely on forward-looking statements as predictions of future events.  We have based the forward-looking statements contained in this prospectus primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition and operating results.

- The marketing of our insurance products depends on our ability to cultivate and maintain cost-effective and otherwise satisfactory relationships with digital app stores, in particular, those operated by Google and Apple.  As we grow, we may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially.

- Our ability to attract new customers will depend on a number of factors, including the pricing of our products, offerings of our competitors, our ability to expand into new markets, and the effectiveness of our marketing efforts.

- We may lose existing customers or fail to acquire new customers.

- Our expansion into new markets may place us in unfamiliar competitive environments and involve various risks.

- [D]ue to other factors beyond our control, we may be unable to attract new customers rapidly and cost-effectively.

*Id.* at 22, 26–27, 65, 83, ECF No. 57-2.

Investors began learning of Root's increased marketing expenditures in late November 2020, when analysts reported that Root's CAC had risen above $500 as of the IPO and that Root's "heavy customer acquisition costs will result in elevated cash burn and net losses through 2023." *Id.* ¶¶ 94–95, 130–33. On December 1, 2020, in Root's first financial report as a publicly traded company, Defendant Rosenthal confirmed that Root's CAC for the third fiscal quarter, which closed prior to the IPO, was "elevated" due to "amplified brand spend" and would remain elevated "for the next two quarters." *Id.* ¶¶ 96. In Root's second financial report, Defendant Timm stated that Root "still ha[s] much work to do in the quarters and years ahead, particularly around . . . managing customer acquisition costs." *Id.* ¶ 97. Then on August 12, 2021, in a letter addressed to shareholders, Root stated that it had to reduce Root's profitability guidance for 2021 because Root needed "to take active steps to reduce our customer acquisition costs." *Id.* ¶¶ 100–01.

As of the IPO, Root's Class A common stock sold for $27.00 per share, resulting in over $600 million in net proceeds for Root and achieving a valuation for the company of approximately $6.7 billion. *Id.* ¶¶ 3, 143. Less than five months later, the stock traded at $12.00 per share. *Id.* ¶ 144. And, on November 18, 2021, a little more than a year after the IPO, Root's Class A common stock closed at just $4.43 per share. *Id.* ¶ 145.

## B. Procedural Background

On November 19, 2021, Plaintiff filed its Amended Complaint. ECF No. 31. The Amended Complaint alleges violations of the Securities Act and the Exchange Act. *Id.* ¶ 2. More precisely, Plaintiff alleges: (1) violations of Section 11 of the Securities Act, against all Defendants, based on allegedly misleading statements about customer acquisition costs in the Registration Statement (Count I); (2) violations of Section 12(a)(2) of the Securities Act, against Root, Mr. Timm, Mr. Rosenthal and the Underwriter Defendants, based on the same allegedly misleading statements in the Registration Statement as well as Mr. Timm's roadshow statements (Count II); (3) violations of Section 15 of the Securities Act, against the Root Defendants (Count III); (4) violations of Section 10(b) of the Exchange Act, against Root, Mr. Timm, and Mr. Rosenthal (Count IV); and (5) violations of Section 20(a) of the Exchange Act, against Mr. Timm and Mr. Rosenthal (Count V). *Id.* at ¶¶ 758–73, ¶¶ 153–222. All claims are premised on purported pre-IPO misstatements and omissions concerning Root's customer acquisition costs.

On May 20, 2022, Defendants jointly move to dismiss Plaintiff's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 57. Plaintiff filed its opposition, ECF No. 58, to which Defendants jointly replied, ECF No. 60. This matter is fully briefed and ripe for review.

## II. STANDARD OF REVIEW

### A. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted. While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (clarifying plausibility standard articulated in *Twombly*). Further, "[a]lthough for purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly,* 550 U.S. at 555) (internal quotations omitted).

**B.    Pleading Securities Fraud**

Regarding Plaintiff's claims sounding in fraud, Plaintiff must also satisfy Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires that "in any complaint averring fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (quoting Fed. R. Civ. P. 9(b)).  The requirement "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading."  *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted).  The Sixth Circuit has explained that to satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and content of the alleged misrepresentation" as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal citations omitted).  Plaintiffs may plead fraud based "upon information and belief," but the complaint "must set forth a factual basis for such belief, and the allowance of this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."  *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (internal quotation marks omitted).

In its analysis, the Court will address which claims sound in fraud and, therefore, must satisfy the more stringent requirements of Rule 9(b).

### III.    ANALYSIS

Defendants move to dismiss all of Plaintiff's claims.  First, they assert that the Court should dismiss Plaintiff's claims brought under Section 11 of the Securities Act of 1933 (Count I) because Plaintiff fails to allege any actionable misstatement or omission in the Registration Statement.  Mot. to Dismiss 12–29, ECF No. 57  Second, Defendants argue that Plaintiff's Section 12 claim (Count II), which largely relies on the same alleged misstatements and omissions as Plaintiff's Section 11 claim, should likewise be dismissed for the same reasons as Plaintiff's Section 11 claim.  *Id.* at 30–32.  Third, Defendants assert that the Court should dismiss Plaintiff's claims under Section 10(b) of the Securities Act (Count IV) because Plaintiff has not pleaded a materially false or misleading statement or omission attributable to any Defendant or, in the alternative, has not properly pleaded scienter.  *Id.* at 33–36.  Finally, Defendants argue that Plaintiff's control-person claims under Section 15 of the Securities Act (Count III) and Section 20 of the Exchange Act (Count V) should be dismissed because Plaintiff fails to plead predicate violations of the Securities Act or Exchange Act.  *Id.* at 36. The Court will address each argument in turn.

### A.    Plaintiff's Claims under Sections 11 and 12(a)(2)

#### 1.    Pleading Standard

The Court will begin by addressing the threshold issue of whether the Rule 8(a) pleading standard or the more demanding Rule 9(b) standard applies to Plaintiff's Sections 11 and 12(a)(2) claims.  Plaintiff is correct that the Rule 8(a)

plausibility pleading standard applies in the absence of allegations of fraud. *In re EveryWare Global, Inc. Secs. Litig.*, 175 F. Supp. 3d 837, 869 (S.D. Ohio Mar. 30, 2016) (citations omitted). But where a claim sounds in fraud, Plaintiff must satisfy Rule 9(b)'s heightened pleading requirements. *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 948 (6th Cir. 2009).

Here, Plaintiff contends that Rule 8(a) applies because the only mention of fraud in the Amended Complaint consists of express statements *disavowing* any fraud. ECF No. 58 at 9–11. Defendants, however, assert that Plaintiff's disavowals are inadequate to trigger Rule 8(a) given that the crux of Plaintiff's Sections 11 and 12(a)(2) claims are that Defendants concealed or misconstrued facts in order to boost the price of its Class A common stock leading up to the IPO. ECF No. 57 at 11–12.

The Court agrees with Defendants. Plaintiff's "blanket disavowal in the complaint that the claims do not allege fraud . . . is insufficient to rescue them from the requirements of Rule 9(b)." *Local 295/Local 851 IBT Emplr. Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 709 (S.D. Ohio Aug. 10, 2010). The language used in Plaintiff's Amended Complaint—its "wording and imputations"—is "classically associated with fraud." *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004). For example, Plaintiff alleges that: Mr. Timm's roadshow statements were "misleading;" the Registration Statement contained "materially false and misleading statements and omissions"; the Registration Statement was "inaccurate and misleading" and

"untrue"; and Defendants operated a "fraudulent scheme." Am. Compl. at ¶¶ 11, 105–123, 155, 187, ECF No. 31. Given that the gravamen of Plaintiff's Amended Complaint sounds in fraud, "Plaintiffs cannot so facilely put the fraud genie back in the bottle." *Local 295*, 731 F. Supp. 2d at 709 (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005)). Accordingly, Plaintiff's Section 11 and Section 12(a)(2) claims are subject to the particularity requirements of Rule 9(b).

### 2. Defendants' Allegedly False or Misleading Statements and Omissions

Because Plaintiff's Sections 11 and 12 claims largely rest on the same purported false and misleading statements and omissions, with the exception of Defendants Timm and Rosenthal's roadshow statements, which apply solely to the Section 12 claim, the Court will consider the parties' arguments regarding these claims together. *See* Am. Compl. ¶¶ 153–176, ECF No. 31.

"Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements." *Sohol v. Yan*, No. 1:15-cv-393, 2016 U.S. Dist. LEXIS 56049, *19 (N.D. Ohio Apr. 27, 2016) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)). "So long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—

then . . . the general rule is that an issuer's liability . . . is absolute." *Id.* (quoting

*Litwin v. Blackstone* Group, L.P., 634 F.3d 706, 715–16 (2d Cir. 2011)); *see also*

15 U.S.C. §§ 77k(a), 77l(a)(2).  Whether a misleading statement or omission is

material "depends on the significance the reasonable investor would place on the

withheld . . . information."  *Benzon v. Morgan Stanley Distribs.*, 420 F.3d 598,

609 (6th Cir. 2005) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir.

2001) *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,

551 U.S. 308 (2007)).  In making this determination, "the critical question is

whether they would have 'significantly altered the total mix of information made

available.'"  *Id.* (quoting *Helwig*, 251 F.3d at 563).

A plaintiff may also support a Section 11 claim where the defendant fails to

comply with certain SEC disclosure requirements.  Under Item 303 of SEC

Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), a registrant must "[d]escribe any

known trends or uncertainties . . . that the registrant reasonably expects will have

a material . . . unfavorable impact on . . . revenues or income from continuing

operations."  Item 105 requires that a prospectus include "a discussion of the

material factors that make an investment in the registrant or offering speculative

or risky."  17 C.F.R. § 229.105(a).  And Rule 408(a) of Regulation C provides that

"[i]n addition to the information expressly required to be included in a registration

statement, there shall be added such further material information, if any, as may

be necessary to make the required statements, in light of the circumstances

under which they are made, not misleading."  17 C.F.R. § 230.408(a).

Case No. 2:21-cv-1197                                          Page 13 of 49

### a. Alleged Misstatements in the Registration Statement

The Court will begin by addressing each alleged misstatement contained in the Registration Statement, with the understanding that Plaintiff has used bold and italicized typeface to highlight the actionable portion of the statement, beginning with the following:

> Within digital marketing we use data science models to dynamically bid on the basis of expected lifetime value. Over time we believe the ongoing data we accumulate through growth will fuel a pricing advantage for target customers, driving improved conversion and ***a cost of acquisition advantage in all channels***.

Am. Compl. ¶ 106, ECF No. 31. Plaintiff asserts that this statement is actionable because, by highlighting Root's CAC, Defendants had a duty to speak fully and truthfully. That is, Defendants should have disclosed that Root's CAC had increased significantly as of the IPO and that it would remain elevated thereafter, thereby negatively impacting Root's financial performance and eliminating Root's competitive advantage. *Id.* ¶ 107.

The Court finds this statement unactionable because of the "bespeaks caution" doctrine. As an initial matter, the Court must address the continued viability of the "bespeaks caution" doctrine. The Private Securities Litigation Reform Act ("PLSRA") contains the "Safe Harbor" provisions which, like the "bespeaks caution" doctrine, protect securities-litigation defendants who make certain forward-looking statements. 17 U.S.C. §§ 77z-2, 78u-5. The Safe Harbor provision is a codification of the judicially-created "bespeaks caution" doctrine and largely overlaps with the same. *In re BioMarin Pharm. Inc. Sec. Litig.*, No.

3:20-CV-06719-WHO, 2022 WL 597037, at *4 (N.D. Cal. Feb. 28, 2022) ("[T]he bespeaks caution doctrine was codified into statute as the PSLRA's safe harbor."); *In re Energy Recovery Inc. Sec. Litig.*, No. 15-CV-00265-EMC, 2016 WL 324150, at *16 (N.D. Cal. Jan. 27, 2016) ("The bespeaks caution doctrine provides for immunity in essentially the same circumstances as does the safe harbor provision."). There are some important differences, however; relevant here, the Safe Harbor provisions expressly exclude statements "made in connection with an initial public offering" from its protection. 17 U.S.C. §§ 77z-2(b), 78u-5(b).

It is not at all clear whether the "bespeaks caution" doctrine survived its codification in the PSLRA. As a general rule, "Congress is understood to legislate against a background of common-law adjudicatory principles" and courts "may take it as given that Congress has legislated with an expectation that the principle[s] will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Such evidence of congressional purpose, however, need not be "clear and manifest," nor need Congress "affirmatively proscribe the common-law doctrine at issue." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 316–17 (1981); *United States v. Texas*, 507 U.S. 529, 534, (1993) (internal quotation marks and citations omitted).

Instead, courts "start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of

federal law." *City of Milwaukee*, 451 U.S. at 317. This assumption is especially strong with rules that "Congress has affirmatively and specifically enacted." *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625–26 (1978). In short, when "Congress addresses a question previously governed by a decision rested on federal common law," courts "have no authority to substitute [their] views for those expressed by Congress in a duly enacted statute." *City of Milwaukee*, 451 U.S. at 314; *Mobil Oil Corp*, 436 U.S. at 625–26.

Given these principles, if the Court were considering the continued viability of the "bespeaks caution" doctrine in a vacuum, it might conclude that the Safe Harbor provisions abrogate the "bespeaks caution" doctrine. That is, Congress has specifically addressed a question (whether certain forward-looking statements are actionable in securities litigation) that was previously governed by federal common law (the "bespeaks caution" doctrine). Thus, the reasoning would go, federal courts no longer have authority to use their common law as a substitute for the statutory Safe Harbor provisions. In addition, using the "bespeaks caution" doctrine in cases expressly excluded from the Safe Harbor provisions (like this one) severely undercuts Congress's desire to not protect forward-looking statements in those excluded situations.

This Court is not considering the issue in a vacuum, however. Federal courts across the country have decided that the "bespeaks caution" doctrine survived its codification as the safe-harbor provisions in its entirety. *See, e.g.*, *Kurtzman v. Compaq Computer Corp.*, No. CIV.A. 99-1011, 2002 WL 32442832,

Case No. 2:21-cv-1197                                    Page 16 of 49

at *22 (S.D. Tex. Mar. 30, 2002) ("The bespeaks caution, doctrine . . . developed prior to the PSLRA and survives today." (internal citation omitted); *Gavish v. Revlon, Inc.*, No. 00 CIV. 7291 (SHS), 2004 WL 2210269, at *21 (S.D.N.Y. Sept. 30, 2004) ("The PSLRA's safe harbor was modeled in part after, but not meant to displace, the judicial bespeaks caution doctrine." (cleaned up)). Against this backdrop, this Court will also apply the "bespeaks caution" doctrine here.

Under the "bespeaks caution" doctrine, Defendants are excused from liability for "projections, statements of plans and objectives, and estimates of future economic performance" so long as the statement is identified as "forward-looking" and is accompanied by "meaningful cautionary statements." *Helwig*, 251 F.3d at 547; *see also In re Humana, Inc. Sec. Litig.*, No. 3:08CV-162, 2009 U.S. Dist. LEXIS 53535, *34 (W.D. Ky. June 15, 2009) (noting that meaningful cautionary language "must convey substantive factors that realistically could cause results to differ materially from those projected in the forward-looking statements").

Both elements are met here. First, the statement here is forward-looking because it expressly reflects Defendants' expectation that ongoing data accumulation "*will fuel*" a CAC advantage "*over time*." Second, alongside this statement was meaningful cautionary language, such as "[y]ou should not rely on forward-looking statements as predictions of future events," Root "may struggle to maintain cost effective marketing strategies, and our customer acquisition costs could rise substantially," and Root's "ability to attract new customers will

depend on a number of factors, including . . . our ability to expand into new markets, and the effectiveness of our marketing efforts." Registration Statement at 27, 65, 83, ECF No. 57-2. Further, the Registration Statement disclosed that Root's expansion "into new markets" would "subject [Root] to additional costs and risks, and [Root's] plans may not be successful." *Id.* at 13. This is not mere boilerplate language. Rather, the Registration Statement's cautionary language was tailored specifically to Root, addressed substantive factors that could affect projections—*i.e.*, Root's planned nationwide advertising campaign—and therefore was sufficiently "meaningful." Accordingly, this statement from the Registration Statement does not give rise to liability under Sections 11 or 12(a)(2).

Next, Plaintiff takes issue with this statement from the Registration Statement:

> Engaging our customers and prospective customers directly through the mobile device gives us access to an underutilized distribution channel, mobile, through which many incumbents have historically had difficulty profitably acquiring customers. Through our hyper-targeted, data-driven and ever-improving performance marketing capabilities, ***we have been able to acquire customers for below the average cost of doing so through each of the direct and agent-based channels***.

Am. Compl. ¶ 106, ECF No. 31. Like the previous statement, Plaintiff takes the position that Defendants' reference to its low CAC triggers a duty to disclose that Root's CAC had increased substantially as of the IPO and would continue at an

elevated level thereafter. *Id.* ¶ 107. This elevated CAC, in turn, knocks out Root's competitive advantage over traditional automobile insurers. *Id.*

The Court finds that this statement, which concerns Root's past performance, does not give rise to liability under the Securities Act. It is axiomatic that "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *In re Sofamor Danek Group*, 123 F.3d 394, 401 n.3 (6th Cir. 1997); *see also In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) ("[T]he disclosure of accurate historical data does not become misleading even if . . . [the company might predict] less favorable results . . . in the future.") (quoting *In re Sofamor*, 123 F.3d at 401 n.3). Here, the challenged statement simply states an undisputed fact: Root, *in the past*, has had a below-average CAC through each of its channels in comparison to traditional insurers. Plaintiff asserts that this language created a duty to disclose that Root no longer maintained a CAC advantage in the near or long term. But there is no "duty to update" statements about past performance, so long as those statements "referred only to past events or conditions and did not imply anything about future circumstances." *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 390 (2d Cir. 2015). This statement falls within the category of statements referenced in *IBEW Local* and therefore is not actionable.

Like the previous two statements, Plaintiff asserts that the following statement from the Registration Statement required Defendants to disclose that

Root's CAC had increased significantly leading up to the IPO, resulting in the loss of its competitive advantage:

> Mobile is the fastest growing retail channel in the United States, as customers spend less time in front of computers and utilize smart phones for more convenient shopping. We therefore designed a mobile-directed customer acquisition strategy, ***delivering customer acquisition costs below the average cost of doing so through each of the direct and agent channels***[.]

Am. Compl. ¶ 106, ECF No. 31.

This statement fails to be actionable for the same reason the prior statement was unactionable—namely, the statement relates to Root's past performance and concerns facts that neither party disputes. The statement unambiguously provides that Root "*designed*" a mobile-centric customer generating strategy that was "delivering" CAC superior to the average CAC associated with "direct and agent channels." This statement was true as of the IPO, and Plaintiff does not allege otherwise. As such, it does not give rise to liability under the Securities Act.

Plaintiff also challenges this statement contained in the Registration Statement:

> **The efficiency of our customer acquisition strategy has resulted in a cost of acquisition advantage versus direct and agent channels.** While our customer acquisition costs can vary by channel mix, by state or due to seasonality, over the period from August 2018 to August 2020 our average customer acquisition cost was $332. In the near term, as we expand our licensed footprint to 50 states, we will invest in our national brand, which will increase awareness, build credibility and support all four of our distribution channels.

*Id.* Plaintiff does not challenge the accuracy of Root's historical CAC average of $332 for the period between August 2018 and August 2020; instead, Plaintiff argues that this representation of Root's CAC advantage created a duty to disclose that there was no CAC advantage in the near or long term because of Root's planned national expansion.

But this statement does not give rise to such a duty. Defendants do not have a duty to update accurate information unless, without the update, the facts actually disclosed would be rendered misleading—and this statement, which is expressly limited to a 24-month period, is not misleading. Indeed, accurate information, such as the information here, "is not rendered misleading by a failure to disclose conditions that might render future results less favorable." *City of Pontiac Gen. Emples. Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 823 (W.D. Mich. Mar. 30, 2012); *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) ("It is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future."). That Plaintiff would have liked the Registration Statement to have disclosed Root's CAC for the period following August 2020 does not create an affirmative duty to do so. *See Walker v. L Brands, Inc.*, No. 2:19-CV-3186, 2020 WL 6118467, at *17 (S.D. Ohio Oct. 16, 2020) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." (quoting *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). Finally, the Registration Statement

explicitly warned investors against relying on Root's past performance when setting expectations for the future. Registration Statement at 76, ECF No. 57-2 ("[O]ur historical results are not necessarily indicative of the results that may be expected for any period in the future."). The Court therefore finds that this challenged statement is not actionable.

The next challenged statements concern Root's planned national advertising campaign:

> Our long-term growth will depend, in large part, on our continued ability to attract new customers to our platform. We intend to continue to drive new customer growth by leveraging our differentiated consumer experience and our telematics-based pricing. Additionally, our proprietary dataset will continue to scale as we grow, enabling us to enhance our predictive models that will further improve pricing and attract potential new customers. We will also continue to target attractive potential customer segments through our digital marketing channels and strategic partnerships. ***Similarly, we intend to increase our presence in digital and traditional channel media and launch a national advertising campaign to build our brand awareness.***
>
> * * *
>
> In the near term, ***as we expand our licensed footprint to 50 states, we will invest in our national brand***, which will increase awareness, build credibility and support all four of our distribution channels. Furthermore, we continue to invest in the technology and data science behind our distribution with A/B tests, dynamic bidding models, and rapid updates and iterations, supporting differentiated cost of customer acquisition over the long term.

Am. Compl. ¶ 108, ECF No. 31.

According to Plaintiff, by discussing Root's national advertising efforts, Defendants had a duty to disclose that Root's planned expansion throughout the

United States had already caused Root's CAC to significantly increase as of the IPO and would remain elevated thereafter, thereby negatively influencing Root's financial outlook. *Id.* ¶ 109. The Court disagrees. These are accurate, forward-looking statements protected by the bespeaks caution doctrine. *See Helwig*, 251 F.3d at 547. First, these statements unequivocally address Root's future plans: "Our *long-term* growth," "*[w]e intend* to continue," "our proprietary data set *will continue* to scale," "*we will* also continue to target," "*we intend* to increase our presence," "*we will* invest in our national brand." Second, the Registration Statement accompanied these forward-looking statements with meaningful cautionary language. Registration Statement, ECF No. 57-2 at 83 ("Our ability to attract new customers will depend on a number of factors, including . . . the effectiveness of our marketing efforts"), at 22 ([W]e will incur additional expenses to support our growth"; "We may lose existing customers or fail to acquire new customers"), at 27 ("As we grow, we may struggle to maintain cost-effective marketing strategies, and our customer acquisition costs could rise substantially."). Thus, these forward-looking statements accompanied by meaningful cautionary language, which Plaintiff does not allege to be inaccurate, did not impose on Defendants a duty to disclose additional information.[1]

---

[1] Plaintiff's assertion that, as of the IPO, a long-term increase in Root's CAC had already materialized is particularly weak. In making this argument, Plaintiff relies almost exclusively on *post*-IPO disclosures about CAC levels *after* the IPO. ECF No. 58 at 25-27. The lone pre-IPO allegation indicating an increase in CAC is Defendant Timm's statement acknowledging a "recent spike" in CAC attributed to marketing experimentation. Am. Compl. ¶ 124, ECF No. 31. Plaintiff's Amended Complaint,

Outside of the bespeaks caution doctrine, these statements would remain unactionable because the Registration Statement warned investors of the risk that increased marketing expenditures could result in an increase to Root's CAC. The Registration Statement disclosed Root's planned "national marketing campaign," noted that Root "will incur additional expenses to support our growth," and warned investors that, as Root grows, "it may struggle to maintain-cost effective marketing strategies, and our customer acquisition costs could rise substantially." *Id.* at 9, 22, 27, 83. "[W]hen a registration statement warns of the exact risk that later materialized," as is the case here, "a [s]ection 11 claim will not lie as a matter of law." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). As such, the Court finds these challenged statements unactionable.

The final statement Plaintiff challenges from the Registration Statement is contained within the section titled "Risk Factors," and it provides: "As we grow, we *may* struggle to maintain cost-effective marketing strategies, and our customer acquisition costs *could* rise substantially." Am. Compl. ¶ 110, ECF No. 31 (emphasis in original). Plaintiff contends that this statement was materially false because Root's CAC "had significantly increased as of the IPO, and would

---

however, fails to adequately allege that a single month's increase in CAC resulted in a material increase to Root's long-term average CAC. Moreover, because Root's public statements leading up to the IPO appear to have been consistent with its data, Defendants "need not present an overly gloomy or cautious picture of current performance and future prospects." *Albert Fadem Trust v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1026 (S.D. Ohio Sept. 10, 2004) (citation omitted).

remain elevated thereafter, thereby negatively impacting Root's operations and financial performance, because Root had substantially boosted its marketing expenditures as part of the Company's expansion throughout the United States." *Id.* ¶ 111. In other words, Plaintiff argues that this statement gives rise to liability because the "hypothetical risk" described in the statement "had already materialized as of the IPO." *Id.*

The Court finds the above statement unactionable. This statement, like several of the previously challenged statements, is a forward-looking statement concerning Root's future CAC. As Root grows, Root certainly could struggle to maintain cost-effective marketing strategies and its CAC could increase substantially—but this prediction about Root's future could not have materialized as of the IPO. Moreover, this statement is a risk factor, and Plaintiff has not shown how its allegations support that this risk factor itself is false. *See Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996) ("Defendants' warnings regarding potential adverse factors are not actionable as a matter of law" where plaintiffs were asserting that defendants should have stated that certain adverse factors "are" affecting rather than "may" affect the financial statements.).

In making its argument that the "hypothetical risk" had already materialized, thus rendering the challenged statement false or misleading, Plaintiff relies on *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013) and *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d

282 (S.D.N.Y. 2018). Although those cases are factually similar to this case, the Court ultimately declines to follow these out-of-circuit cases.

In sum, Plaintiff has failed to allege that the challenged statement is false or misleading. The Court instead finds that the statement is forward-looking and accompanied by meaningful cautionary language, and therefore fails to be actionable under the Securities Act.

### b.    Roadshow Statements

The Court next addresses the alleged misstatements and omissions arising from Root's roadshow, which pertain to Plaintiff's claim under Section 12(a)(2). Plaintiff asserts that Defendant Timm misled prospective investors when he stated:

> On slide 19 you'll also see we do believe that becoming a national brand is important and we do believe we can do that in a very differentiated way that is not gimmicky. So really Root is based on fairness. What you see here, on the left side of slide 19, is a bit of a taste for our brand. *Judge me by the way I drive, not my job. Age is just a number. Phillip isn't. Root's all about you.* Those are some brand campaigns that *we're going to be experimenting with*. We don't believe we will ever be at the level of brand spend of a Geico or Progressive. We think we'll always be more performance oriented, but we also believe that there still is value to becoming a recognized brand and so *we will intelligently experiment with the brand channel*.

Am. Compl. ¶ 124, ECF No. 31. Plaintiff contends that these bolded statements were inaccurate statements of material fact because Root's increased CAC was not caused by "marketing experimentation," but rather by a "sustained increase in marketing expenditures as part of the Company's expansion throughout the

United States that was set to continue as Root became a publicly-traded company and thereafter had increased, and would cause to remain elevated, Root's customer acquisition costs beyond those incurred by traditional insurers." *Id.* ¶ 125. Plaintiff also argues that Root's mention of its CAC triggered a duty to speak fully and truthfully regarding those costs. *Id.*

The Court disagrees. The above statement is protected under the bespeaks caution doctrine—that is, the statement is forward-looking and accompanied by meaningful cautionary language. *See Helwig*, 251 F.3d at 547. First, these statements are forward-looking; they refer to Root's intention to experiment with brand campaigns in connection with "*becoming* a national brand" and that Root "*will* intelligently experiment with the brand channel." Am. Compl. ¶ 124, ECF No. 31 (emphasis added). Moreover, Root included a page in the Registration Statement titled "**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**," which specifically identifies statements concerning Root's "ability to maintain and enhance our brand and reputation," and its "ability to maintain . . . marketing efficiency" as forward-looking. Registration Statement at 64, ECF No. 57-2. This challenged statement, addressing matters identified as forward-looking and prefaced as Root's thoughts and beliefs, puts a reasonable investor on notice that Root is making a forward-looking statement. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010) (concurring with the SEC in that "[t]he use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to

thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement").

Second, these statements are accompanied by meaningful cautionary language in the Registration Statement.  Plaintiff, however, argues that cautionary language within the Registration Statement cannot immunize representations made *outside* of the Registration Statement, such as Defendant Timm's roadshow statements.  ECF No. 58 at 38.  Plaintiff, however, does not cite to any binding caselaw for this proposition, and the case it does cite undermines its own position.  In *P. Stolz Family P'ship L.P. v. Daum*, the Second Circuit affirmed the district court's dismissal of several Section 12(a)(2) claims pursuant to the bespeaks caution doctrine. 355 F.3d 92 (2d Cir. 2004).  At issue were defendants' oral representations that it purportedly had hired an investment bank to do a $30 million financing and to subsequently take the company public, which would raise an additional $50 to $100 million.  *Id.* at 97.  After finding that several of the 12(a)(2) allegations rested on forward-looking statements, the Second Circuit turned to Defendants' prospectus and subscription agreement in search of meaningful cautionary language.  *Id.* at 98.  The documents contained such language, prompting the Second Circuit to hold that "[a]ny *oral* representations concerning a sought-after $30 million or a future IPO (as opposed to the existence of an agreement to try to plan an IPO) were neutralized by [the prospectus and subscription agreement's] cautionary statements."  *Id.*

(emphasis added). Thus, in light of the Second Circuit's application of the bespeaks caution doctrine in *P. Stolz*, and in the absence of any binding caselaw to the contrary, the Court will consider Defendant Timm's roadshow statements alongside the statements contained in the Registration Statement.

The Court reiterates its earlier conclusion that the Registration Statement contains meaningful cautionary language that precisely addressed the risks that Plaintiff alleges. The Registration Statement cautioned that Root "may struggle to maintain cost effective marketing strategies, and our customer acquisition costs could rise substantially," and Root's "ability to attract new customers will depend on a number of factors, including . . . our ability to expand into new markets, and the effectiveness of our marketing efforts." Registration Statement at 27, 83, ECF No. 57-2. Root also explicitly warned investors that they "should not rely on forward-looking statements as predictions of future events. *Id.* at 65. Additionally, the Registration Statement disclosed that Root's expansion "into new markets," would "subject [Root] to additional costs and risks, and [Root's] plans may not be successful." *Id*. at 13. To be sure, vague disclaimers of general risks do not remove the threat of liability. *Lockhart v. Garzella*, No. 3:19-CV-00405, 2022 WL 1046766, at *11 (S.D. Ohio Apr. 7, 2022).

But these warnings are company-specific and "based on a realistic description of the risks applicable to the particular circumstances," and are therefore protected under the bespeaks caution doctrine. *See id.* Accordingly, Defendant Timm's statement does not give rise to Section 12(a)(2) liability.

Plaintiff also takes issue with the following statement from the roadshow:

> And you can see the results on the right-side of the page.  Our customer acquisition cost has maintained well below the direct average and so we really are more competitive.  ***You see the recent spike?  That is from some of this experimentation on brand that you see over here on the left side of the page***.  And again, we're constantly testing new marketing channels and ***we'll continue to do that short term***.  But we believe -- and we've seen long term -- that ***we do have the ability to keep our customer acquisition costs much lower than our competitors***.

Am. Compl. ¶¶ 124, 127, ECF No. 31.  Plaintiff asserts that Defendant Timm's reference to the "recent spike" in CAC, coupled with the plan to continue experimenting on brand in the "short term," were inaccurate statements of material fact because Root's sustained increase in marketing expenditures had caused the increase to its CAC, and such increase would remain in place, thereby eliminating Root's competitive advantage.  *Id.* ¶ 126.  Plaintiff also argues that Defendant Timm's statement that Root has "the ability to keep our customer acquisition costs much lower than our competitors" was an inaccurate statement of material fact because, by September 2020, Root had lost its competitive advantage over traditional insurers in terms of CAC.  *Id.* ¶ 128.

The Court finds the challenged statement to be unactionable.  Beginning with the "recent spike" statement, this statement does not give rise to liability under Section 12(a)(2) because it is an accurate statement that is not misleading.  Defendant Timm directly attributed the increase in CAC to "experimentation on brand" in connection with "becoming a national brand"—*i.e.*, Root's planned national marketing campaign.  *Id.* ¶ 124.  Given that Defendant Timm

unambiguously stated that the spike in costs was a consequence of Root "becoming a national brand," Plaintiff's attempt to characterize the statement as false falls short.

Plaintiff also insists that Defendant Timm's labeling of the experimentation as "short term" was an inaccurate statement of material fact because the marketing campaign was "set to continue long-term." Resp. 35–36, ECF No. 58. But Plaintiff offers no facts supporting that, at the time Defendant Timm made the statement, the marketing experimentation would be long-term. At best, Defendant Timm's statement indicated that, so long as Root was experimenting with "becoming a national brand," Root's elevated CAC could persist—but this understanding does not automatically mean that Defendant Timm's statement was inaccurate *when made*.

Plaintiff next argues that Defendant Timm's statement concerning Root's "ability to keep our customer acquisition costs much lower than our competitors" is actionable. It is not. This statement is mere corporate puffery that is unactionable as a matter of law. *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570–71 (6th Cir. 2004) ("Courts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace - loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'") (citation omitted);

*see also In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2019 WL 6168254, at *9 (M.D. Tenn. Nov. 19, 2019) ("Vague predictions of positive future results cannot engender reasonable reliance by investors."). Defendant Timm's statement, when read in context, speaks to his long-term belief that Root can maintain CAC lower than its competitors: "But we believe -- and we've seen long term -- that we do have the ability to keep our customer acquisition costs much lower than our competitors." This is vague puffery by an executive that is immaterial as a matter of law. *See, e.g., Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (statement that nature of company's business gave it "competitive advantages" was puffery); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (company's belief in its "competitive advantage" was puffery); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 232 (D.N.J. 2002) (characterizing defendants' statement that new business relationship "will . . . driv[e] [its] top line growth and increas[e] margins by lowering [its] customer acquisition costs" as "puffery").

For the reasons stated above, the Court finds that Defendant Timm's roadshow statements do not engender Section 12(a)(2) liability.

### c. Alleged Omissions

The Amended Complaint also sets forth certain material omissions that Plaintiff argues Defendants had a duty to disclose:

> Defendants failed to disclose that Root's customer acquisition costs
> had significantly increased as of the IPO, and would remain elevated
> thereafter, thereby negatively impacting Root's operations and
> financial performance, because Root had substantially boosted its
> marketing expenditures as part of the Company's expansion
> throughout the United States. Furthermore, Root's elevated customer
> acquisition costs meant the Company possessed no competitive
> advantage on this basis over traditional insurers, thereby negatively
> impacting Root's financial operations and performance. Accordingly,
> these statements omitted material information from investors in Root
> Class A common stock in or traceable to the IPO, thereby rendering
> these statements materially incomplete and misleading.

Am. Compl. ¶¶ 107, 126, 129, ECF No. 31.

While the Court has largely addressed Plaintiff's arguments pertaining to these alleged omissions in other sections of this Opinion and Order, the Court will briefly do so again here. First, the Court begins by noting that Root did not have a duty to disclose Root's September 2020 "spike" in CAC. This is so despite having disclosed its CAC average for the period between August 2018 and August 2020 because this disclosure was both accurate and not misleading. *See* Section III.A.b.i. Moreover, Plaintiff fails to allege that a one-month increase in CAC meant that, at the time of the IPO, Root's long-term average CAC had materially increased. *See* Section III.A.b.i n.2. Second, notwithstanding the absence of a duty to update its CAC, Root nevertheless did so when Defendant Timm disclosed to investors that Root had experienced a "recent spike" to its CAC in connection with its national marketing campaign. *See* Section III.A.b.ii. Third, the Registration Statement also warned investors that Root was engaging

in a national marketing campaign that could result in elevated CAC in the long term. *See* Section III.A.b.i.

Fourth, concerning Root's alleged loss of its competitive advantage, Plaintiff fails to allege any facts suggesting that Root no longer had a competitive CAC as compared to other channels as of the IPO. What is alleged speaks exclusively to Root's short-term increase in its *own* CAC due to the nationwide marketing campaign; the Amended Complaint is silent as to whether this elevated CAC eliminated Root's advantage as to *other* channels as of the IPO. Put differently, the Amended Complaint places Root's fluctuating CAC in a vacuum, which is insufficient to allege that it no longer possessed a competitive advantage vis-à-vis other channels in the insurance industry.

Fifth, also with respect to Root's alleged loss of its competitive advantage as of the IPO, Plaintiff fails to allege any facts that Root's short-term increase in CAC meant that it could not, *in the long term*, maintain competitively low CAC. Given the absence of any factual allegations indicating that Root's future predictions were incorrect or that Root should have made a differing prediction leading up to the IPO, coupled with the forward-looking and puffery nature of such a prospective assessment, Root had no obligation to disclose that it no longer possessed a competitive advantage that was negatively impacting Root's financial operations and performance. *See* Sections III.A.b.i–ii.

All told, Plaintiff's alleged omissions do not subject Defendants to liability under the Securities Act because, to the extent Defendants did not already

disclose any alleged omission, Defendants had no duty to do so.  And to the
extent Plaintiff argues that Defendants should have disclosed the loss of their
competitive advantage, Plaintiff fails to allege sufficient facts demonstrating this
loss as of the IPO or that Defendants could not, in the long term, sustain a
competitively low CAC.

### 3. Defendants' allegedly false or misleading statements and omissions do not give rise to liability under Sections 11 and 12(a)(2)

Considering the Court's findings in Section III.A.b., the Court holds that the
allegedly false or misleading statements and omissions identified in the Amended
Complaint are not actionable under the Securities Act.  This is so even when
considering the SEC disclosure requirements, which Plaintiff also asserts impose
Section 11 liability on Defendants.  Beginning with Item 303, which requires
disclosure "where a trend, demand, commitment, event or uncertainty is both
presently known to management and reasonably likely to have material effects
on the registrant's financial conditions or results of operations,"[2] the Registration
Statement complied with Item 303 because the Registration Statement disclosed
Root's planned nationwide marketing campaign.  *See* Registration Statement at
2, 9, 22, 28, 83, 120, ECF No. 57-2.  Nor did the Registration Statement run afoul
of Item 105 because the Registration Statement disclosed specific risks
associated with Root's CAC, the potential increase in costs, and other "significant

---

[2] *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016); *see also* 17 C.F.R. § 229.303(a).

factors that make [the securities] speculative or risky." *See* Registration
Statement at 22, 26–27, 65, 83, ECF No. 57-2; *see also* 17 CFR § 229.105(a).
And the Registration Statement complied with Rule 408 because no additional
information was necessary to make the issued statements not misleading. *See*
17 CFR § 230.408(a). Accordingly, the Court dismisses Counts I (Section 11
claim) and II (Section 12(a)(2) claim) of the Amended Complaint.

**B.     Securities Exchange Act Claims: 10(b) and Rule 10b-5**

Plaintiff also brings claims under Section 10(b) and Rule 10b-5 of the
Securities Exchange Act of 1934. These claims rely on the same alleged
misstatements and omissions as Plaintiff's Sections 11 and 12(a)(2) claims.

Section 10(b), in relevant part, provides:

It shall be unlawful for any person, directly or indirectly, by the use of
any means or instrumentality of interstate commerce or of the mails,
or of any facility of any national securities exchange . . . [t]o use or
employ, in connection with the purchase or sale of any security
registered on a national securities exchange or any security not so
registered, or any securities-based swap agreement . . . any
manipulative or deceptive device or contrivance in contravention of
such rules and regulations as the Commission may prescribe as
necessary or appropriate in the public interest or for the protection of
investors.

15 U.S.C. § 78j(b).

The SEC regulation promulgated under Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of
any means or instrumentality of interstate commerce, or of the mails
or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Thus, a defendant may be liable under Rule 10b-5(b) under a misrepresentation theory and under Rule 10b-5(a) and (c) where it participates in an allegedly fraudulent scheme. *See Benzon*, 420 F.3d at 610.

Regarding the applicable pleading standard for Section 10(b) claims, because they sound in fraud, a plaintiff's pleadings must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Omnicare, Inc.*, 583 F.3d at 942. Heightening the pleadings even further is the PSLRA, which requires a plaintiff to specify any alleged misstatements or omissions, identify the "reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 943; *see also* 15 U.S.C. §§ 78u-4(B)(1)–(2).

Here, Plaintiff's Amended Complaint does not make clear exactly which of Rule 10b-5's categories it claims Defendants violated. *See* Am. Compl. ¶¶ 215–19, ECF No. 31. Given this ambiguity, Defendants' Joint Motion to Dismiss challenged Plaintiff's Section 10(b) claims in their entirety, though focusing largely on Plaintiff's presumed Rule 10b-5(b) misrepresentation claim. Plaintiff has since clarified in its opposition papers that the Amended Complaint alleges

violations of both Rule 10b-5(b) and 10b-5(a) and (c). ECF No. 58 at 40–41.

Assuming, without deciding, that such a clarification at this stage is permissible,

the Court will assess Plaintiff's claims under each category.

### 1. Plaintiff's claim under SEC Rule 10b-5(b)

Section 10(b) and Rule 10b-5 "prohibit fraudulent, material misstatements

or omissions in connection with the sale or purchase of a security." *Zaluski v.*

*United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (quoting *PR*

*Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004). To state a claim

under Section 10(b) and Rule 10b-5(b), Plaintiff must allege: "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a

security; (4) reliance upon the misrepresentation or omission; (5) economic loss;

and (6) loss causation." *Ohio Pub. Empls. Ret. Sys. v. Fed. Home Loan Mortg.*

*Corp.*, 830 F.3d 376, 383–84 (6th Cir. 2016) (quotation omitted). "The test for

whether a statement is materially misleading under Section 10(b) and Section 11

is whether the defendants' representations, taken together and in context, would

have misled a reasonable investor." *Albert Fadem Trust*, 334 F. Supp. 2d at

1019 (quoting *Rombach*, 355 F.3d at 172 n.7).

Here, as discussed with respect to Plaintiff's Sections 11 and 12(a)(2)

claims, Plaintiff fails to allege an actionable misstatement or omission by

Defendants, thus failing to plead the first element of a Rule 10b-5(b) claim. This

is fatal.[3]  *See generally, Norfolk County Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22
F. Supp. 3d 669 (E.D. Ky. May 23, 2014) (dismissing claim under Section 10(b)
and Rule 10b-5 where class failed to allege any actionable misstatements or
omissions).  Accordingly, the Court dismisses Plaintiff's Rule 10b-5(b) claim.

### 2.  Plaintiff's claim under SEC Rule 10b-5(a) and (c)

Plaintiff also alleges scheme liability under SEC Rule 10b-5(a) and (c).[4]  At
the outset, the Court notes that the Sixth Circuit has not defined the elements of
scheme liability, though it has explained that such claims "encompass conduct
beyond disclosure violations."  *Benzon*, 420 F.3d at 610.  Turning to "the two
circuit courts that traditionally see the most securities cases, the Second and
Ninth Circuits,"[5] they have concluded that "[a] defendant may only be liable as
part of a fraudulent scheme based upon misrepresentations and omissions under
Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those
misrepresentations or omissions."  *WPP Luxembourg Gamma Three Sarl v. Spot*

---

[3] This conclusion—that Plaintiff has failed to allege any material misstatements or
omission by Defendants—also precludes a finding of the second required element:
scienter. *See Phillips v. Triad Guar., Inc.*, No. 1:09CV71, 2012 WL 259951, at *6
(M.D.N.C. Jan. 27, 2012) ("If there were no false statements, there can be no scienter.")
(citing *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007)).
[4] Plaintiff asserts that Defendants waived any challenge to Plaintiff's scheme liability
claim by not explicitly seeking its dismissal. The Court disagrees. Defendants' Joint
Motion to Dismiss unambiguously sought dismissal of Plaintiff's Section 10(b) claims,
which necessarily encompassed Plaintiff's scheme liability claim under Rule 10b-5(a)
and (c). Moreover, in seeking dismissal of Plaintiff's Section 10(b) claims, Defendants'
Joint Motion to Dismiss presented arguments that directly pertain to the scheme liability
claim. As such, the Court finds Plaintiff's scheme liability claim sufficiently briefed and
ripe for review.
[5] Nicholas Fortune Schanbaum, *Scheme Liability: Rule 10b-5(a) and Secondary Actor
Liability after Central Bank*, 26 REV. LITIG. 183, 197 (Winter 2007).

*Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c)[.]"); *see also Public Pension Fund Group v. KV Pharm.*, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b).").

The Second Circuit has articulated the pleading standards governing scheme liability claims: "To state a scheme liability claim, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (citing *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)).

Here, the Amended Complaint specifically addresses Defendants' scheme in just four of its 222 paragraphs:

> Root and Timm and Rosenthal knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The *fraudulent scheme* described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Timm and Rosenthal.
>
> [. . .]

As set forth elsewhere herein in detail, Timm and Rosenthal, by virtue of their receipt of information reflecting the true facts regarding Root, their control over, and/or receipt and/or modification of Root's allegedly materially misleading statements and/or their association with the Company that made them privy to confidential proprietary information concerning Root, participated in the *fraudulent scheme* alleged herein.

[. . .]

As detailed herein, Root and Timm and Rosenthal engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Root Class A common stock and operated as a fraud or deceit on Class Period purchasers of Root Class A common stock. When the prior misrepresentations and fraudulent conduct of Root and Timm and Rosenthal were disclosed and became apparent to the market, the trading price of Root Class A common stock fell precipitously as the artificial inflation was removed.

[. . .]

Root and Timm and Rosenthal: (i) employed devices, *schemes*, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) *engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Root Class A common stock during the Class Period*.

Am. Compl., ¶¶ 187, 194, 198, 217, ECF No. 37 (emphasis added).

In the Court's view, the scheme alleged in the Amended Complaint consisted of the same series of statements and alleged omissions discussed with regard to Plaintiff's other claims. That is, these purported misstatements and omissions served to deceive the market in order to artificially balloon the price of Root's Class A common stock, thereby defrauding purchasers. In other words, there is no meaningful distinction between Plaintiff's misrepresentation theory under 10b-5(b) and its scheme liability theory under 10b-5(a) and (c). This

suggests that Plaintiff has failed to adequately allege a separate scheme liability

claim. *See WPP*, 655 F.3d at 1057; *Lentell*, 396 F.3d at 177.

In any event, Defendants' Joint Motion to Dismiss does not challenge the

adequacy of the Amended Complaint's allegations concerning Defendants'

"deceptive or manipulative act[s]" or the extent to which Defendants acted "in

furtherance of the alleged scheme to defraud." Instead, Defendants' Joint Motion

to Dismiss argues that Defendants lacked the requisite intent—*i.e.*, scienter—to

prevail on its Section 10(b) and Rule 10b-5 claims. Mot. 33-36, ECF No. 57.

The PSLRA mandates that a plaintiff pleads facts "giving rise to a strong

inference that the defendant acted with the requisite state of mind" in violating the

securities laws." 15 U.S.C. § 78u-4(b)(2)(A). "To decide if a plaintiff adequately

pleaded a strong inference of scienter, we use a three-part test to determine the

sufficiency of a plaintiff's scienter allegations." *City of Taylor Gen. Emps Ret.*

*Sys. v. Astec Indus.*, 29 F.4th 802, 812 (6th Cir. 2022) (citing *Dougherty v.*

*Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018)). "First, we must

accept all factual allegations in the complaint as true." *Id.* (quoting *Tellabs, Inc.*,

551 U.S. at 322). Next, the Court reviews the allegations holistically "to

determine whether all of the facts alleged, taken collectively, give rise to a strong

inference of scienter." *Dougherty*, 905 F.3d at 979 (quoting *Tellabs, Inc.*, 551

U.S. at 322–23). Finally, "we 'must take into account plausible opposing

inferences' and decide whether 'a reasonable person would deem the inference

of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged.'" *Id*. (quoting *Tellabs, Inc.*, 551 U.S. at 323–24).

In evaluating the sufficiency of securities fraud pleadings regarding scienter, courts consider the allegations against the backdrop of a non-exhaustive list of factors: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig*, 251 F.3d at 552; *see also Omnicare*, 769 F.3d at 484 (applying the *Helwig* factors).

The Court holds that the Amended Complaint fails to allege enough facts to create a strong inference of scienter to support Plaintiff's scheme liability claim. Plaintiff's opposition to Defendants' Joint Motion to Dismiss lists multiple facts that purportedly establish a strong inference of scienter. Resp. 44, ECF No.

58. The Court will discuss each fact in turn, keeping in mind the holistic approach required for such an inquiry.

First, Plaintiff argues that Defendants understood but disregarded "the most current factual information" about Root's CAC leading up to and as of the IPO. *Id.* First, this argument falls short because Plaintiff fails to identify what particular factual information Defendants disregarded. *See In re The Goodyear Tire & Rubber Co.*, 436 F. Supp. 2d 873, 902 (N.D. Ohio Mar. 22, 2006). While Plaintiff references "adverse facts" concerning Root's CAC, the specific "adverse facts" remain unclear. But even if the Court assumes these "adverse facts" refer to Root's increased CAC in September 2020, Defendants still did not disregard this information. As stated in the Amended Complaint, Defendant Timm disclosed to investors the September spike in Root's CAC. Am. Compl. ¶ 124, ECF No. 31.

Second, to the extent Plaintiff argues that Defendants intended to deceive investors by failing to disclose a long-term loss in Root's CAC advantage, this argument likewise fails. Plaintiff has alleged facts indicating that Defendants Timm and Rosenthal were aware of the September 2020 increase in CAC, but there are no factual allegations suggesting that they knew the September 2020 increase was the beginning of a long-term elevation in CAC. Thus, this weighs against finding a strong inference of scienter. *See Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 134, 137 (E.D.N.Y. 2020) (where defendants stated that they "expect[ed] continued improvement going forward," and plaintiffs failed to plead

"that company executives did not expect continued improvement . . . going forward," court found scienter lacking given absence of allegations that defendants "had knowledge of facts or access to information that contradicted their public statements").

Plaintiff also argues that Defendants Timm and Rosenthal, given their executive roles with Root and their participation in the roadshow, must have known the future of Root's CAC. But simply being in a high-level role with a company is insufficient to give rise to a finding of scienter. *See, e.g., Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021) ("[T]he fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent. So this is not a scienter-bolstering fact."); *PR Diamonds, Inc,* 364 F.3d at 688 ("Contrary to Plaintiffs' assertions, fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information . . . . [T]he Complaint must allege specific facts or circumstances suggestive of their knowledge.").

Plaintiff also argues that the "closeness in time of the alleged misstatements and omissions made on October 28, 2020 and Root's disclosures of contrary information beginning on December 1, 2020" supports a strong inference of scienter. ECF No. 58 at 44. This *Helwig* factor raises an inference of scienter so long as the later-disclosed information is "inconsistent" with the allegedly fraudulent statements or omissions. *Helwig*, 251 F.3d at 552. Here, however, the information disclosed subsequent to the IPO is largely consistent

with the alleged misstatements and omissions. Plaintiff cites to several analyst reports indicating an increase in CAC during the last quarter of 2020 and 2021 and identifying the reason for the increase as Root's national advertising campaign. Resp. 47, ECF No. 58; *see also* Am. Compl. ¶¶ 130–38, ECF No. 31. But these reports are congruent with Defendant Timm's disclosure that the September 2020 spike in CAC was due to Root's experimentation with becoming a national brand.

Plaintiff does identify a report from February 25, 2021 indicating that Root "still ha[s] much work to do in the quarters and years ahead, particularly around . . . managing customer acquisition costs." Resp. 47, ECF No. 58. This suggests that Root's elevated CAC has become a long-term concern; however, given the nearly four-month gap between the IPO and this report, the Court does not find this extended period of time to be probative of scienter. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1042 (6th Cir. 2016) (stating that an 86-day gap did not allow a scienter inference). Thus, this *Helwig* factor favors rejecting a scienter inference.

Plaintiff has also failed to establish the ninth *Helwig* factor—that Defendants Timm and Rosenthal possessed the "self-interested motivation . . . of saving their salaries or jobs." *Helwig*, 251 F.3d at 552. Under this factor, Plaintiff argues that an inference of scienter is warranted because the Defendants substantially increased the size of the IPO before the IPO, in order to "make it as lucrative as possible," and "the IPO generated an enormous amount of wealth for

Root and the Company's executives and directors," "instantly ma[king] Defendant Timm a multimillionaire." ECF No. 58 at 48–49. However, the mere fact that Defendants stood to profit from the success of the IPO is insufficient to support an inference of scienter. Sixth Circuit precedent provides that "general allegations of 'an executive's desire to protect his position within a company or increase his compensation' do not comprise a motive for fraud, because such a desire is shared by all corporate officers." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981–82 (6th Cir. 2018) (quoting *PR Diamonds*, 364 F.3d at 690). Indeed, "such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter." *Chill v. GE*, 101 F.3d 263, 268 (2d Cir. 1996). Thus, given that the nucleus of Plaintiff's argument is Defendants' "generalized motive" to have a successful IPO, the Court finds that the ninth *Helwig* factor does not support an inference of scienter.[6]

Plaintiff premises its final scienter argument on Defendant Timm's "failure during the roadshow to disclose the true reason for the spike in CAC as of the IPO, while falsely stating that Root had the 'ability to keep [its] customer

---

[6] Even if these allegations did support a finding of scienter, they would be insufficient, standing alone, to support a strong inference. *See In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 737 (S.D. Ohio Apr. 12, 2004) (collecting cases holding that "the magnitude of a defendant's compensation package, *together with other factors*, may provide a heightened showing of motive to commit fraud") (emphasis added). Because the Court finds that none of the other *Helwig* factors raise an inference of scienter, a different conclusion concerning the ninth *Helwig* factor would not disturb the Court's ultimate conclusion that the Amended Complaint does not raise a strong inference of scienter.

acquisition costs much lower than [its] competitors.'" Resp. 49, ECF No. 58. This argument does not raise a strong inference of scienter. The Court has already held that: (1) Defendant Timm's roadshow statements are unactionable and (2) the Amended Complaint pleads no facts suggesting that Defendant Timm expected a long-term increase in Root's CAC requiring such disclosure as of the IPO. *See* Section III.A.b.ii.

In sum, nothing in the Amended Complaint, taken collectively and taken as true, gives rise to a strong inference that Defendants acted with scienter. Indeed, nothing in the Amended Complaint would lead a reasonable person to "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs Inc.*, 551 U.S. at 323–24. Put differently, the Amended Complaint fails to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." See 15 U.S.C. § 78u-4(b)(2). The Amended Complaint therefore fails to state a scheme liability claim under Section 10(b) and SEC Rule 10b-5(a) and (c).

## C.    Sections 15 and 20(a): Control Person Liability

Plaintiff also asserts claims against the Root Defendants as "controlling persons" under Section 15(a) of the Securities Act (Count III) and Section 20(a) of the Exchange Act (Count V). Am. Compl. ¶¶ 177–84, 220–22, ECF No. 31.

Section 15 of the Securities Act, codified at 15 U.S.C. § 77o, attaches liability to "[e]very person who, by or through stock ownership, agency, or

otherwise, . . . controls any person liable under section 11 or 12, shall also be liable jointly and severally to the same extent as such controlled person." Section 20(a) similarly attaches liability to "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder . . .,unless the controlling person acted in good faith and did not . . . induce the . . . violation or cause of action." 15 U.S.C. § 78t.

Both Sections 15 and 20(a) require a primary violation of Section 10(b), 11 or 12. Given the Court's rulings above finding no such primary violations, Plaintiff has failed to allege the prima facie elements for control person liability pursuant to both Section 15 and Section 20(a). Consequently, the Court dismisses Counts III and V of the Amended Complaint. *See Local 295*, 731 F. Supp. 2d at 715–15, 728 (dismissing Section 15 and Section 20(a) claims where plaintiffs failed to allege a primary securities law violation).

## IV.   CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendants' Joint Motion to Dismiss with prejudice. ECF No. 57. Accordingly, Plaintiff's Amended Complaint is **DISMISSED with prejudice**, and the Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**